# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (BALTIMORE)

| | |
|---|---|
| WASHINGTON COUNTY BOARD OF EDUCATION,<br><br>    Plaintiff,<br><br>    v.<br><br>MALLINCKRODT ARD INC.,<br>MALLINCKRODT PLC,<br>EXPRESS SCRIPTS HOLDING COMPANY,<br>EXPRESS SCRIPTS, INC.,<br>CURASCRIPT, INC., d/b/a CURASCRIPT, SD,<br>PRIORITY HEALTHCARE CORP. AND<br>PRIORITY HEALTH CARE DISTRIBUTION,<br>INC. d/b/a CURASCRIPT SD AND<br>CURASCRIPT SPECIALTY DISTRIBUTION<br>SD, ACCREDO HEALTH GROUP, INC.,<br>UNITED BIOSOURCE CORPORATION, and<br>GREGG A. LAPOINTE,<br><br>    Defendants. | CASE NO. 1:19-cv-01854-JKB<br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

# <u>TABLE OF CONTENTS</u>

Page

NATURE OF THE CASE ........................................................................................... 1

JURISDICTION AND VENUE ................................................................................ 10

THE PARTIES........................................................................................................... 10
    PLAINTIFF........................................................................................................ 10
    DEFENDANTS ................................................................................................. 11

FACTUAL BACKGROUND.................................................................................... 14

THE MALLINCKRODT SYNACTHEN ACQUISITION ALLOWS IT TO EXPEND ITS
UNFAIR AND DECEPTIVE SCHEME TO PROMOTE ACTHAR USE................................. 59

THE QUI TAM WHISTLEBLOWER COMPLAINT AGAINST MALLINCRODT ............... 72

RELEVANT MARKETS, MARKET POWER AND
THE FTC COMPLAINT AGAINST MALLINCKRODT.......................................................... 75

COUNT I
WASHINGTON COUNTY BOARD OF EDUCATION V. ALL DEFENDANTS
VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT,
MD CODE ANN., COM. LAW § 13-101, *ET SEQ* .................................................... 87

COUNT II
WASHINGTON COUNTY BOARD OF EDUCATION v. ALL DEFENDANTS
NEGLIGENT MISREPRESENTATION ...................................................................... 92

COUNT III
WASHINGTON COUNTY BOARD OF EDUCATION v. ALL DEFENDANTS
FRAUD ...................................................................................................................... 95

COUNT IV
WASHINGTON COUNTY BOARD OF EDUCATION v. MALLINCKRODT
AND EXPRESS SCRIPTS ENTITIES
UNJUST ENRICHMENT ........................................................................................... 97

COUNT V
WASHINGTON COUNTY BOARD OF EDUCATION v. ALL DEFENDANTS
CONSPIRACY TO DEFRAUD/CONCERTED ACTION........................................... 98

PRAYER FOR RELIEF ........................................................................................... 100

JURY DEMAND ...................................................................................................... 101

i

## AMENDED COMPLAINT

1.      As a matter of law, Plaintiff, Washington County Board of Education (*"the Board"*), is a body politic and corporate and having perpetual succession.  The Board members have no authority over school affairs as individuals; however, they have complete authority when they sit as a legal body.

2.      Delegating the administrative function makes the Board responsible for evaluating the effectiveness of the execution of Board policies as well as the effectiveness of the general administration.

3.      Pursuant to Section 3-104(b) of the Maryland Education Code Annotated, the Board:

> (1) Has perpetual existence;
> (2) May sue and be sued; and
> (3) May have, use, alter, or abandon a common seal.

*Md. Education Code Ann. § 3-104.*

4.      The Board thus brings this action on behalf of the Washington County Public Schools (*"WCPS"*)("the Board" and "WCPS" shall be collectively referred to as *"Plaintiff"*), and by and through its undersigned counsel, alleges as follows:

## NATURE OF THE CASE

4.      Plaintiff brings this action to challenge the unjust, unfair and deceptive scheme and conspiracy by Defendants, Mallinckrodt ARD Inc., formally known as Questcor Pharmaceuticals, Inc. (*"Questcor"*) and its parent company, Mallinckrodt plc (collectively *"Mallinckrodt"*), as well as Mallinckrodt's exclusive agent for the delivery of its principal product, Express Scripts Holding Company (*"ESHC"*) and Express Scripts, Inc. (*"ESI"*)(collectively *"Express Scripts"*), including their wholly-owned subsidiaries, CuraScript, Inc., doing business as CuraScript SD, formerly known as CuraScript Pharmacy, Inc.,

1

("*CuraScript*"), Priority Healthcare Corp. and Priority Healthcare Distribution Inc. ("*Priority*")
also doing business as CuraScript SD (collectively, "*CuraScript SD*"), Accredo Health Group,
Inc. ("*Accredo*"), and United BioSource Corporation n/k/a United BioSource LLC
("*UBC*")(collectively referred to as the "*Express Scripts Entities*"), and Gregg A. LaPointe.

5.      Mallinckrodt manufactures, markets, distributes and sells H.P. Acthar, NDC Nos.
63004-8710-01 and 63004-7731-01 ("*Acthar*").  Acthar is the only therapeutic ACTH product
sold in the United States.  Mallinckrodt is the sole provider in the U.S. of approved ACTH drugs.
Thus, Mallinckrodt is a monopolist.

6.      Mallinckrodt acquired its ACTH monopoly in 2001 when Questcor purchased
Acthar from Aventis for $100,000.  By 2014, when Mallinckrodt purchased Questcor, the value
of that Acthar monopoly was $5.9 billion—the price paid for the single-product company.  This
stark increase in value was not due to any change in the Acthar being sold.  The formulation of
the drug has never changed.  The only change between 2001 and 2014 was the price.

7.      This case does not seek to challenge the lawfulness of Mallinckrodt's monopoly.
It seeks to challenge the unfair and deceptive acts and practices in which Mallinckrodt, the
Express Scripts Entities and LaPointe engaged in light of that monopoly power, in conjunction
with their co-conspirators, including raising the prices to Acthar to artificially inflated levels far
above the reasonable value of the medication to consumers, especially for the treatment of
rheumatoid arthritis, and taking other actions to market and sell Acthar in violation of the
Maryland consumer fraud laws and common law.

8.      The issue is not whether Mallinckrodt possessed monopoly power in the ACTH
market.  It is whether Mallinckrodt's actions in contracting the largest agent of its leading
customers, Express Scripts, and in acquiring the only competitive product in the marketplace,

2

Synacthen, constitute unfair and deceptive acts or practice under Maryland law.  As described below, the Federal Trade Commission (***"FTC"***) and a competitor of Mallinckrodt both charged the company with antitrust, which Mallinckrodt chose to settle rather than fight.  The actions and omissions underlying these charges of antitrust by the FTC form part of the bases of the unlawful conduct charged in this Complaint under Maryland law.

9.      Importantly, the FTC was joined in its lawsuit against Mallinckrodt by the State of Maryland, acting by and through its Attorney General.  Maryland charged Mallinckrodt with violating the Maryland Antitrust Act, Md. Code Ann. Com. Law §§ 11-201 *et seq*., and sought and successfully obtained injunctive relief in form of an agreement by Mallinckrodt to license Synacthen to a competitor.

10.     In this case, brought exclusively under Maryland state law, Plaintiff alleges that the Defendants engaged in unfair and deceptive conduct by intentionally and artificially inflating the costs of Mallinckrodt's Acthar, which Plaintiff paid for under a contract with Cigna, the owner of Express Scripts, and by concealing from Plaintiff the true costs for Acthar through undisclosed, direct contractual arrangements between Mallinckrodt and Express Scripts.  In charging inflated prices for Acthar, and collecting the money from Plaintiff for such prices, Defendants concealed their direct relationships and deceived Plaintiff as to Express Scripts' role in the distribution, pricing and sale of Acthar to Plaintiff's beneficiaries.  Plaintiff made direct payments of these inflated prices to Cigna, Express Scripts' owner, for the benefit of Mallinckrodt, thereby unjustly enriching both Defendants.

11.     Acthar is a "specialty pharmaceutical".  Unlike most prescription drugs, it is not sold in retail pharmacies, nor is it distributed through wholesalers to retail pharmacies.  Instead, it is distributed only through "specialty pharmacy distributors" (***"SPDs"***) and "specialty

3

pharmacy providers" (***"SPPs"***).

12.     While there are dozens of specialty pharmacy distributors in America, one of the largest is Express Scripts' CuraScript, including CuraScript SD, which Express Scripts has owned since 2004.

13.     In 2007, Mallinckrodt decided to embark on a self-described "new strategy", and it changed its distribution of Acthar as part of such strategy.  The mastermind of this new strategy was Gregg LaPointe, a member of Questcor's Board of Directors at the time, who joined with Steve Cartt, Questcor's Chief Operating Officer, to convince another Board member, Don Bailey, that the strategy should be implemented, over the objections of the existing Questcor CEO and several Board members and executives.

14.     Express Scripts was critical to the success of this new strategy.  Rather than continue to distribute Acthar to the existing distribution network available for specialty drugs, Mallinckrodt chose to limit Acthar distribution exclusively through Express Scripts' CuraScript SD.  In effect, Mallinckrodt contracted with the agent of its leading customers, and the largest SPD at the time, in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly through exorbitantly higher prices. Defendants concealed this exclusive arrangement from Plaintiff with the intention to deceive Plaintiff as to the real reason for the Acthar price increases which followed.

15.     First, Mallinckrodt changed the way it distributed and sold Acthar (the "**Distribution Scheme**").  It limited the distribution of Acthar from multiple distribution outlets to just one, CuraScript, and engaged UBC to act as its exclusive "HUB" of operations controlling both the distribution and reimbursement of Acthar directly with patients and TPPs.  Mallinckrodt created this exclusive distribution arrangement to limit and control distribution and output of

4

Acthar, and to raise the prices of Acthar to unconscionable levels.  Mallinckrodt and UBC created the Acthar Support and Access Program ("ASAP") described below as the vehicle to effectuate their Distribution Scheme.

16.     While this conduct constitutes antitrust, and is the subject of a separate federal class action lawsuit pending in Rockford, Illinois[1], it is also the subject of separate *qui tam* lawsuits brought in federal Court by former employees of Mallinckrodt, in which the federal government has intervened.  *See U.S. ex. Rel. Charles Strunck and Lisa Pratta v. Mallinckrodt ARD, Inc., et al.* 2:12-cv-00175-BMS (E.D.Pa.) at Document No. 40 ("*Strunck & Pratta Complaint*"); *U.S. ex. Rel. Scott Clark v. Questcor Pharmaceuticals, Inc.,* 2:13-cv-01776-BMS (E.D.Pa.) at Document 1 ("*Clark Complaint*").

17.     Second, throughout the relevant time period, since August 2007 through the present, Mallinckrodt has willfully manipulated and inflated the prices paid by TPPs and payors for Acthar, causing payors like WCPS to substantially overpay for a drug with very limited uses and benefits and an unknown method of action (the "**Pricing Scheme**").  Specifically, after limiting Acthar distribution by the Distribution Scheme, in August 2007, Mallinckrodt agreed with CuraScript and UBC to raise the average wholesale prices (*"***AWPs***"*) paid for Acthar by the Board from $2,062.79 per vial to $29,086.25, a more than 1,300% increase in the cost of Acthar in the span of one month.  Such a price increase is both unprecedented and unconscionable, especially for a more than 65-year old drug.  Mallinckrodt, Curascript and UBC have continued to raise the AWPs for Acthar each year, sometimes by double-digit percentages, such that now a drug that once cost $40.00 costs patients and third-party payors over $43,000.00.  The only way Mallinckrodt has been able to get TPPs to pay such high prices for Acthar was

---

[1] *See City of Rockford v. Mallinckrodt ARD, Inc., et. al*., Case No. 17-cv-50107 (N.D.Ill.) (hereinafter the "*Rockford* **case**").

through the fraudulent schemes alleged herein.  But for such schemes, payors like WCPS would not have paid what they did for Acthar.

18.     Third, Defendants devised a marketing and sales scheme designed to ensure that Acthar was reimbursed by TPPs at the new, inflated AWPs, without substantial backlash from patients and payors (the "**Marketing Scheme**").  Fearing an uproar of complaints from patients, patient support groups, private payors and the federal government for their unjustified distribution limitations and price increases, and in order to circumvent cost containment mechanisms for high-priced specialty drugs, Mallinckrodt devised a multi-faceted scheme and RICO enterprise to bribe doctors in order to induce them to prescribe Acthar over other available treatments.  The scheme involved cultivating key opinion leaders (or "KOLs") from around the country to serve as the company's "spokes-doctors" in promoting prescriptions of Acthar for unapproved uses and doses.  The scheme also sought to remove patient complaints about high co-pays on Acthar by funneling tens of millions of dollars to UBC to run a so-called "patient assistance program" or "PAP" designed to ensure that payors like Plaintiff paid the bulk of the costs of Acthar.

19.     On April 30, 2019, it was revealed publically for the first time by CNN[2] that two whistleblowers, both former pharmaceutical sales representatives for Mallinckrodt, had sued the company years before for a "multi-tiered strategy" to boost sales by bribing doctors to prescribe the high-priced Acthar to their patients.  As described more fully in the *Strunck & Pratta Complaint*, Mallinckrodt's scheme involved "using valuable incentives, rewards and other forms of renumeration to induce health care providers to promote and prescribe H.P. Acthar in lieu of less expensive therapies that are equally more effective…".  *Strunck & Pratta* Cmplt. at ¶ 3(i).

---

[2] https://www.cnn.com/2019/04/30/health/mallinckrodt-whistleblower-lawsuit-acthar/index.html

According to Strunck and Pratta, there is a pervasive culture at Mallinckrodt designed to sell Acthar at all costs.

20.     Separately, a different whistleblower sued Mallinckrodt in federal court on April 4, 2013, alleging a different aspect of Mallinckrodt's scheme to sell Acthar at high prices.  In a case unsealed as part of the government's filing of a consolidated, amended pleading, former employee Scott Clark alleges that "Mallinckrodt designed supposed 'patient assistance' funds that paid copays for Acthar only and then funded them through 'donations', knowing its money would be used on Acthar copays to the exclusion of other drugs."  *See* United States' Complaint in Intervention, Dkt No. 2:13-cv-01776-BMS (E.D.Pa.) (BMS) at Document No. 57 ("***U.S. Complaint***") at ¶ 5.  Such conduct is unlawful.

21.     As the federal government has alleged:

> "Mallinckrodt knew that the cost of Acthar would make it difficult to sell because there were cheaper, effective competitor drugs available to treat certain of its approved uses, namely acute exacerbations in multiple sclerosis, lupus and rheumatoid arthritis.  Mallinckrodt intended to overcome this difficulty and did so by making the drug 'free' to patients by subsidizing their Medicare [and private] copayments.  By doing so, Mallinckrodt could maintain the high price of Acthar to maximize its own sales revenues, but minimize the risk that the drug's high price would impede doctors and patients from using it."

*Id*. at ¶ 4 (brackets added).

22.     Accordingly, in conjunction with limiting Acthar distribution and raising the prices for Acthar in 2007, as part of the Distribution and Pricing Schemes, Mallinckrodt also embarked on a Marketing Scheme designed to incentivize sales of Acthar at the new high prices.  Patients and TPPs had no choice but to pay the high prices charged by Mallinckrodt and UBC, Mallinckrodt's exclusive agent and "HUB".

23.     Mallinckrodt vastly expanded its direct-to-consumer selling of Acthar by

expanding its sales force, including creating a team of "medical science liaisons" or "MSLs". The MSLs were highly trained specialists in the Acthar treatments who worked with other Mallinckrodt sales representatives to create a network of KOLs.  These KOLs were leading specialists in their respective medical fields whom Mallinckrodt identified as being potentially influential on other doctors.  These KOLs were paid handsomely to join with Mallinckrodt's MSLs and sales representatives as "spokes-doctors", promoting Acthar to other medical providers and delivering Mallinckrodt's false, misleading and deceptive promotional messages about the safety, efficacy and value of Acthar in relation to other cheaper, safer, and equally or more effective treatments.  As a result, thousands of new patients have been prescribed Acthar for unapproved uses and doses in the treatment of diseases in neurology, nephrology and rheumatology, among others.  And Plaintiff has been forced to pay the exorbitant prices charged by Defendants.

24.    As described more fully below, this "new strategy" involved the implementation of actual, written agreements, signed by both Mallinckrodt and Express Scripts, by which Express Scripts was granted exclusive specialty distribution of Acthar in exchange for its agreement to allow Mallinckrodt to raise the prices of Acthar to exorbitant, non-competitive levels.

25.    Immediately after signing the exclusive agreements in the summer of 2007, Mallinckrodt and Express Scripts jointly agreed in writing to raise and fix the average wholesale prices (*"AWPs"*) paid for Acthar by employers like Plaintiff from $2,062.79 per vial to $29,086.25, more than a 1,300% increase in the cost of Acthar in the span of a month.

26.    As a result of this exclusive arrangement, Mallinckrodt was able to charge inflated prices for Acthar to all purchasers of Acthar, through Express Scripts acting as the

"pharmacy benefits manager" or "PBM" of such direct purchasers, as well as all indirect purchasers of Acthar, like Plaintiff, who purchase Acthar through a different means.

27.     While Plaintiff contracted with Cigna for the medical benefits of its employees. Cigna utilizes Tel-Drug for the distribution of specialty drugs, like Acthar.  Thus, Tel-Drug arranged with the Express Scripts Entities for the distribution of the Acthar sold to Plaintiff's beneficiaries.

28.     In 2016, Plaintiff started paying for Acthar.  The Board was charged prices based upon the AWP for Acthar.  By that time, Mallinckrodt and Express Scripts had jointly agreed to raise the AWP for Acthar to over $40,000.00.  In other words, these Defendants jointly agreed to raise the price paid by patients and payors, like Plaintiff and Plaintiff's beneficiaries, from $40.00 in 2001 to over $40,000.00 in 2015.

29.     Over the 3-year period between 2016 and 2018, Plaintiff and its beneficiaries spent a staggering **$2,841,747** for Acthar.  The Board continues to pay for Acthar this year, based upon the inflated AWP for the drug.

30.     Plaintiff brings this lawsuit to obtain declaratory and injunctive relief, in order to have the conduct of Defendants declared unlawful and to enjoin such unlawful conduct going forward to arrest the unfair and deceptive scheme and to prevent a recurrence of the overcharges. Plaintiff also seeks to recover money damages for its past overcharge payments for Acthar, pursuant to consumer protection laws of Maryland, as well as the common law of Maryland. Plaintiff seeks compensatory damages pursuant to the Maryland common law of unjust enrichment, fraud, conspiracy to defraud and aiding and abetting.  Finally, Plaintiff seeks punitive damages for the Defendants' willful, outrageous and reckless conduct.

## JURISDICTION AND VENUE

31.     This Court has personal jurisdiction over the parties because Defendants

Mallinckrodt and LaPointe are both located in and conduct substantial business in this State, and

the corporate Defendants all are registered to do business in this State.  For instance,

Mallinckrodt ARD is registered at 2405 York Road, Suite 201, Lutherville Timonium, Maryland,

21093-2264.  Defendants also have had systematic and continuous contacts with this State, and

they have agents and representatives that can be found in this State.

32.     Venue is proper in this Court because Plaintiff and its employees and

beneficiaries reside in Maryland and have purchased and reimbursed for Acthar in Maryland.

33.     Acthar is sold in both interstate and intrastate commerce, and the unlawful

activities alleged in this Complaint have occurred in Maryland.

## THE PARTIES

### PLAINTIFF

34.     The Washington County Board of Education is located at 10435 Downsville Pike,

Hagerstown, Maryland, which is situated in Washington County, Maryland.

35.     More than 22,000 students attend 46 school facilities administered by nearly

2,500 employees of Plaintiff, making Plaintiff the third largest employer in Washington County.

36.     Plaintiff provides healthcare benefits to its employees through Cigna Health and

Life Insurance Co. ("Cigna").  Cigna provides prescription drug benefits to Plaintiff's

beneficiaries.  Specialty drugs, like Acthar, are provided by Cigna's wholly-owned subsidiary

operation, Tel-Drug.

37.     Plaintiff's/WCPS's employee-beneficiaries were treated with Acthar for

rheumatoid arthritis.  Plaintiff was charged and it paid $$2,841,747 for Acthar through late 2018.

10

These exorbitant charges were based upon the inflated AWPs established by Mallinckrodt and Express Scripts.  Plaintiff continues to pay the charges for Acthar based on inflated AWPs as set by Defendants, pursuant to the scheme launched by LaPointe 12 years ago.

## DEFENDANTS

38.     Questcor Pharmaceuticals, Inc. ("Questcor") was acquired by Mallinckrodt on August 14, 2014 for $5.9 billion, after Questcor had paid only $100,000 for Questcor's lone product Acthar 13 years earlier.

39.     Following the acquisition, Questcor became a wholly-owned subsidiary of Mallinckrodt and its name was changed to Mallinckrodt ARD Inc ("Mallinckrodt ARD"). Defendant Mallinckrodt ARD is a biopharmaceutical company incorporated in California, with offices located at 675 McDonnell Boulevard, Hazelwood, Missouri 63042, 26118 Research Road, Hayward, California 94545 and 1425 U.S. Route 206, Bedminster, New Jersey 07921.

40.     Mallinckrodt also maintains several business locations in Maryland, including at 6011 University Blvd, Ellicott City, Maryland.  Previously, Mallinckrodt Inc. maintained a registered business location at 351 West Camden Street, Baltimore, Maryland 21201-7912.

41.     Questcor had signed agreements with Maryland-based Cangene bioPharma, Inc., a subsidiary of Emergent BioSolutions, Inc, located at 1111 South Paca Street in Baltimore, for the contract manufacture of Acthar, before purchasing Canadian-based BioVectra Inc. in January 2013.

42.     At the time of the Mallinckrodt acquisition of Questcor in 2014, Mallinckrodt ARD's only product sold in the United States was Acthar.  Since the acquisition, Mallinckrodt has continued to manufacture, distribute, market and sell Acthar directly to patients, exclusively through Express Scripts, by a program known as the "Acthar Support and Access Program"

("ASAP") described more fully below.

43.     Defendant Mallinckrodt plc ("Mallinckrodt plc") is an Irish public limited company, with its corporate headquarters in Staines-upon-Thames, United Kingdom.  Its principal executive offices are located at 3 Lotus Park, the Causeway, Staines-upon-Thames, Surrey, TW18 3 AG.

44.     Where appropriate, Mallinckrodt plc and Mallinckrodt ARD are collectively referred to as "Mallinckrodt".

45.     Defendants Express Scripts, Inc. ("ESI") and Express Scripts Holding Company ("ESHC") are Delaware corporations with their principle executive offices located at 1 Express Way, Saint Louis, Missouri 63121 and Century Center Drive, Memphis, Tennessee (collectively, "Express Scripts").

46.     Defendants Priority Healthcare Corp. and Priority Healthcare Distribution Inc. ("Priority") d/b/a CuraScript SD (collectively, "CuraScript SD"), are wholly-owned subsidiaries of Express Scripts.  Priority/CuraScript SD has maintained corporate offices at 1680 Century Center Parkway, Memphis, Tennessee 38134-8827.

47.     Defendant CuraScript, Inc., d/b/a CuraScript SD, f/k/a CuraScript Pharmacy, Inc., is a wholly-owned subsidiary of Express Scripts.  ESHC acquired CuraScript in January 2004. Its operation was expanded when ESHC acquired Priority in October 2005 and combined it with CuraScript.  The combined Priority and CuraScript SD (collectively "CuraScript") became one of the nation's largest specialty pharmacy and distribution companies with more than $3 billion in annual revenue.

48.     CuraScript is an Indiana corporation with corporate offices located at 255 Technology Park, Lake Mary, Florida 32746.  This is the same Florida address patients are

required to mail any revocation of the broad authorization granted by patients to Mallinckrodt and Express Scripts via the Acthar Start Form (*see*, Exhibit "A" hereto). CuraScript has been Mallinckrodt's exclusive specialty pharmacy distributor for Acthar since 2007.

49.     Significantly, Express Scripts chose to end this exclusive distribution relationship in September 2017 only after it was sued for antitrust in 2017 by the City of Rockford, Illinois.

50.     Defendant Accredo Health Group, Inc. ("Accredo") is a wholly-owned subsidiary of Express Scripts. Accredo became a wholly-owned indirect subsidiary of Medco Health Solutions, Inc. ("Medco") on August 18, 2005, months before Express Scripts acquired Priority, and then became part of Express Scripts when Express Scripts acquired Medco in 2012. At that time, Medco became a wholly owned subsidiary of ESHC.

51.     Accredo is a Delaware corporation with its corporate headquarters at 1640 Century Center Parkway, Memphis, Tennessee 38134 and a business location at 201 Great Circle Road, Nashville, Tennessee 37228. Accredo also has operations in Warrendale, Pennsylvania, Corona, California, Greensboro, North Carolina, Orlando, Florida, and Indianapolis, Indiana. Accredo

52.     Defendant United BioSource Corporation n/k/a United BioSource LLC ("UBC") is a Delaware corporation with its corporate headquarters at 920 Harvest Drive, Blue Bell, Pennsylvania 19422 and a business location at 1670 Century Center Drive, Memphis, Tennessee. UBC was a wholly-owned subsidiary of Express Scripts from 2012, when it was acquired by Express Scripts as part of the Medco merger, until November 2017, when Express Scripts announced that it sold UBC to Avista Capital Partners, a private equity firm.

53.     UBC is a wholly owned subsidiary of United BioSource Holdings, Inc., the interests of which are held by and through various privately held intermediary entities, which are

13

ultimately owned by private investment funds sponsored by and/or affiliated with Avista Capital Partners and as-yet-unknown individuals associated with Avista Capital Partners.

54.     UBC is described as Mallinckrodt's "agent" on the Acthar Start Form (*see* Exhibit "A" hereto) which Mallinckrodt employs exclusively to operate the ASAP program and to manage the Express Scripts Entities' exclusive distribution, sales and reimbursement of Acthar by its 3 operating arms, CuraScript, Accredo and Express Scripts.

55.     UBC provides customer support and reimbursement support for Acthar as the "HUB" of Express Scripts' three operating arms, CuraScript (providing specialty distribution services), Accredo (providing specialty pharmacy services) and Express Scripts (providing pharmacy benefit management services)

56.     Gregg LaPointe ("LaPointe") is an individual and resident of the State of Maryland, residing at 846 Still Creek Lane, Gaithersburg, MD 20878.

57.     As stated in Paragraph 1 above, ESI, ESHC, CuraScript, Accredo and UBC are collectively referred to herein as "Express Scripts".

58.     Mallinckrodt and Express Scripts are collectively referred to herein as "Defendants", as appropriate.

59.     The corporate Defendants' acts alleged in this Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

## FACTUAL BACKGROUND

60.      "I have a Cadillac in my refrigerator."  That is how one Acthar patient named Sharon Keller described an unused 5-ml vial of the medication sitting in her kitchen refrigerator.

61.     The tale of how a 65-year-old brand medication could rise in price from $40 per vial in 2001, to $40,840.80 per vial by 2015, raising that value of the brand from $100,000 to $5.9 billion, is a story of perhaps the most egregious fraud and monopolistic conduct in U.S. history by a prescription drug company.

62.     The issue in this case is how Mallinckrodt achieved such a startling outcome.

### History of Acthar Development, Distribution and Pricing

### Acthar Development and Limited Approval by the FDA

63.     Acthar was approved by the Food and Drug Administration ("FDA") in 1952 for over 50 conditions, ranging from alcoholism, poison ivy, and radiation sickness to nephrotic syndrome.  Over time, as discussed below, with additional evidence-based requirements for prescription drugs, the list was winnowed by the FDA to the fewer, present-day 19 indications.

64.     Acthar is adrenocorticotropic hormone ("ACTH"), which causes the body to produce cortisone and other steroid hormones.  Two Mayo Clinic researchers, Drs. Philip Hench and Edward Kendall, developed the treatment, which won them the Nobel Prize for medicine at the time it was developed.  Acthar was developed by Armour Pharmaceutical Company.  As described by the Seventh Circuit in *Armour & Co. v. Wilson & Co.*, 274 F.2d 143, 145-46 (7th Cir. 1960):

> In a human being, . . . (ACTH) appears in the anterior lobe of the pituitary gland located at the base of the brain. When the human body is under stress or attacked by certain diseases, control centers in the brain excite the pituitary, and the pituitary secretes ACTH. In the blood stream the ACTH thus secreted is carried to the adrenal glands situated in the human body above the kidneys. As the ACTH hits the outer wall of the adrenal glands, it stimulates the adrenals to produce a set of chemical substances such as steroids, including the hormones, cortisone and hydrocortisone.
>
> The cortisone hormones then act in the tissues of the body to suppress inflammations and allergic reactions. ACTH thus is used to relieve such conditions as rheumatoid arthritis and allergies. ACTH does not, itself,

15

directly attack disease. However, it stimulates the adrenals which produce more than twenty-eight steroids, and these hormones attack the diseased tissues. When the human body itself does not supply sufficient ACTH, pharmaceutical ACTH can fill the gap.

65.     In layman's terms, ACTH is a hormone released by the brain that triggers the adrenal glands to make cortisol, which is the body's equivalent of prednisone, a steroid.  ACTH works by inducing a patient's adrenal glands to release cortisol, thereby replicating the effect of taking prednisone. Because of this, ACTH has risks and benefits similar to those of prednisone.

66.     According to the "Pre-Decisional Agency Memo" issue September 27, 2010 by the Division of Drug Marketing, Advertising, and Communications ("DDMAC") for Acthar, NDA 022432 ("DDMAC Memo"), the formulation of ACTH now known as H. P. Acthar Gel (Repository Injection), which is known generically as corticotropin, was originally approved by the FDA *prior to* the 1962 Kefauver-Harris Amendment to the Federal Food, Drug And Cosmetics Act of 1962 ("FDCA"), which introduced the requirement of "substantial evidence" of two adequate and well controlled studies.

67.     In its 2010 assessment of Acthar, the DDMAC observed:

At the time of the original approval drug manufacturers only had to show the drug was safe for use in humans.  The original data included case reports from a few physicians describing patients with conditions originally treated with Acthar powder that were transferred to treatment with Acthar Gel and gave dosing guidance for treatment of these individual conditions.   A few patients had improvements in hematology data and improvement in symptoms (decreased diarrhea, improved appetite, sense of well being, etc.) reported to support the efficacy of treatment.
***
These data would be grossly inadequate to support approval of a new drug or new indications by the Agency under current standards requiring evidence from adequate and well-controlled clinical trials.

DDMAC Memo at 2-3.

68.     Despite published reports that Acthar was "grandfathered" by the FDA, in truth

Acthar was subjected to a Drug Efficacy Study Implementation (DESI) review in the early

1970s.

69.     At the time of the 1962 amendments to the FDCA, there were thousands of drugs

on the market whose effectiveness was suspect or altogether unknown.  The amendments thus

required the FDA to *withdraw* prior approval of a drug if it found: "on the basis of new

information before [it] with respect to such drug, evaluated together with the evidence available

to [it] when the application was approved, that there is a lack of substantial evidence that the

drug will have the effect it purports or is represented to have under the conditions of use

prescribed, recommended, or suggested in the labeling thereof."  FDCA, 21 U.S.C. § 355(e).

70.     Acthar was thus subjected to a DESI review in 1971, and was found effective

only for a narrow subset of indicated uses.  The 1971 report titled "Corticotropin for Parenteral

Use", Federal Register, Vol. 36, No. 152 (Aug. 6, 1971) at 14509-14510, found Acthar "lacking

substantial evidence of effectiveness" for its "recommended use" in over 30 of its originally

approved indications.  With respect to certain of the remaining indications, the FDA found

Acthar "probably effective"; for others, the FDA found "these drugs are regarded as possibly

effective for their labeled indications."  *Id*. at 14510.

71.     In 1977, the FDA issued a "Follow Up Notice and Opportunity for Hearing",

Federal Register, Vol. 42, No. 40 (March 1, 1977) at 11891-11892, in which it reported:

> [on] August 6, 1971, the [FDA] announced its conclusions that the drug products
> described below [including Acthar] are effective, probably effective, possibly
> effective, and lacking substantial evidence of effectiveness for their various
> labeled indications.  The notice provided an opportunity for a hearing for the
> indications concluded at the time to lack substantial evidence of effectiveness.
> No data in support of any of the less-than-effective indications were submitted.
> All such indications are now reclassified to lacking substantial evidence of
> effectiveness.   …No person requested a hearing concerning them, and they are no

17

longer allowable in the labeling.
***
The drugs now lack substantial evidence of effectiveness for the indications evaluated as probably and possibly effective for the indications evaluated as probably and possibly effective in the August 6, 1971 notice.

*Id*. (brackets added).

72.     As a result, Acthar was left with about 19 narrow indications.  In the area of "rheumatic disorders", Acthar was approved only "as adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in … rheumatoid arthritis".  *Id*. at 11892 (parenthetical in original).

73.     By the 1960s, Acthar was essentially a generic drug.  Injectable ACTH medications faced a variety of competing products.  *See Armour & Co. v. Wilson & Co.*, 274 F.2d at 145 ("Both Armour and Wilson manufacture and sell gelatin-ACTH preparations . . . . Gelatin-ACTH now constitutes more than 80% [o]f all forms of ACTH products sold by Armour and Wilson.  Other companies . . . produce similar products").

74.     For the majority of the Acthar's drug lifespan, however, generic corticosteroids, such as prednisone, effectively treated the majority of the indications for which Acthar was approved.  That factor tended to limit the market for Acthar to treating infantile spasms ("IS") which was originally an "off-label" indication.  Consequently, because of the limited, off-label market for Acthar, by 2001, the drug was priced at $40 per vial and accounted for less than a million dollars of revenue for Aventis Pharmaceuticals, Inc. ("Aventis"), the then-owner.

**Questcor Acquires Acthar from Aventis**

75.     In 2001, Questcor acquired Acthar from Aventis Pharmaceutical Products, Inc. ("Aventis") for only $100,000, but in 2014 Mallinckrodt acquired Questcor for approximately $5.9 billion.

76.     In the July 27, 2001 Asset Purchase Agreement between Aventis and Questcor, Questcor acknowledged that there were risks in the transaction due to the limited approved indications for Acthar.  Indeed, Questcor and Aventis held a meeting with FDA on February 7, 2001 in which such issues were discussed.  Nevertheless, Questcor went through with the purchase.

77.     Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS").  IS is a serious condition in infants, but one with an annual patient population of less than 2,000 children per year.  However, Acthar was not originally approved by the FDA to treat IS, further limiting its value.  In 2010, the IS indication was approved by the FDA, and orphan drug status was granted.

78.     Between 2001 – 2007, Acthar's primary sales were for the treatment of IS, despite its off-label indication.

### Sigma Tau's Ownership and Control of Questcor, and the Launch of the "New Strategy"

79.     In 2001, Questcor was floundering as a company until it got millions of dollars from Sigma Tau Finanziaria, an Italian drug conglomerate run by brothers Claudio and Paolo Cavazza, giving the Cavazzas and Sigma-Tau approximately 31% of the common stock outstanding as of March 15, 2002 and making them the largest shareholder in Questcor.  Indeed, in its 2001 10-K, Questcor admitted that "these shareholders can control the outcome of certain shareholder votes, including votes on election of directors, … and other significant corporate transactions."

80.     In addition, the Cavazzas owned warrants to purchase another 2,559,494 shares of common stock, as well as a $2.0 million 8% convertible debenture, giving them even greater control over Questcor and its decision-making

81.   According to Questcor's public filings, the company reported the following:

In April 2001, we entered into a Stock and Warrant Purchase Agreement with Sigma-Tau Finance Holding S.A. ("Sigma-Tau") pursuant to which Sigma-Tau purchased (i) an aggregate of 2,873,563 shares of common stock at a purchase price of $0.52 per share, for an aggregate purchase price of $1,500,000, and (ii) a warrant to purchase an additional 2,873,563 shares of common stock at a purchase price of $0.52 per share. In May 2001, as required under the rules of AMEX, we sought and received shareholder approval to allow for full exercise of the warrant. In July 2001, Sigma-Tau assigned the warrant to Paolo Cavazza and Claudio Cavazza, the principal shareholders of Sigma-Tau, who exercised the warrant in full, purchasing 2,873,563 shares of common stock at a purchase price of $0.52 per share, resulting in aggregate proceeds to us of $1,500,000 (including the $100,000 originally paid by Sigma-Tau to acquire the warrant).

In July 2001, concurrent with our agreement to acquire Acthar from Aventis, we entered into a Stock Purchase Agreement with Sigma-Tau pursuant to which Sigma-Tau purchased 5,279,034 shares of common stock at a purchase price of $0.66 per share, for an aggregate purchase price of $3,500,000.

In December 2001, we entered into a Promotion Agreement with VSL Pharmaceuticals, Inc., a private company owned in part by the principal shareholders of Sigma-Tau, to promote, sell and distribute the product VSL#3 in the U.S. In connection with this Promotion Agreement, we entered into two Stock and Warrant Purchase Agreements, one with Paolo Cavazza and one with Claudio Cavazza, to purchase (i) an aggregate of 640,000 shares of common stock for a purchase price of $1.50 per share (representing a twenty percent premium to our market price for the five days prior to execution of the Purchase Agreements), for an aggregate purchase price of $960,000, and (ii) warrants, at an aggregate purchase price of $300,000, to purchase an additional 1,800,000 shares of common stock at a purchase price of $1.75 per share before December 1, 2003. We issued the common stock related to this transaction in February 2002. Additionally, in connection with this transaction, we entered into a standstill agreement with Sigma-Tau whereby Sigma-Tau and its affiliates agreed to limit purchases of common stock on the open market to no more that 2,000,000 shares through July 2003. Assuming Sigma-Tau exercises its warrants in full, they would own approximately 34% (including the 640,000 shares of common stock issued in February 2002) of our outstanding common stock as of December 31, 2001.

\* \* \*

20

> On March 15, 2002, in two separate transactions, we issued $4.0 million of 8% convertible debentures to an institutional investor and Sigma-Tau. We will pay interest on the debentures at a rate of 8% per annum on a quarterly basis. The debentures are convertible into shares of our common stock at a fixed conversion price of $1.58 per share (subject to adjustment for stock splits and reclassifications). At the end of the term of the debenture, under certain circumstances, we have the option to repay the principal in stock and, under certain circumstances, we can also redeem the debenture for cash prior to maturity. The debentures mature on March 15, 2005. In conjunction with this transaction, we issued warrants to both the institutional investor and Sigma-Tau to acquire an aggregate of 1,518,988 shares of common stock at an exercise price of $1.70 per share. Both warrants expire on March 15, 2006….

82.     Importantly, a few years earlier, Claudio Cavazza had earned notoriety, and 1 ½ years of probation, for his role in a 1993 scandal in which he admitted paying kickbacks to health officials to get Sigma Tau products onto Italy's national drug formulary at increasingly higher prices.  He also reportedly delivered bribes on behalf of other drug companies.

83.     But Claudio's criminal record, a record of bribes to force payers to overpay for prescription drugs, did not stop Questcor from taking the Cavazzas' money and ceding effective control of the company to the Cavazza brothers in conjunction with Questcor's acquisition of Acthar.

84.     Instead, Questcor allowed the Cavazzas to build their ownership stake in Questcor to more than 30%, giving them substantial control over Questcor's Board of Directors.

85.     The Cavazzas used that control to install one of their own, Gregg LaPointe, to the Questcor Board of Directors.

86.     In 2001, LaPointe was the Vice-President of Finance for Sigma Tau Pharmaceuticals, Inc. of Gaithersburg, Maryland ("Sigma-Tau Pharma").  Sigma Tau Pharma was the wholly-owned, U.S. subsidiary of Sigma-Tau.  By 2003, LaPointe was the Chief Operating Officer ("COO") of Sigma Tau Pharma.  He was elevated to CEO in April 2007, in

conjunction with his adoption of the below-described "new strategy" for Questcor's sale of Acthar.

87.    With the Cavazzas effectively in control, and now with LaPointe on the Questcor Board, the situation was ripe for fraud and abuse with Acthar, the likes of which have never been seen before, especially with a prescription drug of such limited therapeutic value.

### Acthar Distribution: Mallinckrodt Adopts a "New Strategy" to Restrict Acthar Distribution to Maintain and Enhance its Monopoly Power over Acthar

88.    Acthar is a specialty pharmaceutical distributed directly to patients, like the beneficiaries of Plaintiff in this case.

89.    For decades, Acthar was distributed to any doctor, hospital, wholesaler or specialty pharmacy who requested the drug to treat seriously ill patients.  After Questcor acquired the rights to Acthar, it initially maintained that broad distribution network.

90.    However, on July 2, 2007, Mallinckrodt restricted its distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to just Express Scripts, the agent of its largest customers.  Mallinckrodt's announcement stated, "[e]ffective August 1, 2001, Acthar…will be available exclusively through Specialty Pharmacy Distribution.  Acthar Gel will no longer be available from traditional pharmaceutical wholesalers or retail pharmacies."  *See* July 2, 2007, "Urgent Product Alert H.P. Acthar Gel" (attached to the Complaint at Exhibit "B").  All distribution would now be done exclusively through CuraScript.  Mallinckrodt directed that "all new Acthar Gel prescriptions should be submitted to the Acthar Support & Access Program."  *Id.*  From that point on, all aspects of Acthar distribution were handled by the Express Scripts Entities.

91.    The goal of this "new strategy" was to lock patients into receiving Acthar through one distribution channel controlled by Mallinckrodt and the Express Scripts Entities, and to

ensure prescription distribution and payment through one source, the Express Scripts Entities. Mallinckrodt has maintained this exclusive arrangement with the Express Scripts Entities since 2007 up through at least September 2017 when the Express Scripts Entities claim that CuraScript SD "is no longer the exclusive distributor of Acthar".

92.     Mallinckrodt's "new strategy" was the brainchild of Defendant Gregg LaPointe, a critical member of the Questcor Board of Directors installed by the largest shareholders, the Cavazzas.  LaPointe also served as a member of the Corporate Council of the National Organization for Rare Diseases ("NORD"), which served as an important player in Mallinckrodt's scheme to minimize resistance and pushback by patients and physicians to Acthar's higher prices by serving as a leading distributor of free Acthar supplied by Mallinckrodt to patients who could not afford to pay the newly established monopoly prices.

93.     LaPointe convinced Steve Cartt, Questcor's Chief Operating Officer and Executive Vice-President in charge of sales and marketing of Acthar at the time, that the company should implement the "new strategy" for Acthar.

94.     Cartt and LaPointe approached then-Questcor Board member Don Bailey to garner his support for the new strategy.  Their "offline" discussions did not sit well with Questcor's President and CEO at the time, James L. Fares.

95.     In February 2005, Mr. Fares was appointed President and CEO of Questcor by the Board of Directors.  According to Albert Hanson, the Chairman of the Board, "the Board sought an accomplished pharmaceutical executive with substantial expertise in selling and marketing pharmaceutical products."  Chairman Hanson further explained the selection of Feres as follows:

> [T]he Board assessed each candidate's track record and capability to think creatively about Questcor's business.  Such skills are critical in developing and executing a successful long-term strategy for a specialty pharmaceutical business.  We looked for a talented executive who understood the specialty

23

> pharmaceutical market and had demonstrated the leadership skills necessary
> to create shareholder value.  We believe that in Jim Fares we have found that
> executive.   His successful track record in sales, marketing, business
> development, and general management, coupled with his energy and
> enthusiasm for pharmaceuticals, convinced us that we had found the right
> individual to lead Questcor.

96.     Prior to joining Questcor, Feres held senior management positions at Merck, Athena Neurosciences and Elan Pharma.  He founded and served as Sr. Vice President of Commercial Operations at Xcel Pharmaceuticals from 2001 – 2003.  In his last position, he served as CEO and President of FGC Pharm/Novella Neurosciences.

97.     Feres resigned in May 2007.  He was replaced by Don Bailey, whom the Board first appointed as Interim President, but then elevated to full-time President and CEO in conjunction with Questcor's adoption of the new strategy.  LaPointe also was elevated to CEO of Sigma-Tau Pharma in April 2007.

98.     In sum, Bailey was not well qualified to lead a prescription drug company like Mallinckrodt.  But he was willing to jettison responsible and ethical business practices in favor of the "new strategy", with unconscionable price increases [the Pricing Scheme] and an aggressive campaign of off label promotion fueled by misrepresentations and deception about Acthar's price, MOA, approved indications and doses, and value.  For that, he was rewarded by being appointed the company CEO.

99.     Mallinckrodt then signed contracts with CuraScript and UBC in late June 2007 for the exclusive distribution of Acthar and exclusive operation of the HUB for ASAP.

100.    Mallinckrodt and UBC then began to promote Acthar aggressively pursuant to the Pricing Scheme and Marketing Scheme detailed below.  They did so to overcome resistance by providers, patients, and private payors (like the Board) to the high cost and limited value of Acthar.

24

101.     Shortly thereafter, in July 2007, three Board members resigned, including the Chairman Albert Hanson.

102.     In addition to CEO Feres, Mallinckrodt's Sr. Vice President of Strategic Planning and Communications, Eric Liebler, also quit.  Liebler quit less than a year after being hired.  He quit just three weeks after the "new strategy" was announced.

103.     LaPointe also resigned within a week of the new strategy being launched, but not because he disagreed with the new strategy.  Quite to the contrary: his work on behalf of the Cavazzas was done.  The Cavazzas had accomplished was they set out to do, engineering a coup at Questcor to take the company on an aggressive path centered around the new strategy and the three schemes detailed herein, the Distribution Scheme, the Pricing Scheme and the Marketing Scheme.  Without LaPointe's installment on the Questcor Board, this would not have been possible.

104.     These facts were confirmed by Questcor COO Steve Cartt on September 6, 2007, when he wrote to all senior staff at Questcor the following about LaPointe's departure:

Subject: Lapointe departure

Wanted to give you all a heads-up that Gregg LaPointe has left the Board of Directors (see attached link).  This has been expected for some time actually, and is no cause for concern.  Gregg joined the Board so that Sigma Tau could have some visibility on how Questcor was being run and the strategy going forward for the company.  He actually as you can imagine ended up spending far more time on Questcor business over the last year than he ever imagined.  Sigma Tau, our largest shareholder, is now comfortable with the company's path forward now, and is interested in having Gregg fully focused on Sigma Tau's own US business going forward, so the decision was made.

Also, in case you were wondering, Gregg has been a big supporter of the pricing strategy from the very beginning, so his departure was not the result of any disagreement with strategy.  Quite the contrary actually.

Let me know if you have questions.  Thanks, Steve.

25

105.    It is believed and therefore averred that this mass exodus of leading executives and Board members was caused by Mallinckrodt's decision to adopt the "new strategy", with the Distribution Scheme, the Pricing Scheme and the Marketing Scheme as the hallmarks of an overarching scheme to raise Acthar prices, and overcome payor resistance to high drug prices.

106.    In spite of this mass exodus of leading executives and Board members, Mallinckrodt chose to adopt LaPointe's controversial "new strategy" to allow Mallinckrodt to "optimize" its monopoly status for Acthar, especially in the IS market.

107.    The decision was highly lucrative for all who supported it.

108.    For instance, between 2006-2007, Don Bailey purchased tens of thousands of shares of Questcor stock for $1.67 per share.  He also received warrants to buy tens of thousands of additional shares of stock at just $0.44 per share.  After the new strategy was pushed through, and the company started gouging patients and payers for Acthar, Bailey sold his shares, making tens of millions in profits.

109.    Bailey's last warrant exercise and sale of Questcor stock took place in the summer of 2014, just prior to Mallinckrodt's purchase of Questcor.  He exercised warrants to purchase 40,000 shares of common stock at $5.12 (at a total cost of $204,800).  He then sold the same stock one month later at $91.96 per share (at a total price of $3,678,240).  This was a profit of more than $3.2 million in one month!

110.    The self-described "orphan drug strategy" worked as follows: despite the fact that Acthar was an older drug, Mallinckrodt would "re-launch" Acthar with a new, limited distribution system and a substantially higher price, to make it appear as if Acthar were a new product being launched as the only product indicated for IS, an off-label indication at the time.

111.    The IS market was a captive market involving a life-threatening disease afflicting

infant children.  Like other debilitating or life-threatening, orphan conditions, for which there

was only one, sole-source drug treatment, IS presented Mallinckrodt with an opportunity to

leverage its monopoly power against a particularly fragile, powerless patient population in an

extremely narrow market.

112.    As a result, Mallinckrodt predicted that the IS market would likely be able to

absorb a much higher price with little resistance.  In contrast, Mallinckrodt feared that the market

for drug treatments of other disease states, such as the MS market, would not tolerate such a high

price.  Nevertheless, Mallinckrodt only viewed the anticipated resistance to higher prices by

patients and payors as a challenge to be overcome.

113.    Mallinckrodt overcame such challenges in several ways, as part of a new

marketing and sales scheme, including the following:

> (i) knowingly disregarding federal laws and FDA regulations prohibiting off-label marketing and promotion;
>
> (ii) knowingly misrepresenting the purported efficacy, safety and value of Acthar for the treatment of unapproved conditions and unapproved doses in promotional and marketing material not submitted to, reviewed by, or approved by the FDA;
>
> (iii) failing to disclose and submit to the FDA all of their promotion, advertisements and marketing materials, as required by law;
>
> (iv) promoting the sale of Acthar for uses that were not proven to be safe or effective, as required by law;
>
> (v) promoting the sale of Acthar for doses that were not proven to be safe or effective, as required by law;
>
> (vi) willfully underreporting adverse events, as required by law;
>
> (vii) utilizing improper, false and misleading comparative marketing tactics, such as comparing Acthar to prednisone, and including unsubstantiated superiority and value claims; and
>
> (viii) improperly compensating healthcare professionals with free vials of Acthar, speaking and consultant fees and benefits, and other kickbacks as an inducement

to induce them to promote and prescribed Acthar to their patients.

(ix) operating patient assistance programs as a means to secretly channel funds to third parties to pay for patient copay obligations, to remove patient complaints about the high costs of Acthar, and to force payors like the Board to pick up the balance of the Acthar bill.

114.    Mallinckrodt vastly expanded its direct-to-consumer selling of Acthar by expanding its sales force, including creating a team of "medical science liaisons" or "MSLs". The MSLs were highly trained specialists in the Acthar treatments who worked with other Mallinckrodt sales representatives to create a network of KOLs.  These KOLs were leading specialists in their respective medical fields whom Mallinckrodt identified as being potentially influential on other doctors.  These KOLs were paid handsomely to join with Mallinckrodt's MSLs and sales representatives as "spokes-doctors", promoting Acthar to other medical providers and delivering Mallinckrodt's false, misleading and deceptive promotional messages about the safety, efficacy and value of Acthar in relation to other cheaper, safer, and equally or more effective treatments.  As a result, thousands of new patients have been prescribed Acthar for unapproved uses and doses in the treatment of diseases in neurology, nephrology and rheumatology, among others.  And payors like the Board have been forced to pay the exorbitant prices charged by Defendants.

115.    The new pricing established by Mallinckrodt and Express Scripts was only limited by what these companies predicted that payors, like Plaintiff, would be willing to bear. This was because the Marketing Scheme adopted at the same time ensured that the promotional message delivered by UBC, as well as Mallinckrodt sales representatives and MSL's, was false, misleading and deceptive, and backed by unlawful kickbacks and inducements.

116.    Mallinckrodt Executive Vice-President, Steve Cartt, admitted "'[w]e did some market research,' . . . [t]alking to physicians and others about pricing 'gave us some comfort that

28

the [new] strategy would work, and physicians would continue to use the drug, and payers would pay' . . . . 'The reality was better than we expected.'"[3]

**Acthar's Limited Clinical Data, Lack of Proven Efficacy and Unknown Mode of Action**

117.     In 2010, in response to Questcor's request for approval of the IS indication for Acthar, the FDA expressly found that "the exact mechanism of action for specific indications, such as the treatment of infantile spasms, **is not known**."  DDMAC Memo at 1 (emphasis added).  The FDA made such finding in part due to the fact that the original FDA approval in 1952 was based upon limited clinical evaluation of patients, not any current FDA-approved clinical study standards.

118.     Despite this unambiguous finding by the FDA, Mallinckrodt has repeatedly and consistently misrepresented to the public the "value" of Acthar for specific indications, including the rheumatoid arthritis for which Plaintiff's beneficiaries were prescribed Acthar.

119.     Mallinckrodt has falsely and misleadingly promoted the sale of Acthar for the long-term treatment of rheumatic disorders, including rheumatoid arthritis, which marketing far exceeds the approved indication, "as adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in … rheumatoid arthritis."

120.     Indeed, in has been part of Mallinckrodt's long-term business strategy to promote the administration of Acthar as a maintenance medication for all indications where it is approved only for the treatment of acute episodes or exacerbations of disease.

121.     Executives of Questcor, especially CEO Don Bailey, and Mallinckrodt, have routinely misrepresented the value of Acthar for the treatment of specific diseases, despite the

---

[3] Milt Freudenheim, *Benefit Managers Profit by Specialty Drug Rights*, New York Times, C1, April 19, 2008 (titled The Middleman's Markup in New York Print Ed.)(hereinafter, "*Fruedenheim*").

FDA's finding that the "mechanism of action" (***"MOA"***) is not known.

122.    Internally, Mallinckrodt admits that the mode of action for Acthar is not known; publically, it misleads investors, third party payors, like Plaintiff, doctors and patients.

123.    Prior to the launch of the new strategy in 2007, Mallinckrodt executives, at best, have a rudimentary understanding of the Acthar MOA.

124.    Despite this lack of understanding, Mallinckrodt has aggressively promoted Acthar as both safe and effective for a host of disease, including as maintenance medication for rheumatoid arthritis.

125.    Due to its aggressive marketing, Mallinckrodt sales representatives are questioned most often by doctors about the efficacy of Acthar and its MOA.

126.    For instance, in August 2011, when asked directly by investors about the Acthar MOA, Bailey stated claimed publically that while "Acthar is an extraction of porcine pituitaries", "it's an undisclosed composition, so that's a trade secret."  He also claimed that it is a barrier to entry for competitors to enter the market for ACTH drugs that "there are *probably* multiple active ingredients" in Acthar, and "there are multiple peptides within Acthar, and they're undisclosed."  (emphasis added).

127.    Late on that same conference call, Bailey admitted "there is actually a fair amount of confusion about the mechanism of action here."  He then passed the question to Christine Clemson, a medical science liaison whom Mallinckrodt uses to promote the efficacy of Acthar to doctors.  She admitted, "[w]e ***now know*** [about Acthar's] effects in, say, MS are really relevant to its direct effect on the immune system.  …So that's really the primary, direct effect of Acthar that I discuss in an MS's office.  This is ***new information***…."

128.    In other words, since the time of the new strategy in 2007, Mallinckrodt has been

spending money in research to discover and understand the MOA of Acthar, all the while promoting the drug for the treatment of disease.

129.    In April 2015, Mallinckrodt settled a securities fraud class action brought by its investors against the company in January 2013 in the United States District Court for the Central District of California for the sum of $38 million.  The securities lawsuit charged the company with, *inter alia*, "issu(ing) false and misleading statements about *the effectiveness of*, and prospects for, Questcor's sole product, Acthar."  The court denied in part the Defendants' motions to dismiss, allowing certain claims to proceed.  The court granted class certification in November 2014.

130.    Following the settlement, Mallinckrodt's CEO Mark Trudeau suggested to investors on October 6, 2015 that drug prices "should be reflective of the value that you deliver to the marketplace."

131.    As Express Scripts' Dr. Miller conceded, Acthar is not worth what Defendants are charging for it, especially for the treatment of rheumatoid arthritis.

**Mallinckrodt Uses KOLs to Create Clinical Data and Cultivate High Acthar Prescribers**

132.    In view of the extremely limited clinical data that existed at the time of Acthar's approval in 1952, Mallinckrodt was forced to create data to support its false and misleading marketing effort about Acthar's "value" to treat disease beyond the narrow indications on its label.

133.    Mallinckrodt cultivate KOLs to create such data, and paid them handsomely.  As ProPublica has reported, dozens of high prescribers of Acthar have been paid tens of thousands of dollars for their work on behalf of Mallinckrodt.

134.    These KOLs are paid by Mallinckrodt to cultivate a narrow group of high

prescribers of Acthar.

135.    In June of 2018, a team of researchers and concerned clinicians used Medicare

and Medicaid data to investigate the frequency of use and overall expense of Acthar.  To

characterize payments from Mallinckrodt to physicians who prescribe Acthar, these researchers

and clinicians conducted a cross-sectional analysis of data from CMS, including the Medicare

Part D Public Use Files.  Focusing on 2015, the researchers used the database to identify

physicians, and their specialties, who prescribed Acthar more than 10 times that year,

characterizing them as "frequent prescribers."

136.    Their study, published in JAMA Network Open, found that in 2015 only 300

providers wrote more than 10 prescriptions for Acthar.  Of those 300 prescribing providers of

Acthar, 235 of them were rheumatologists, neurologists, or nephrologists.

137.    Further, among those 235 rheumatologists, nephrologists and neurologists who

issued more than 10 prescriptions for Acthar in 2015, 88% (207/235) received payments from

Mallinckrodt – with more than 20% of those frequent prescribers receiving more than $10,000 –

despite Acthar's considerable cost and the dearth of evidence in support of its use, according to

those findings published in the JAMA study.

138.    Some physicians prescribing Acthar were paid as much as $56,000-$138,000 by

Mallinckrodt for activities related to Acthar, making such payments equivalent to the salary of

full-time employees of Mallinckrodt.

139.    Indeed, as noted by one of the researchers and clinicians in the JAMA study, Dr.

Daniel M. Hartung, "[e]xpensive therapies with uncertain or insufficient evidence supporting

their use should be particularly scrutinized."  He further noted that, "[t]he continued growth in

corticotropin [Acthar] use is peculiar given its very high cost, widespread negative media

32

coverage, and notable lack of evidence supporting its use over lower-cost synthetic corticosteroids. Our experience suggests aggressive marketing of the drug partly accounts for increasing use."

140.     The JAMA study also noted an association between providers who received higher compensation and their writing more Acthar prescriptions—and the Acthar prescriptions written by these frequent prescribers accounted for $200 million in Medicare spending during the period that the study examined.

141.     Indeed, this study also found that from 2011 to 2015, spending on Acthar increased 10-fold, totaling more than $1.3 billion for just several thousand Medicare patients. Upon information and belief, and given the continued marketing of Acthar, those numbers have increased since 2015.

142.     The conclusion of the JAMA study was that most nephrologists, neurologists, and rheumatologists who frequently prescribe Acthar received Acthar-related payments from Mallinckrodt, suggesting that financial conflicts of interest may be driving the prescription and use of Acthar.  Indeed, as noted by Dr. Hartung, "we observed a positive association between the amount of money paid to these prescribers, their prescribing intensity, and corticotropin [Acthar] expenditures in the Medicare program with a return on investment for Mallinckrodt of about 5:1."

143.     Consistent with the JAMA study's conclusions, in October of 2014, Mallinckrodt had a briefing with its investors.   At that briefing, Dr. Gary Phillips, the Senior Vice President, and President of Mallinckrodt's Autoimmune and Rare Disease Business, pledged, "[t]he one thing that you can be sure of is that the awareness and the evidence of the product will just expand dramatically over the next year."

144.    Dr. Phillips presented PowerPoint slides detailing the company's strategy, including the need to get Acthar to its "underserved patient population" in rheumatology, pulmonology, ophthalmology, dermatology and kidney disease.

145.    One graphic showed 9,000 patients were currently being treated with Acthar and that 300,000 people had "addressable but currently untreated" conditions.  The slide also noted a total of 4 million Americans suffered from "Acthar indicated conditions."

146.    The aggressive marketing push outlined by Mallinckrodt executives in that October 2014 investor meeting appears to have paid off: Medicare spent more than $600 million on more than 12,000 Acthar claims in 2016 – more than double the numbers from 2013, the year before Mallinckrodt's purchase.  Many of those prescriptions were made by rheumatologists, nephrologists, and neurologists – the very type of doctors Mallinckrodt executives said they planned to target in October 2014.

147.    By 2016, Plaintiff began paying for Acthar prescriptions as maintenance medication for two beneficiaries for the treatment of rheumatoid arthritis.  It has not stopped paying since, due to Mallinckrodt's continued marketing effort, and the Express Scripts Entities' substantial assistance through its hub.

**Acthar Distribution: the Acthar Support & Access Program and Express Scripts' "HUB"**

148.    One of the primary means by which Defendants manifested their unlawful scheme was through a program known as the "Acthar Support & Access Program" or "ASAP."  This program is structured so that Mallinckrodt ships Acthar directly to patients and receives payment directly from the associated third-party payors.

149.    Once the patient (or their physician) contacts Mallinckrodt for a prescription of Acthar, they are directed to UBC.  Otherwise, patients and/or their providers contact UBC

34

directly, as directed by the Acthar Start Form (Exhibit "A" hereto).  UBC then serves as the "HUB" for Mallinckrodt and the Express Scripts Entities.  UBC also serves as the primary interface with other PBMs and specialty pharmacy provider, like Cigna's Tel-Drug utilized by Plaintiff from 2016 to the present, during which time it has paid for Acthar.  As the HUB, UBC confirms the prescription by the provider with a specialty pharmacy, whether Accredo or some other specialty pharmacy.  UBC then confirms the patient's insurance coverage or other source of payment, whether with Express Scripts, Cigna or some other PBM or insurer.  UBC then arranges for Acthar to be delivered directly to the patient by CuraScript.

150.    This process is laid out in the "Acthar Start Form" provided by Mallinckrodt (Exhibit "A" hereto).  The form requires patient, physician/pharmacy and payor authorization before Mallinckrodt ships the Acthar to patients via CuraScript.  At no point is any Express Scripts Entity at risk, as Mallinckrodt ensures its payment at each level of the process.

151.    The Acthar Start Form consists of 3 sections: (1) a section requiring signature by the "HCP" (or health care professional); (2) a patient authorization requiring signature by the "patient or legal representative"; and (3) information concerning Acthar indications and usage. The required signature of the patient authorizes "Mallinckrodt and its agents" to do a number of things in relation to the prescription and distribution of Acthar.  It further authorizes Mallinckrodt and its agents, "including Mallinckrodt reimbursement support personnel and United BioSource Corporation ("UBC") or any other operator of the Acthar Support Access Program on behalf of Mallinckrodt (collectively, 'Designated Parties')" to provide Acthar and receive payment, among other things.

152.    Specifically, the patient authorizes Mallinckrodt, UBC, "or any other operator" of ASAP on behalf of Mallinckrodt, referred to as Mallinckrodt's "Designated Parties", "to provide

certain services to [the patient], including reimbursement and coverage support, patient assistance and access programs, medication shipment tracking, and home injecting training."  In other words, the patient directly authorizes Mallinckrodt and its agents to ship Acthar to them directly via CuraScript, and authorizes payment by both the patient and any third-party payor prior to obtaining the medication.  So, the patient authorizes Express Scripts to bill the payor for Acthar.

153.    Similarly, the physician must "authorize[ ] United BioSource Corporation ("UBC"), the current operator of the Acthar Support and Access Program ("Program"), and other designated operators of the program, to perform a preliminary assessment of benefit verification for this patient…".  The physician also "agree(s) that the designated specialty pharmacy receive this prescription via a designated third party, the Program and that no additional confirmation of receipt of prescription is required by the designated specialty pharmacy."

154.    The interaction of all 4 elements of the Express Scripts Entities' functions on behalf of Mallinckrodt are described below.

155.    Express Scripts is the largest buyers' agent for pharmaceuticals in the United States.  Express Scripts has substantial buying power as a result of its representation of the largest number of buyers in the pharmaceutical marketplace.

156.    Express Scripts styles itself as a "pharmacy benefit manager" or "PBM", but it does more than simply process claims for prescriptions filled at retail pharmacies.  In addition to "retail pharmacy claims processing, formulary management, utilization management and home delivery pharmacy services", Express Scripts offers "specialty services that deliver . . .  high-cost injectable, infused, oral or inhaled drugs," and "compliance programs, . . . drug therapy

management programs, [] data analysis, and [] distribution services."[4]  Acting "either directly or through its subsidiaries", Express Scripts acts as a direct pipeline from a pharmaceutical manufacturer to the patient, facilitating the direct distribution of a prescription drugs from the factory to the patient's home.

157.   Express Scripts is able to act as a manufacturer's direct distributor of specialty drugs to patients because it provides what it calls "integrated specialty services."  (emphasis in original).[5]  As one Express Scripts' executive put it "we're family."  These integrated services include a PBM (Express Scripts), a specialty pharmacy distributor (CuraScript), and a specialty pharmacy provider (Accredo).

158.   Express Scripts coordinates all of these functions through its so-called pharmaceutical support services unit, UBC.  UBC acts as a "'hub,' that serves as a centralized point of contact for [] patients [] and prescribers"[6] by "[w]orking hand-in-hand with Express Scripts' specialty pharmacy and specialty distribution organizations, Accredo and CuraScript [],"[7] to coordinate delivery of and reimbursement for specialty pharmaceuticals.

159.   In total, UBC operates "an integrated service model that involves UBC . . . manag[ing] multiple system applications that support one product.  [UBC's] services include the UBC coordinating center, nurse coordination . . . product fulfillment through Accredo and wholesale fulfillment through CuraScript[].  When a patient is prescribed [a specialty] medication, the doctor sends a referral to the Reimbursement Hub. [UBC's] team serves as the

---

[4] Express Scripts Holding Company Annual Report on Form 10-K for the Fiscal Year Ending December 31, 2012.

[5] https://curascriptsd.com/corporate-overview

[6] http://www.ubc.com/services/loyalty/reimbursement-patient-assistance

[7] http://www.ubc.com/about/about-ubc

liaison among doctors, patients, and insurance companies as [UBC] . . . navigate[s] the coverage process.  [UBC] . . . ensure[s] a smooth transition from enrollment through shipment of the medication."

160.    Part of the reimbursement hub process is coordination with Express Scripts' CuraScript, which acts as an "integrated delivery network" connecting patients to manufacturers through "end-to-end distribution services."[8]  Simply put, CuraScript is similar to a FedEx, DHL, or UPS for specialty prescription drugs.  CuraScript advertises that it is "recognized by the manufacturing community as [] a reliable partner in the management of brands" through CuraScript's "integrated specialty services," which deliver medications to patients "alongside sister organizations Accredo and UBC."[9]

161.    To facilitate these end-to-end distribution services, UBC coordinates CuraScript's activities with Accredo, which provides so-called specialty pharmacy services.  By acting as the hub, UBC ensures that a patient whose pharmacy benefits are managed by Express Scripts can get a specialty medication delivered to him or her by coordinating direct shipment through CuraScript and Accredo and direct payment through Express Scripts.  "As one UBC executive has explained "if UBC is the Hub and Accredo is the [specialty pharmacy] . . . we can send the patient's prescription over to Accredo, and they will not have to duplicate any of our efforts, which another pharmacy would be compelled to do because of risk. Accredo trusts us."

162.    Accredo provides specialty pharmacy and related services for patients with certain complex and chronic health conditions.  Accredo's staff is comprised of a team of specialty-trained pharmacists, nurses, patient care advocates, social workers and insurance coordinators

---

[8] https://curascriptsd.com/Rare-Disease-Specialty-Distribution-Program

[9] https://curascriptsd.com/supplier-relations

whom, among other things, "handle everything about" a patients' medications and/or specialty therapy.

163.    Along with UBC, Accredo provides: (a) support to orphan and ultra orphan patient populations; (b) HUB employees to navigate insurance requirements, like prior authorizations, for patients and prescribers; (c) clinicians who are available 24/7 to address patient concerns and provide guidance on mitigating adverse events; (d) reimbursement HUB specialists to steer patients to funding solutions, and (e) an integrated solution allowing patients to start therapy twice as fast.

164.    Plaintiff's beneficiaries dealt with Cigna's Tel-Drug for their fulfillment of Acthar.  It is believed, and therefore averred, however, that UBC coordinated the shipment of Acthar directly to the beneficiaries via the same integrated "hub" network with the lone exception being that Plaintiff's payment was made to Cigna, before being routed to Mallinckrodt via Express Scripts.  In all other respects, the operations of the hub were the same, with the Acthar being shipped by Express Scripts' Curascript pursuant to the same exclusive agreement entered in 2007.

165.    In simple terms, through UBC's coordination with Accredo, CuraScript, and Express Scripts, Express Scripts delivers a prescription drug directly from the manufacturer to the patient, removing all impediments to delivery and payment, whether medical, logistical or financial.

166.    With respect to Acthar, Mallinckrodt has a contract with UBC to coordinate the delivery of Acthar through what it has called the ASAP Program.  Beginning with its July 2, 2007 announcement, Mallinckrodt directed physicians to prescribe Acthar through the ASAP program.  *See* Exhibit "B".  In this announcement, Mallinckrodt directed physicians that "all new

Acthar [] prescriptions should be submitted to the [ASAP program]."  Prescriptions are submitted to the ASAP program through the "Acthar Start Form."  *See* Exhibit "A".  This form authorizes UBC to coordinate reimbursement with Express Scripts and direct the prescription to a "designated specialty pharmacy."  This designated specialty pharmacy is Accredo.  Accredo dealt with the Plaintiff's employees/beneficiaries in 2015.  Part of UBC's activities involve coordinating the shipment of Acthar from CuraScript through Accredo to the patient.  Indeed, in order to revoke UBC's authorization to perform these services, the patient must mail a letter to CuraScript's address in Florida.  It is believed and therefore averred that Plaintiff's beneficiaries provided a similar authorization to UBC for shipment from CuraScript.

167.     The Acthar direct distribution arrangement between Mallinckrodt and Express Scripts is illustrated in the following two figures.  In Figure 1, the product distribution and payment arrangement for payors who directly contract with Express Scripts is as follows:



**Figure 1**

168.     Figure 2 below illustrates how Acthar is prescribed, authorized, distributed and paid for through Express Scripts when the payor does not have a contract with Express Scripts,

as in the case of Plaintiff who utilizes Tel-Drug as its specialty pharmacy provider.  Although these payments pass through Express Scripts, payment flows and products flows are ultimately aligned between Mallinckrodt and UBC, Express Scripts' reimbursement hub, through a contract with Mallinckrodt to operate the ASAP program, which confirms the medical necessity of the prescription (by Accredo or other specialty pharmacy), arranges for payment (by PBMs like Express Scripts) and then for shipment and billing (by CuraScript).



**Figure 2**

169.    Since the launch of the new strategy, CuraScript has contracted directly with Mallinckrodt to ship Acthar.  Through such contractual arrangement, Acthar travels from Mallinckrodt directly to the patient, and payments are channeled directly back to Mallinckrodt.

170.    As depicted above, the patient typically has prescription insurance coverage through his or her health plan.  In this case, Plaintiff had a health plan with Cigna that covered its beneficiaries.  The health plan used its operating subsidiary entity Tel-Drug Rx to supply

prescription drugs, including specialty drugs like Acthar.  Cigna thus collects payments for the price of Acthar from the payer, and passes such payments to Express Scripts on behalf of Mallinckrodt.

171.    By these arrangements, Acthar product flows directly from Mallinckrodt through Express Scripts to the patient, while the money flows directly from the patient and payor through Express Scripts and back to Mallinckrodt for all payers who contract with Express Scripts for PBM services.  For payers who contract with other plans/PBMs, like Plaintiff, the money flows indirectly through Cigna and then on to the Defendants.  However, the product flow remains direct, as depicted in Figure 1 above.

172.    Wielding both the largest collection of patients in the United States and a direct shipment channel for specialty drugs, Express Scripts is in a unique position to negotiate the most competitive, discount prices for specialty drugs in the United States.  This bargaining power has allowed Express Scripts to push back against attempts by pharmaceutical drug manufacturers to charges inflated prices for drugs above the actual market value of the drugs.

173.    Mallinckrodt leveraged and enhanced its monopoly power by limiting the distribution of its sole specialty drug to just one specialty pharmacy distributor, CuraScript, and employing as its agents, Express Scripts, Accredo and UBC, along with CuraScript, to coordinate all aspects of the distribution and sales of Acthar: from prescription by the physician, to direct home delivery to the patient, to direct reimbursement by the payor.  This allowed Mallinckrodt to raise its prices tenfold initially, and nearly double in the ensuing years.

**Express Scripts Lowers the Cost of Daraprim**

174.    Turing Pharmaceuticals, LLC ("Turing") acquired the rights to Daraprim, and proceeded to increase the price 5000% from $13.50 to $750.00 per pill.  One year's course of

treatment rose from $6,500 to $361,000.

175.    Strikingly, Express Scripts employed its market power to counter Turing's action. It worked to create an alternative that was much less expensive than Daraprim.

176.    On December 1, 2015, Express Scripts announced that it would "partner with Imprimis Pharmaceuticals to drive access to a low-cost alternative to Daraprim." "Express Scripts Champions $1 per Pill Access to an Alternative for Daraprim", Dec. 1 2015, http://lab.express-scripts.com/lab/insights/drug-options/express-scripts-champions-1-per-pill-access-to-an-alternative-for-daraprim. In partnership with Express Scripts, "Imprimis [] offer[ed] a compounded oral formulation of pyrimethamine and leucovorin (a form of folic acid) for as low as $1 per capsule for people whose pharmacy benefit is managed by Express Scripts." *Id.* When it is in Express Scripts' interest, it acts to "improve access and affordability." *Id.*

177.    Express Scripts' Chief Medical Officer, Dr. Steve Miller, stated that Express Scripts had found a way to deliver "a safe, high-quality and extremely cost-effective way to provide access to a Daraprim alternative."  However, because of its agreement with Mallinckrodt, Express Scripts has not served as an effective agent for pharmaceutical buyers to seek to lower the cost of Acthar, or the availability of reasonably priced alternatives.

**Acthar Pricing Manipulation**

178.    Mallinckrodt acquired the rights to Acthar from Aventis in July 2001.

179.    At the time of its acquisition, the end payor price of a vial of Acthar was approximately $40.00.

180.    After acquisition, Mallinckrodt raised the per-vial price substantially.  By September 2001, Mallinckrodt raised the list price for Acthar, or the wholesale acquisition cost ("WAC"), to $748.16.  It raised the end payor price, or the average wholesale price ("AWP"), to

43

$935.20.

181.    From 2001 until Mallinckrodt executed its new strategy in 2007, the WAC grew

from $748.16 to $1,650.23, while the AWP grew from $935.20 to $2,062.79.

182.    The below table reflects the WAC price changes implemented by Mallinckrodt

from 2001 through February 2007:

| | |
|---|---|
| Sept. 21, 2001 | $748.16 |
| June 24, 2002 | $782.60 |
| April 1, 2003 | $859.20 |
| March 1, 2004 | $902.00 |
| January 1, 2005 | $988.00 |
| April 1, 2005 | $1,037.20 |
| January 1, 2006 | $1,120.40 |
| October, 1, 2006 | $1,232.44 |
| December 21, 2006 | $1,269.41 |
| February 2, 2007 | $1,650.23 |

183.    When Mallinckrodt implemented its new strategy on August 27, 2007, it raised

the WAC for Acthar from $1,650.23 to $23,269.00.  It also raised the AWP for Acthar from

$2,062.79 to a staggering $29,086.25 – representing a 1,310% increase in the span of a month,

and a 72,615% increase from the time Mallinckrodt first acquired the drug.

184.    Express Scripts was keenly aware of this price increase, as it participated directly

in the decision-making with Mallinckrodt.  However, when it reported the increase to its

customers and the public as part of its annual "Drug Trend Report" for 2007, Express Scripts

44

reported only that Acthar "experienced a significant price increase in 2007."[10]  It further stated that "[i]n August 2007, the manufacturer of this drug increased its wholesale price from $2,062 per vial to more than $29,000 per vial, increasing the average cost per prescription to $11,041."

185.     This statement by Express Scripts was false, misleading and deceptive under Maryland law.  It sought to lay the blame for the price increase on the manufacturer of Acthar, Questcor, without revealing the truth about the Express Scripts Entities' direct involvement in decision to raise prices in the wake of contracting for exclusive distribution rights.

186.     Until Mallinckrodt obtained FDA approval for the IS indication in 2010, the price of Acthar remained relatively stable.  However, in 2011, Mallinckrodt increased the price of Acthar three times: by 5% on January 3, 2011, by another 5% on June 1, 2011, and then by 6.5% on December 27, 2011.  These three price increases totaled a staggering 16.5% in one year.  As of 2012, Acthar's end payor price/AWP stood at $34,150.00.

187.     Each such price increase was reviewed with Express Scripts and approved by Express Scripts, in writing, as required by the parties' written agreements.

188.     Despite the fact that both Mallinckrodt and Express Scripts were keenly aware that Acthar pricing was a sensitive topic for payors, like Plaintiff, they continued to the raise the Acthar prices each year.  They raised the price by 5% on May 15, 2012.

189.     Further, as discussed more fully below, Mallinckrodt, along with Express Scripts, continued to conceal and suppress the truth about their coordinated conduct in raising Acthar prices, and continued to misrepresent publicly the reasons for the many Acthar price increases.

190.     A poignant example is the attempted price increase in September of 2012.

---

[10] Express Scripts 2007 Drug Trend Report at p. 35, available at http://lab.express-scripts.com/lab/publications ("2007 Drug Trend Report").

191.    That month, Mallinckrodt desired to take another 5% price increase.  The decision to raise the Acthar price was made by Questcor's COO Steve Cartt in early September.  Mr. Cartt then communicated with Express Scripts executives via email on September 5 to seek their approval, as required by the parties' agreements.  Their intention was to make the price increase effective on September 25, 2012.

192.    There was no expectation by either Mallinckrodt or Express Scripts that the additional 2012 price increase – raising the total increase for the year to 10% – would materially impact Acthar ordering levels, due to the control Mallinckrodt held over Acthar and the substantial assistance of the Express Scripts Entities in ensuring that Acthar was prescribed, and paid for, at the ever-increasing price levels.

193.    Furthermore, the parties jointly agreed to conceal their joint agreement, keeping their awareness of and involvement in the price increase on a "need to know" basis within their respective organizations.

194.    However, before the parties could finalize their agreement to raise the Acthar price by an additional 5% for 2012, a problem arose.  On September 19, 2012, health insurer Aetna, a competitor of Cigna, announced that it would cut back reimbursements for Acthar, due to the lack of evidence of Acthar efficacy for various disease states among other reasons.

195.    Questcor's stock (as opposed to Mallinckrodt at the time) declined 56% the same day as the Aetna announcement.  Within a week, Questcor's stock fell another 37%.

196.    Mallinckrodt and Express Scripts then jointly agreed to place the intended price increase "on hold for now", due to the Aetna situation.

197.    This price increase was later taken by Mallinckrodt and Express Scripts on June 7, 2013, when the Acthar WAC was increased 5% to $30,120.00 and the Acthar AWP was

46

increased 5% to $37,650.

198.   In 2014, Mallinckrodt and Express Scripts resumed their aggressive price increase strategy, just prior to Mallinckrodt plc's $5.9 billion acquisition of Questcor.  But they continued to conceal the truth, lying to the public about the real reasons for the exorbitant price increases.

199.   On January 16, 2014, the Acthar WAC and AWP were raised 5%, to $31,626 and $39,532.50, respectively.

200.   Prior to Questcor's acquisition by Mallinckrodt plc in 2014, Questcor had planned an additional 5% increase for Acthar in December 2014.  This would have meant a total percentage increase of 10% for the year.

201.   However, after the acquisition, Mallinckrodt raised the planned increase to 8.9%, or 13.5% for the year.

202.   On December 14, 2014, Mallinckrodt notified Express Scripts of the impending 8.9% price increase.

203.   In the interim, the Executive Committee ("EC") of Mallinckrodt met.  The EC consists of the senior management of Mallinckrodt, including President and CEO Mark Trudeau and Executive Vice President and Chief Commercial Officer Hugh O'Neill.

204.   COO O'Neill raised the matter of the 8.9% price increase with the EC on Friday December 12, 2014, and it was decided by the Mallinckrodt leadership team to "change[] the magnitude" of the pricing action, reducing the proposed increase from 8.9% to 2%. The EC did this in order to take advantage of an "opportunity for breakthrough pricing strategies" in the future.

205.   It is believed and therefore averred that such pricing opportunity was presented by the Synacthen acquisition.

47

206.    As described more fully below, under the section titled the "Mallinckrodt Synacthen Acquisition", Mallinckrodt completed its acquisition of Synacthen in 2013.

207.    As a result of such Synacthen acquisition, and the existing express agreements and implied understandings with the Express Scripts Entities that Synacthen would not be brought to market to threaten the established Acthar inflated prices, Mallinckrodt was confident that reducing the planned 8.9% Acthar price increase in late 2014 to little more than the consumer price index [which stood at about 1.7% in 2014] -- causing a $26 million shortfall in the forecasted revenues [based on the 5% increase that was "baked in" for December] -- would not negatively affect the company moving forward.  This decision, while ostensibly made against Mallinckrodt's economic self-interest, was made to further enhance the profits of all Defendants in the long run.

208.    Accordingly, with the direct input and hands-on decision-making by President and CEO Trudeau, Mallinckrodt reduced its December 2014 Acthar price increase to 2%.  This led to a WAC increase to $32,260.00 and an AWP increase to $40,325.00, respectively, on December 16, 2014.

209.    Due to its already announced intention to effectuate an 8.9% price increase, Mallinckrodt had to correct its prior notice to Express Scripts.  However, Express Scripts agreed with both decisions, even though the lower price increase was far better for Express Scripts' direct customers and indirect purchasers, like Plaintiff, than the announced 8.9% price increase.

210.    Mallinckrodt then notified the other Express Scripts Entities, as well as the pricing compendia that published its AWP for Acthar, of the new price increase.

211.    Under Mallinckrodt plc's stewardship, the AWP of Acthar continued to rise in to well above $40,000, while Plaintiff was paying for it.

48

212.    Remarkably, Mallinckrodt's CEO, Mark Trudeau, deliberately lied to the public in a press release, directly responding to Rockford's claims against the Defendants.  He willfully misrepresented that "[t]he current 'list price' per vial for the drug is $36,382, not the higher numbers which have appeared in various reports, and Mallinckrodt discounts this list price to both public and private payers."  *See* Mallinckrodt's June 29, 2018 Press Release H.P. Acthar® Gel Value to Patients attached hereto as Exhibit "C".

213.    The price paid by "private payers" like Plaintiff is the AWP.  As set forth above, that price has been in excess of $40,000 since 2014.  Mallinckrodt does not "discount" that price to Plaintiff, or any other private payer, as claimed.

214.    If Mr. Trudeau was actually representing that the WAC for Acthar was $36,382 as of June 2018, which is not the end payer price paid by private payers like Plaintiff, then the AWP paid by private payers was actually a staggering $45,477.50, based on the historical 25% markup Mallinckrodt has employed for its Acthar AWPs!

215.    Since the acquisition of Acthar in 2001, the end payor price of Acthar has grown over 100,000% reflecting the precipitous rise in the value of the Acthar assets from $100,000 in 2001 to $5.9 billion in 2014 – a 5,899,900% increase in value. Mallinckrodt has continued to deceive payors like Plaintiff and the public about the actual prices of Acthar, and the reasons for its many price increases.

216.    In fact, in direct response to a lawsuit filed against Mallinckrodt in April 2017 by the City of Rockford, Illinois, Mallinckrodt issued a public statement, claiming to "set the record straight" about Acthar pricing and other issues.  *See* Mallinckrodt's June 29, 2018 Press Release H.P. Acthar® Gel Value to Patients attached hereto as Exhibit "C".  This Press Release is replete with misrepresentations and deliberate falsehoods that only continues to deceive the public about

49

Acthar pricing and the actual reasons for the high Acthar prices.

217.    Defendants named herein all conspired and agreed to conduct a fraudulent scheme and conspiracy to deliberately inflate the AWPs for Acthar and to maintain such high AWPs for Acthar in the face of complaints by patients and payors, like Plaintiff.  As Defendants well know, the AWP is used by government and private assistance programs for prescription drug reimbursement.

218.    Government and private assistance programs have used the AWPs published in pharmaceutical industry publications, such as the Red Book and Medispan, for years as a basis for reimbursement, in whole or in part.

219.    These publications set forth the AWP for Acthar.  However, in periodically announcing the AWPs for Acthar, the publications simply published the prices that were supplied to them by the Mallinckrodt, as agreed to by Express Scripts.  These Defendants knew that they could, and did directly, control and raise the AWP for Acthar at any time simply by forwarding to the pricing compendia a new and higher AWP.

220.    This scheme allowed the Defendants to control, as part of their sales, marketing and distribution strategies, their respective profit levels by the direct manipulation of the Acthar AWP.

221.    Years before Defendants engaged in their scheme to increase their profits, in 2003, the Office of Inspector General ("OIG") admonished, "[i]f a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated."  *In re Pharm. Ind. Average Wholesale Price Litig*., 491 F.Supp. 2d 20, 39-44 (D. Mass. 2007). Ironically, this published decision appeared the same month that Mallinckrodt and Express

Scripts signed their first of many conspiratorial agreements to manipulate the AWP for Acthar.

### The Views of Express Scripts' Chief Medical Officer, Dr. Steve Miller, on Express Scripts' Market Power

222.    Beginning in 2007, Express Scripts became the exclusive agent of Mallinckrodt for the distribution of Acthar.  When Mallinckrodt chose to increase the price of this 50-plus year-old medication, Express Scripts did not push back.  Instead, when confronted with the 2007 price increase, Express Scripts' Chief Medical Officer Steve Miller stated that "[t]he increase was a manufacturing decision.  I can't comment on it."[11]

223.    The circumstances of this case demonstrate why Dr. Miller chose to stay silent in the face of Express Scripts' decision to join Mallinckrodt in overcharging payors for Acthar.

224.    Express Scripts' Director of Network Audit in Supply Chain, Greg Blaies, has stated under oath that "Express Scripts' mission is to make prescription drugs safer and more affordable for its clients and their members.  Express Scripts provides value to its client health plans by reducing waste and inefficiency in prescription drug spend."

225.    However, in the case of Acthar, Express Scripts did the opposite: it conspired and agreed with the manufacturer of Acthar to raise the prices of Acthar, to the substantial detriment of its clients, and other third-party payors, like Plaintiff, who pay for the Acthar supplied by Express Scripts directly to its members.

226.    By the time Plaintiff's beneficiaries were prescribed Acthar in 2016, Express Scripts was handling each and every aspect of Acthar distribution through the above-described functions.  CuraScript was the exclusive specialty pharmaceutical distributor, Accredo was the specialty pharmacy provider, and UBC coordinated both the product and money flows through the ASAP Program.  As Mallinckrodt's exclusive agent, Express Scripts had no interest in

---

[11] *Freudenheim*, *supra*.

lowering the price for Acthar because it was making money off all aspects of its exclusive arrangement with the manufacturer.  Together, Express Scripts and Mallinckrodt were able to realize greater profits at the expense of payors, like Plaintiff.

227.     On May 19, 2017, just weeks after Mallinckrodt and Express Scripts had been sued by the City of Rockford in early April 2017 for, inter alia, price fixing, Express Scripts senior officers made comments about the "somewhat controversial" drug Acthar on a private investor conference call hosted by Citi.[12]  The Citi interviewer stated, "it's been in the news as – given the pricing around the drug over the past – I don't know – 12 months at least," and then asked for "any thoughts around … how that can be managed and how you see cost of the playing out?"  Citi Transcript at 12.

228.     In response, Express Scripts' Senior Vice President, Supply Chain and Specialty Pharma, Everett Neville stated:

> I don't think [Acthar is] a very great [drug] – *it's a pretty poor drug with a very limited need* and certainly [Express Scripts Chief Medical Officer, Dr,] Steve [Miller] could comment.  He's a doctor and I'm just a really bad pharmacist.

> …[Y]ou know, and Steve, you could chime in here too, but I think Steve and I both would agree, and *I think everybody in our company would agree, that the product is vastly overpriced for the value.  We don't set the price.*  We've told [Mallinckrodt] that.  I personally told [Mallinckrodt's] management team that their drug is hugely overpriced.  I know Steve has as well.

Citi Transcript at 12 (emphasis added) (brackets added).

229.     Many of these statements were false, misleading and deceptive when made.  They were made willfully, in order to deceive the public and payors, like Plaintiff, who were paying

---

[12] *See* Conference Call Transcript of call hosted by the Citigroup Healthcare Team on May 19, 2017 at 11:00a.m. est, with Dr. Steve Miller, Chief Medical Officer from Express Scripts, and Mr. Everett Neville, Senior Vice President of Supply Chain and Specialty ("Citi Transcript").

the "vastly overpriced", inflated AWPs for Acthar, as set by both Mallinckrodt and Express Scripts under exclusive agreements concealed from the public through confidentiality provisions in the agreements.

230.    What was true is that Acthar had a "very limited need".  But Express Scripts did nothing to limit the prescription approval (through Accredo), the distribution (through CuraScript), or the coordination of payment (through UBC) for Acthar, because it was making money off the monopoly profits realized by the "vastly overpriced" Acthar sales.

231.    Mr. Neville also made deliberate, willful misrepresentations about the roles of CuraScript and UBC in the maintenance of Mallinckrodt's monopoly and price fixing schemes.

232.    As for UBC, while he admitted that Express Scripts "interacts" with Acthar through UBC, he claimed that UBC only "does pharma services [like] running the patient assistance program, pre-screening drug program [t]hat is for patients that meet a need-based criterion for poverty."  Citi Transcript at 12 (brackets added).  Clearly, as set forth above, UBC does much more in its central role as the hub of the Express Scripts/Mallinckrodt relationship and the sole operator of the ASAP.

233.    As for CuraScript, while Mr. Neville admitted that Express Scripts "interacts" with Acthar through CuraScript, he sought to deliberately conceal the exclusive distribution arrangement, claiming "[w]e wholesale the drug, ie., we sell it to physicians, for office use, which is where most of this [Acthar] is used.  We don't control the criteria whether the drug is used or not used or paid or what [is] paid.  We merely serve the same role that an ABC [AmerisourceBergen] or a Cardinal or McKesson would in supplying a product with a very minimal markup to a physician.  That's it." Citi Transcript at 12 (brackets added).

234.    Cleary, as set forth above, CuraScript does much more as the exclusive distributor

of Acthar for Mallinckrodt, shipping the drug directly to patients, not their doctors, and charging the patients and their third-party payors, not the doctors, for the drug. CuraScript also applies more than a "minimal markup" to Acthar's price charged to third party payors, like Plaintiff.

235.    Finally, Mr. Everett sought to willfully deceive the public and consumers of Acthar by stating, "[t]his is a drug that has very little impact in our company." Citi Transcript at 12. In conspiring and agreeing with Mallinckrodt to raise and fix the AWP-based prices of Acthar to exorbitant, anticompetitive levels, and in conspiring and agreeing with Mallinckrodt to keep Synacthen off the market to maintain and enhance Mallinckrodt's monopoly, Express Scripts worked to protect its share of the Acthar monopoly profits, the loss of which would have had a huge "impact" on the Express Scripts Entities.

236.    On the same conference call, Dr. Miller stated that he was in "100% agreement with [Mr.](Everett)." Citi Transcript at 12 (brackets added). Then, he added, "[i]f you look at the data, the indications for the drug are really – while it had, in the compendium, it's listed under a lot of indications, its real use should be very, very limited. It's an old drug. There's better products in the marketplace and so we're going to continue to be very vigilant in our utilization management." Citi Transcript at 12-13.

237.    One of the areas where Acthar should be limited is the treatment of rheumatoid arthritis.

238.    Despite this express acknowledgment by Express Scripts' Chief Medical Officer, in the weeks and months following Mallinckrodt's settlement with the FTC, Express Scripts did not act to contain costs, to limit prescriptions of Acthar where it has not been shown to be effective, or to provide a reasonable alternative for Acthar, such as the Synacthen Depot owned by Mallinckrodt.

239.    Indeed, it was not until December 21, 2017 that Express Scripts provided an updated "Prior Authorization Policy" for Acthar, effective January 2018 (hereinafter "2018 Prior Authorization Policy") – far too late to save payors like Plaintiff from the exorbitant overcharges it has suffered since 2016 as a result of the unfair and deceptive scheme and conspiracy between Mallinckrodt and Express Scripts, with the substantial assistance of KOLs.

240.    The 2018 Prior Authorization Policy now admits that Acthar "may be used for … rheumatic disorders as an adjunctive therapy for short-term administration for an acute episode or exacerbation (in sporiatic arthritis, rheumatoid arthritis, juvenile rheumatoid arthritis [selected cases may require low-dose maintenance therapy]…".

241.    The adult beneficiaries of Plaintiff have been prescribed Acthar for years, and not in low-dose form.

242.    It is believed and therefore averred in his role as Express Scripts' Chief Medical Officer, Dr. Miller reviewed and approved of the updated 2018 Prior Authorization Policy.

243.    In that update, Express Scripts finally, affirmatively admitted all the following facts about Acthar:

    a.   "Initial approval of Acthar in the US was in 1952.  At that time, original **approval only required** that the medication was safe for human use."  2018 Prior Authorization Policy at 4 (emphasis supplied)

    b.   "The recommended authorization criteria address the use of Acthar in infantile spasms and MS exacerbations in adults.  Regarding Acthar's other uses, **data and guidelines do not suggest** that Acthar has a substantial role in therapy.  Further data are needed before use in other areas can be recommended."  *Id*. (emphasis supplied)(brackets added).

    c.   In its "Policy Statement", Express Scripts stated, "[p]rior authorization is recommended for prescription benefit coverage of Acthar.  The recommended authorization criteria address the use of Acthar in infantile spasms and MS exacerbations in adults."  But even as to these limited indications, "[a]ll approvals are provided for one month in duration, where 1 month is equal to 30 days, unless otherwise noted below."  *Id*. at 5.

244.   It is significant that Express Scripts only made these factual admissions about the

lack of efficacy of Acthar for the long-term treatment of rheumatoid arthritis and other diseases

after it lost the exclusive distribution rights to Acthar in late 2017, after it was sued by the City of

Rockford.

245.   Dr. Miller, Express Scripts Chief Medical Officer, has articulated the power of

Express Scripts in the prescription drug marketplace to extract lower prices for its customers,

using its tremendous buying power and influence.  He has made all of the following public

comments:

> "When I joined the company, we represented 12 million members.  We're
> at 85 million today.  That gives us extraordinary sway in the marketplace.
> If you think about any other aspect of health care, no one else has that
> many lives that they can represent."[13]
>
> "We have tremendous scale, which allows us to get the best deals for our
> plan sponsors from both the pharmaceutical manufacturers and also the
> pharmacies.  If any pharmacy chain ever becomes too large, we're able to
> move our patients and … get the lowest cost."[14]
>
> "I think that because of the continued escalation of cost, you need a PBM
> now more than ever.  And what a best-in-class PBM like Express Scripts
> does really ensure is great health outcomes and more affordable costs."[15]

---

[13] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

[14] *Business Insurance*, "Q&A: Dr. Steve Miller, Express Scripts Holding Co.," by Shelby Livingston, May 22, 2016, http://www.businessinsurance.com/article/00010101/STORY/305229991/Q&A-Dr-Steve-Miller,-Express-Scripts-Holding-Co

[15] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

"Pharma has shown that they feel very emboldened with their pricing power.  We're using our clout in the marketplace to really tamp these down for our clients."[16]

"There are pharma companies that recognize this is in their best interest," he says.  "They, like us, want to get to a sustainable marketplace.  They know if they're overcharging for drugs that have very little efficacy, that puts them in a competitive disadvantage."[17]

"Discussions to control costs have never been more important, as recent estimates put global drug spend at $1.5 trillion by 2021, according to data from Quintiles IMS Holding.  Yet sometimes, in the drug pricing debate, blame is placed on one part of the drug distribution system when, in fact, all of us – pharmaceutical companies, pharmacy benefit managers (PBMs), policymakers and payers – have a role to play in achieving better affordability and accessibility for medicine.  As the largest PBM, our job is to make sure our patients, and our clients who provide them a pharmacy benefit, are getting medicines at the lowest net cost while working with our industry partners to make that possible."[18]

"…[I]t is incumbent upon the pharmacy benefits managers to more forcefully illustrate the critical role we play in making medicine more affordable and accessible.  For example, we partnered with a drug maker who was willing to lower the price of its hepatitis C drug.  In doing so, we were able to provide 50,000 patients affordable access to this medication."[19]
"The biggest problem is not new expensive drugs but repricing old ones, and not just ones being purchased by Martin Shkreli or Valeant. 'You

---

[16] *Nightly Business Report*, "Express Scripts Looks to Limit Drug Price Increases," by Meg Tirrell, October 2, 2015, http://nbr.com/2015/10/07/express-scripts-looks-to-limit-drug-price-increases/
[17] *Medical Marketing and Media*, "Express Scripts' Steve Miller Takes on Drug Industry in Pricing Battle," by Jaimy Lee, February 1, 2015, http://www.mmm-online.com/payersmanaged-markets/express-scripts-steve-miller-takes-on-drug-industry-in-pricing-battle/article/460559/

[18] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017,
http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110550.html

[19] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017,
http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110550.html

have no new research.  You have no innovation.  You have nothing but increased drug prices."[20]

"We are constantly trying to be vigilant and chase the bad actors out of the marketplace."[21]

246.    Through such statements, Express Scripts acknowledged its strong influence on pharmaceutical markets.  The striking feature of the current circumstance is that Express Scripts has not asserted its influence to effectuate lower prices for Acthar or to prevent Mallinckrodt's unfair and deceptive marketing and sales tactics with providers and patients, through the ASAP and otherwise.

247.    While acknowledging the lack of "value" of the medication does not warrant its high prices, Express Scripts has facilitated, rather than forestalled, Mallinckrodt's desire for ever growing profits by "repricing" an "old drug".

248.    Ironically, just one month after Express Scripts was sued by the City of Rockford in April 2017 for antitrust, Dr. Miller appeared on CNBC's program "Squawk Box".  On May 31, 2017, Dr. Miller stated, "when there's competition in the marketplace, we [Express Scripts] do a great job of holding down prices.  When we have competition in the marketplace, we are able to play them [the drug companies] off against each other."[22]

249.    On the same program, in direct response to a line of questioning about the increased pricing of Mylan's Epipen, Dr. Miller further stated as to Epipen:

---

[20] *Forbes, Pharma & Healthcare*, "Solving Pharma's Shkreli Problem," by Matthew Herper, January 20, 2016, https://www.forbes.com/sites/matthewherper/2016/01/20/solving-pharmas-shkreli-problem/#6dcce78c6be3

[21] The New York Times, "Specialty Pharmacies Say Benefit Managers Are Squeezing Them Out," by Katie Thomas, January 9, 2017, https://www.nytimes.com/2017/01/09/business/specialty-pharmacies-say-benefit-managers-are-squeezing-them-out.html

[22] https://www.cnbc.com/video/2017/05/31/competition-is-key-to-contain-drug-prices-dr-steve-miller.html

It's a 100-year-old drug in a 20-year-old pen that used to be $95 for a two-pack. Over the course of several years, they raised the price to $600. So, only one company controls that, that's the manufacturer.

So, what really works is when we [Express Scripts] can move market share, we can bring prices down. You guys saw this in Hepititis C. When we got competition into the marketplace, the market worked. We brought the price of Hepititis C down by over 50%. It's actually cheaper in the United States then it is in Europe. So, that's when the market really is working.

250.    The situation described by Dr. Miller about Epipen is similar to Acthar in that one drug manufacturer "controlled" the product. However, with Acthar, unlike Epipen, the manufacturer went to the largest payor representative, Express Scripts, conspired and agreed to preclude competition in the marketplace, to maintain and enhance monopoly power and to continue to fix and raise prices without issue.

251.    In an article published by Forbes Magazine on February 8, 2016, titled "Solving Pharma's Shkreli Problem", Dr. Miller was presented with the problem of "repricing" old drugs, like Acthar and "the ones being purchased by Martin Shkreli or Valeant", including Turing's Daraprim. He responded, "[y]ou have no research. You have no innovation. You have nothing but increased drug prices." What Dr. Miller failed to acknowledge publically is that the increased prices of Acthar were caused due in large part to Express Scripts' decision to withhold its power to effectuate lower prices for Acthar by its exclusive agreements with Mallinckrodt to set the prices of Acthar at exorbitant levels.

**THE MALLINCKRODT SYNACTHEN ACQUISITION ALLOWS IT TO EXPEND ITS UNFAIR AND DECEPTIVE SCHEME TO PROMOTE ACTHAR USE**

252.    Since 2007, Acthar has provided the vast majority of Mallinckrodt's revenue. Acthar was so important to Questcor that its then-CEO, Don Bailey announced publicly on

multiple occasions that Questcor "is basically a single product company."[23]

253.    Through its exorbitant price increases, Mallinckrodt was able to grow its revenue from Acthar sales from less that $1 million in 2001 to $798.9 million in 2013.  Much of this increase occurred between 2011 and 2013 when Mallinckrodt's revenues increased $218.2 million to $798.9 million.

254.    However, by 2013, Mallinckrodt had identified a competitive threat.  Novartis AG ("Novartis") had developed Synacthen Depot (cosyntropin depot) ("Synacthen"), a synthetically derived ACTH medication, which, like Acthar, could be injected intra-muscularly.  While it was used outside the United States, it was not yet approved by the FDA for use in the United States. Recognizing that the entry of Synacthen in the U.S. market for ACTH drugs would threaten its exercise of its power over Acthar patients and payors, Mallinckrodt first attempted to buy the rights to Synacthen in 2009.  It failed.

255.    As of 2013, Novartis agreed to sell Synacthen to Retrophin, Inc., which at the time was helmed by Mr. Shkreli.  Mr. Shkreli founded Turing (the maker of Daraprim) after he departed Retrophin.

256.    When faced with a competitive threat to its monopoly, Mallinckrodt disrupted the bidding process for Synacthen by intervening at the last minute to pay multiple times what had been offered by three competitors, including Retrophin.  Retrophin had agreed to buy Synacthen for $16 million.  Upon learning of this imminent threat, Mallinckrodt acted to protect and enhance its monopoly power by licensing Synacthen for a minimum of $135 million from Novartis. It licensed the U.S. exclusive rights to Synacthen from Novartis, not to bring this

---

[23] Exhibit 99.1 to Questcor form 8-K, Aug. 11, 2011 Canaccord Genuity Conference Transcript at 1; *see also* UBS Investment Bank's Global Life Sciences Conference, Sept. 19, 2011, Transcript at 2 (wherein CEO Bailey stated "Questcor is a single-product company" and affirmed "this presentation was filed with the SEC on [September] 9th").

viable synthetic alternative to Acthar to market, but to eliminate the nascent competitive threat posed by an independently owned Synacthen.

257.    Acquiring Synacthen allowed Mallinckrodt to maintain its unfair and deceptive scheme with Acthar by removing a competitive threat from the marketplace.  The Synacthen acquisition allowed Mallinckrodt to continue to raise prices for Acthar, which it did, and to promote it for broader use through KOLs.

258.    From 2013 through 2017, Mallinckrodt raised the price of Acthar from $36,144 to $43,658.

259.    But Mallinckrodt could not have gotten away with increasing Acthar prices without the express written consent of Express Scripts, as required by the parties' contracts. Accordingly, Express Scripts had to agree with Mallinckrodt to allow it to not bring Synacthen to market.

260.    While the details of this consent are not yet known, and can only be discovered by Plaintiff through discovery in this case, this much is known.

261.    As the largest PBM in America, and the exclusive distributor of Acthar for Mallinckrodt, Express Scripts knew that Mallinckrodt had acquired Synacthen Depot from Novartis.  It is believed and therefore averred that Express Scripts also knew at the time of the Synacthen acquisition that there were other bidders for Synacthen, who were expecting to bring the product to market to directly compete with Acthar.

262.    Certainly, after Retrophin sued Mallinckrodt in January 2014, which lawsuit is discussed below, these facts were known to Express Scripts.  And yet, Express Scripts did nothing to force Mallinckrodt to bring Synacthen to market to compete with Acthar to lower Acthar prices for the benefit of its direct-purchasing customers, like Rockford, and indirect

purchasing customers, like Plaintiff.

263.   Instead, Express Scripts continued its unlawful conspiracy and agreements with

Mallinckrodt to maintain inflated prices for Acthar, unchallenged by Synacthen competition.

### THE ACTHAR "MARKETING SCHEME".

**As Part of its "New Strategy", Mallinckrodt Creates a Team of Highly-Trained "Medical
Sciences Liaisons" to Promote the Sale of Acthar at High Prices Through a Campaign of
Misrepresentations and Deception in Conjunction with KOLs.**

264.   As part of the new strategy in 2007, Mallinckrodt created a new position within

the company: "Medical Science Liaison" or "MSL" were highly trained sales employees who

were deployed to speak directly to doctors about the safety and efficacy of Acthar for

unapproved uses and doses.

265.   Mallinckrodt also employed MSLs to provide periodic training to employees of

UBC.

266.    Such training included information about Acthar's approval uses and doses, as

well as its purported safety and efficacy for unapproved uses and doses based upon

Mallinckrodt-sponsored "open label" clinical studies, usually conducted by Mallinckrodt-paid

KOLs.

267.   In the *Strunck & Pratta* Complaint, they detail the important role the new MSLs

played in the Mallinckrodt and UBC schemes alleged.  Specifically, the allege:

> Another tactic employed by Questcor to promote H.P. Acthar Gel off-label
> is to use its Medical Science Liaisons ("MSLs") as an end-run around
> sales representatives' duty to lawfully promote the drug.  Questcor's use
> of MSLs in this manner is a way for the company to make the unlawful
> promotional activities for H.P. Acthar Gel appear lawful. *See e.g.* 21
> C.F.R. 99.101. et seq.
>
> Medical Science Liaisons are supposed to talk with physicians only about
> science-to-science issues, and only when those discussions are initiated by
> the physician.  Their primary role is to engage in non-promotional medical

activities, and they are not supposed to engage in product promotion. Thus, a sales representative is not permitted to use an MSL as a conduit through which to initiate and pursue off-label promotion activities with physicians.

The law notwithstanding, Questcor erects no wall between its medical and sales staffs, and actively encourages its MSLs to probatively participate in promotional activities. Medical Science Liaisons routinely accompany Questcor sales representatives on their sales calls.

Questcor encourages its sales representatives to probatively partner with MSLs to increase H.P. Acthar Sales growth. Commonly, the sales representative will initiate an off-label discussion, and then the MSL will complete the discussion. On other occasions, sales representatives ask their MSL colleagues to contact physicians who are reluctant to prescribe H.P. Acthar Gel for off-label uses in order to attempt to overcome that reluctance whether or not the physician initiated the off-label discussion or requested further information. Again, Questcor ignores that MSLs are not permitted to engage in promotional activities.

*Strunck & Pratta* Complaint at ¶¶ 142-145.

268.     The Relators then proceed to explain the critical role of these MSLs in promoting the off-label use of Acthar.

**Mallinckrodt Uses KOLs to Create Biased Clinical Data to Deceive Patients and TPPs, and to Cultivate High Acthar Prescribers as "Spokes-Doctors".**

269.     In view of the extremely limited clinical data that existed at the time of Acthar's approval in 1952, and since that time, Mallinckrodt has been forced to try to create data to support its false and misleading marketing effort about Acthar's "value" to treat disease beyond the narrow indications on its label.

270.     Mallinckrodt cultivated so-called "Key Opinion Leaders" or "KOL's" create such data, and then disseminated such data to other doctors through their highly-compensated spokes-doctors.

271.    As ProPublica has reported, and as demonstrated below by a few examples, dozens of high prescribers of Acthar have been cultivated as spokes-doctors and paid tens of thousands of dollars for their work on behalf of Mallinckrodt in this regard.

272.    These KOLs are paid by Mallinckrodt to cultivate a narrow group of high prescribers of Acthar, some of whom are also engaged by Mallinckrodt to generate clinical data based on their own patient populations to support Acthar's off-label uses and doses, without FDA oversight, input or scrutiny.  The company then widely disseminates the results of such anecdotal studies as part of its vast marketing campaign to convince doctors that Acthar is safe and effective for unapproved uses.

273.    As similarly alleged in the opioid litigation, in which Mallinckrodt has been sued as a defendant in MDL 2804 (pending in an Ohio Federal District Court) and in state courts throughout the country, including Pennsylvania, Mallinckrodt cultivated a select circle of doctors who were chosen and sponsored for their pro-Acthar messages in order to create "the grave misperception science and legitimate medical professionals favored the wider and broader use" of Acthar.  These KOLs were used to present the appearance that unbiased and reliable medical research supporting the broad use of Acthar for neurology, nephrology and rheumatology had been conducted and was being reported on by independent professionals.  *See In re: National Prescription Opiate Litigation*, Case No. 1:17-md-02804-DAP, N.D.Ohio, Doc. No. 1025 (Report and Recommendation dated October 5, 2018) at 6-7.

274.    The publications of many of these physicians, including those of Dr. James A. Tumlin of Tennessee described below, were funded by Mallinckrodt as they supported the position that Acthar for broad use in neurology, nephrology and rheumatology was appropriate, all the while knowing these statements were false, misleading and deceptive.

64

275.     Mallinckrodt utilized KOLs, like Dr. Tumlin, to develop "open label" clinical data to support Mallinckrodt's promotion of Acthar for new indications in nephrology, neurology and rheumatology.

276.     "Open label" clinical trials, unlike the FDA-approved trials described above, do not attempt to disguise the drug being studied, meaning that no standard treatment or placebo is utilized.  This leans towards bias, as both the patient and the physician are aware of which groups are receiving what type of treatment.  The results are thus unreliable.

277.     In NS, for instance, Mallinckrodt was aware as early as 2009 that doctors were nearly unanimous in their expression of a need for clinical data to support the efficiency and safety of Acthar in NS, as well as the need for clarification on the appropriate dosing regimen. Working with KOLs who expressed interest in generating such data became a major focus for Mallinckrodt MSLs in 2009 and beyond.

**JAMA Study of Mallinckrodt KOLs, and Connection Between Kickbacks Payments and Higher Acthar Prescriptions.**

278.     In June of 2018, a team of researchers and concerned clinicians used Medicare and Medicaid data to investigate the frequency of use and overall expense of Acthar.  To characterize payments from Mallinckrodt to physicians who prescribe Acthar, these researchers and clinicians conducted a cross-sectional analysis of data from CMS, including the Medicare Part D Public Use Files.  Focusing on 2015, the researchers used the database to identify physicians, and their specialties, who prescribed Acthar more than 10 times that year, characterizing them as "frequent prescribers."

279.     Their study, published in JAMA Network Open, found that in 2015 only 300 providers wrote more than 10 prescriptions for Acthar.  Of those 300 prescribing providers of Acthar, 235 of them were rheumatologists, neurologists, or nephrologists.

280.     Further, among those 235 rheumatologists, nephrologists and neurologists who issued more than 10 prescriptions for Acthar in 2015, 88% (207/235) received payments from Mallinckrodt – with more than 20% of those frequent prescribers receiving more than $10,000 – despite Acthar's considerable cost and the dearth of evidence to support its use.

281.     Some physicians prescribing Acthar were paid as much as $56,000-$138,000 by Mallinckrodt for activities related to Acthar, making such payments equivalent to the salary of full-time employees of Mallinckrodt.

282.     Indeed, as noted by one of the researchers and clinicians in the JAMA study, Dr. Daniel M. Hartung, "[e]xpensive therapies with uncertain or insufficient evidence supporting their use should be particularly scrutinized."  He further noted that, "[t]he continued growth in corticotropin [Acthar] use is peculiar given its very high cost, widespread negative media coverage, and notable lack of evidence supporting its use over lower-cost synthetic corticosteroids. Our experience suggests aggressive marketing of the drug partly accounts for increasing use."

283.     The JAMA study also noted an association between providers who received higher compensation and their writing more Acthar prescriptions—and the Acthar prescriptions written by these frequent prescribers accounted for $200 million in Medicare spending during the period that the study examined.

284.     Indeed, this study also found that from 2011 to 2015, spending on Acthar increased ten-fold, totaling more than $1.3 billion for just several thousand Medicare patients. Upon information and belief, and given the continued marketing of Acthar by Mallinckrodt pursuant to the marketing scheme alleged by the Qui Tam Relators, those numbers have increased since 2015.

285.    The conclusion of the JAMA study was that most nephrologists, neurologists, and rheumatologists who frequently prescribe Acthar received Acthar-related payments from Mallinckrodt, suggesting that financial conflicts of interest may be driving the prescription and use of Acthar.  Indeed, as noted by Dr. Hartung, "we observed a positive association between the amount of money paid to these prescribers, their prescribing intensity, and corticotropin [Acthar] expenditures in the Medicare program with a return on investment for Mallinckrodt of about 5:1."

286.    Consistent with the JAMA study's conclusions, in October of 2014, Mallinckrodt had a briefing with its investors.   At that briefing, Dr. Gary Phillips, the Senior Vice President, and President of Mallinckrodt's Autoimmune and Rare Disease Business, pledged, "[t]he one thing that you can be sure of is that the awareness and the evidence of the product will just expand dramatically over the next year."

287.    Dr. Phillips presented PowerPoint slides detailing the company's strategy, including the need to get Acthar to its "underserved patient population" in rheumatology, pulmonology, ophthalmology, dermatology and kidney disease.

288.    One graphic showed 9,000 patients were currently being treated with Acthar and that 300,000 people had "addressable but currently untreated" conditions.  The slide also noted a total of 4 million Americans suffered from "Acthar indicated conditions."

289.    The aggressive marketing push outlined by Mallinckrodt executives in that October 2014 investor meeting appears to have paid off: Medicare spent more than $600 million on more than 12,000 Acthar claims in 2016 – more than double the numbers from 2013, the year before Mallinckrodt's purchase of Questcor.  Many of those prescriptions were made by rheumatologists, nephrologists, and neurologists – the very type of doctors Mallinckrodt

67

executives said they planned to target in October 2014 to capture the "underserved patient population."

290.     Few medical providers have come forth to blow the whistle on Mallinckrodt's tactics.  One brave doctor, Dr. Megan Clowse of the Duke University School of Medicine, wrote last year that "[w]e also know from personal experience that Acthar's manufacturer is actively looking for clinical researchers open to perform more, small, open-label, nonrandomized trials of their drugs."  In other words, even doctors not receptive to Mallinckrodt's marketing scheme are approached.  Discovery of Mallinckrodt's records will enable Plaintiff and the Class to ferret out the chaff from the wheat, the ethical doctors from the spokes-doctors.

291.     One such spokes-doctor, Dr. William Shaffer, a neurologist in Greeley, Colorado, was the highest prescriber of Acthar in 2012.  He wrote only 78 prescriptions for the drug, but the prescribed Acthar cost Medicare $4,000,000.

292.     Dr. Shaffer has been paid handsomely by Mallinckrodt for his loyalty to the company.  The very next year, Dr. Shaffer was rewarded by being engaged by Mallinckrodt to speak as a KOL on multiple occasions, in multiple places, as part of all-expense paid trips sponsored by the company.  For instance, he was flown to the east coast to conduct four speaking engagements with dozens of the doctors over the course of two days, January 24-25, 2013.  He spoke in Reston and Falls Church, Virginia, and then Bethesda, Maryland.

293.     But Dr. Shaffer was far from alone. He is just one of dozens of highly-compensated Mallinckrodt spokes-doctors, all important spokes in the wheel of Mallinckrodt's RICO conspiracy, as they are all connected to Mallinckrodt's self-described "HUB" and all profit as integral "spokes doctors" in Mallinckrodt's marketing and sales scheme.

294.     One such "spokes-doctor" in Maryland is Dr. Ruwani Gunawardane, a neurologist from Fulton, Maryland.  According to CNN, Dr. Gunawardane "received 502 payments worth $332,393.36 -- nearly half was compensation for services, about a third was honoraria, about a sixth was for travel and lodging, and the rest was for consulting, education and food and beverage. Gunawardane filed 38 claims resulting in $1,329,002.84 in Medicare coverage."24 Dr. Gunawardane declined to comment when confronted by CNN.  *Id.*

295.     According to ProPublica, Dr. Gunawardane has been paid a staggering $1,111,326 as a paid consultant to drug companies, $332,000 of which was paid by Mallinckrodt**.**  She is among the top eight largest prescribers of Acthar in the country, and is among the highest paid of Mallinckrodt's KOLs.

296.     Only discovery will reveal if Dr. Gunawardane has been paid more than a consulting fee, honoraria and travel expenses, such as whether she has been paid additional monies based on the Acthar sales generated by the other doctors with whom she has spoken on behalf of Mallinckrodt.  Such a "pyramid scheme" would perhaps explain how Dr. Gunawardane has been able to generate more than $100,000 a year working for Mallinckrodt as a KOL, in addition to maintaining a healthcare practice in Maryland.

**Leading "KOLs" are employed by Mallinckrodt in the Promotion of Acthar for the Treatment of "New" Indications, like Rheumatoid Arthritis**

297.     In order to effectuate their scheme and conspiracy fully, the corporate Defendants needed some help with the promotion of Acthar to physicians, especially in the medical fields where Acthar was not the preferred course of treatment.  Indeed, Acthar was not approved by the

---

24 https://www.cnn.com/2018/06/29/health/acthar-mallinckrodt-medicare-claims-doctor-payments/index.html

FDA for the long-term treatment of most diseases for which Acthar had a narrow indication from its 1952 label.  One such field was rheumatoid arthritis.

### Mallinckrodt targets rheumatic disorders as a potential new market to promote off-label sales of Acthar.

298.    Prior to 2011, Mallinckrodt had virtually no sales of Acthar for the treatment of rheumatic disorders, especially rheumatoid arthritis.  However, these numbers increased exponentially in the years that followed, largely due to Mallinckrodt's focused marketing effort, not any change in either the Acthar label or the demonstrated efficacy of the drug to treat rheumatic disease.

299.    As Express Scripts' 2018 Prior Authorization Policy acknowledged, "data and guidelines do not suggest that Acthar has a substantial role in therapy" for the treatment of disease beyond the approved indications.  Instead, Express Scripts found in late 2017, as the FDA found in 2010, that "[f]urther data are needed before use in other areas [beyond IS and MS] can be recommended."  *Id*. at 4 (brackets added).

300.    To overcome this lack of data to support the use of Acthar to treat " new indications" like rheumatoid arthritis, and to support its off label marketing and sale effort in rheumatology, Mallinckrodt engaged certain rheumatologists strategically situated throughout the country as "Key Opinion Leaders" or "KOLs".

301.    Mallinckrodt turned to KOLs initially to determine whether there was a viable potential market for Acthar with rheumatologists.

### Mallinckrodt engages KOLs for "white coat marketing" of Acthar to rheumatology

302.    This new marketing initiative into off-label promotion of Acthar for rheumatoid arthritis was made possible by the "success of the new Acthar pricing strategy" by which "significant funds [were] now available for the first time to support Acthar-related research" by

70

paying "KOLs to explore areas of mutual research interest."  Id.  In other words, the profits realized by the implementation of Defendant Lapointe's "new strategy" in 2007 made it possible for Mallinckrodt to pay doctors to serve as KOLs as part of the Mallinckrodt white coat marketing strategy into rheumatology, nephrology and other areas.

303.     The practice of "white coat marketing" was identified by the Office of Inspector General (OIG) of the federal government as a potential area of fraud and abuse as early as 1991. See, e.g., OIG Advisory Opinion No. 11-08, issued June 12, 2011, at 6 (citing 56 Fed. Reg. 35952, 35974 (July 29, 1991)).  As described in Advisory Opinion No. 11-08:

> The fraud and abuse risks are compounded where, as here, a physician or other health care professional is involved in the marketing activity – a practice sometimes referred to as "white coat" marketing.  White coat marketing is closely scrutinized under the anti-kickback statute because physicians and other health care professionals are in an exceptional position of public trust and thus may exert undue influence when recommending health care-related items or services – especially when marketing to their patients. *See,* e.g., 56 Fed. Reg. 35952, 35974 (July 29, 1991).  Given the nature of these relationships, when physicians or other health care professionals market items and services to their patients, patients may have difficulty distinguishing between professional medical advice and a commercial sales pitch.

304.     Mallinckrodt sought help in effectuating their scheme and conspiracy by seeking KOLs in the medical fields where Acthar was not the preferred course of treatment.  Indeed, Acthar was not approved by the FDA for the long-term treatment of any disease; instead, Acthar has had a narrow indication since 1952 for the treatment of only acute exacerbations of disease and flare-ups.

305.     In order to cultivate KOLs for its white coat marketing scheme, Mallinckrodt directed its sales force to make direct calls on rheumatologists to generate clinical data to support sustained use of Acthar for the treatment of rheumatic disease.

306.     Mallinckrodt then began "[w]orking with KOLs who have expressed interest in generating such data" to support the off-label use of Acthar to treat rheumatoid arthritis.  This became a "major focus" for Mallinckrodt after it acquired Questcor.

## THE QUI TAM WHISTLEBLOWER COMPLAINT AGAINST MALLINCRODT

307.     On April 30, 2019, CNN reported that the United States Department of Justice ("DOJ") had intervened in a false claims act action brought by two former employees of Mallinckrodt.

308.     The intervention actually took place the month before, on March 6, 2019, but the case was sealed at the time.  *See Plaintiff Under Seal v. Defendant Under Seal*, Civil Action No. 12-CV-0175-BMS, E.D.Pa., at Dkt. No. 55.  The government's decision to intervene, a relatively rare occurrence, was done after the government conducted its own extensive investigation of the claims by the former employees and concluded that the allegations are credible.

309.     The case, now known as U.S. ex. Rel. Charles Strunck and Lisa Pratta, was filed in 2012 by Charles Strunck, New York-based former Multiple Sclerosis ("MS") Sales Specialist for Questcor, and Lisa Pratta, a New Jersey-based Acthar neurology specialist for both Questcor and Mallinckrodt (collectively, the "Relators").  Strunck worked from September 2010 through August 2011, while Pratta worked from September 2010 through June 2017.

310.     As reported by CNN, and as averred in their Qui Tam Complaint, the Relators allege that Mallinckrodt has engaged in a long—standing scheme to bribe doctors to prescribe Acthar at the exorbitant, inflated prices detailed herein.  They claim there was a "culture" at Mallinckrodt designed to sell Acthar at all costs, from lying to the FDA to offering bribes to doctors.

311.    Importantly, Mallinckrodt has not denied the allegations.  Instead, Mallinckrodt claims the conduct alleged is a "legacy matter" involving Questcor and its conduct prior to Mallinckrodt's acquisition.

312.    However, Relator Pratta, who worked at both Questcor and Mallinckrodt after the 2014 acquisition, has alleged that the conduct continues at Mallinckrodt.

313.    In a conference call with investors held May 7, 2019, CEO Mark Trudeau publicly stated that the company has reserved for the settlement of the Relators' case and is actively pursuing settlement which he stated is "likely to resolve sooner than later".

314.    The conduct alleged by Relators involved kickbacks to doctors in the form of free Acthar, as well as active concealment by Mallinckrodt of the conduct for years.

315.    For this reason, Plaintiff did not know and could not have known about such unlawful conduct until the earliest date of April 30, 2019.  As a result, Plaintiff's claims stated herein premised upon the unlawful conduct revealed by the Relators' case are timely.

316.    Plaintiff had no way of knowing that Mallinckrodt was paying doctors in Maryland thousands of dollars to prescribe Acthar to their patients.

317.    The kickback scheme involved the promotion of Acthar to treat disease states for which Acthar was not the "gold standard", as in the case of IS, and for treatments that were not covered by the Acthar label.

318.    For instance, Acthar is approved to treat acute exacerbations of disease.  But the scheme uncovered by Relators involved widespread promotion of Acthar for the long-term treatment of disease.

319.    In the case of Plaintiff's beneficiaries, they have been prescribed Acthar for years to treat rheumatoid arthritis.  As a result of Mallinckrodt's promotional effort, instead of treating

73

Plaintiff's beneficiaries for acute exacerbations, or flare-ups, they have been treated with Acthar as maintenance medication with no hope for an end in sight.  Plaintiff is forced to pay hundreds of thousands of dollars each year for Acthar.

320.    The conduct revealed by the Relators goes to the manner in which Mallinckrodt was able to convince doctors to prescribe the high-priced Acthar, after the Defendant' conspired and agreed to raise the prices and maintain the prices at artificial levels.  The conduct involved systematically promoting and marketing Acthar for unapproved off-label uses, including the rheumatoid arthritis for which Plaintiff's beneficiaries have been prescribed Acthar.

321.    The scheme involved compensating sales representatives thousands of dollars to promote the sale of Acthar for unapproved uses and doses, to benefit Mallinckrodt and the sales reps.  Sales representatives have been paid tens of thousands of dollars for such promotional efforts.  As detailed in the Relators' complaint, one sales representative was paid a $124,000 bonus in the second quarter of 2011, including $75,000 for just one month.  Others received bonuses of $110,000 and $80,000 in the same period.

322.    The compensation of sales reps was directly tied to sales growth, a growth that was possible by expanding the approved uses for Acthar which had a narrow, limited market of patients.

323.    Mallinckrodt employed a team of "Medical Science Liaisons", like Sagar Shah, who were directed by Nikki Mutschler to join with sales specialists, like Strunck and Pratta to promote the sale of Acthar for unapproved uses.

324.    To hide the fact that the promotional effort was for unapproved, off-label uses, Mallinckrodt referred to such uses as "new indications."

74

325.    The sales of Acthar for these "new indications" became a primary focus for Mallinckrodt, as it strived to grow its revenue to the more than $1 billion in sales it achieves each year for Acthar alone.

326.    Mallinckrodt achieved such exponential growth, despite the price increases detailed herein, by providing valuable remunerations to doctors to induce and encourage them to prescribe Acthar for unapproved uses and doses.

327.    As the Relators' Complaint reveals, and as Plaintiff alleges herein, Mallinckrodt engaged in such conduct in violation of the Maryland laws by providing secret kickbacks to doctors throughout the country, including Maryland, to get them to prescribe Acthar at exorbitant prices, which Plaintiff has been forced to pay, and continues to pay to this day.  That is why Plaintiff's seek declaratory and injunctive relief against Mallinckrodt to end such practices.

## RELEVANT MARKETS, MARKET POWER AND
## THE FTC COMPLAINT AGAINST MALLINCKRODT

328.    On January 18, 2017, the Federal Trade Commission ("FTC") sued Mallinckrodt, alleging that Mallinckrodt exercised, and continues to exercise, monopoly power in the United States in the sale of Acthar.  See generally, Complaint for Injunctive Relief and Other Equitable Relief ("FTC Complaint") at Exhibit "D" hereto.

329.    The FTC alleged that such purchases "extinguished a nascent competitive threat to [Mallinckrodt's] monopoly."  FTC Complaint, ¶ 1.

330.    At all relevant times material to this case, Mallinckrodt possessed monopoly power—the ability to profitably raise price significantly above competitive levels without losing significant sales—in the relevant product market.  None of the vast price increases taken by Mallinckrodt between 2007 and the present have caused a significant loss of sales.  To the contrary, Mallinckrodt's sales have increased during that time.

331.     Mallinckrodt has repeatedly and profitably raised Acthar's price from the time it acquired the product for $100,000 in 2001 from Aventis to the present.  Mallinckrodt has been able to raise prices unchecked, as set forth above, and achieve corresponding revenue growth to more than $1 billion.

332.     Mallinckrodt has encountered no competitive constraints on its ability to repeatedly increase Acthar's price and, by extension, its revenue and profit margins. Mallinckrodt does not set the price of Acthar in reference to the price of any of the other drugs that are prescribed to treat the same indications that Acthar treats.  Acthar is priced significantly higher than non-ACTH drugs used to treat the same indications, except for IS.

333.     Indeed, one Mallinckrodt executive, Steve Cartt, commented that the price for Acthar "was chosen by looking at the prices of other specialty drugs and estimating how much insurers and employers would be willing to bear."  According to Cartt, Mallinckrodt took "some comfort that the strategy would work, and physicians would continue to use the drug, and payers would continue to pay."  In fact, according to Cartt, the "reality was better than expected."

334.     In its Annual Report on Form 10-K for the Fiscal Year ended December 31, 2007, Questcor illustrated the effect of its monopolization strategy on its "5 Year Cumulative Total Return", illustrating a 290% return between 2006 and 2007 as follows:



Comparison of 5 Year Cumulative Total Return*
Among Questcor Pharmaceuticals, Inc.,
the Amex Composite Index
and the Nasdaq Pharmaceutical Index

**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN\***
Among Questcor Pharmaceuticals, Inc., The AMEX Composite Index
And The NASDAQ Pharmaceutical Index



| | Cumulative Total Return* | | | | | |
|---|---|---|---|---|---|---|
| | 12/02 | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 |
| QUESTCOR PHARMACEUTICALS, INC. | 100.00 | 75.51 | 54.08 | 106.13 | 151.02 | 588.78 |
| AMEX COMPOSITE INDEX | 100.00 | 143.18 | 175.20 | 215.26 | 257.04 | 299.37 |
| NASDAQ PHARMACEUTICAL INDEX | 100.00 | 144.89 | 160.46 | 160.65 | 163.42 | 154.46 |

\*   $100 invested on 12/31/02 in stock or index-including reinvestment of dividends. Fiscal year ended December 31.

This stock performance graph shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

335.   FDA approval is required to market pharmaceuticals to U.S. consumers.  As a result, drugs sold outside of the United States are not viable competitive alternatives for U.S. consumers, even in the event of a significant price increase for ACTH drugs available in the United States.

336.   Acthar has a 100% share of the market for ACTH drugs in Maryland and throughout the United States.  No other ACTH drug is FDA-approved for therapeutic use.

337.   Former CEO Don Bailey claimed that one of the barriers to entry is the Acthar drug formulation.  While Acthar is a biologic extraction of porcine pituitaries, Bailey claimed, "[i]t's an undisclosed composition, so that's a trade secret."  He also claimed "[t]he manufacturing process is also a trade secret.  It's complex, it's unique, and we own all elements of the manufacturing process. …The composition of Acthar that comes out of the manufacturing process is tied to the process, so if you don't know the process you can't figure out what's actually in Acthar."

338.    Ironically, Mallinckrodt to this day does not fully understand the mechanism of action of Acthar for the treatment of the various diseases it promotes and sells Acthar to treat. Thus, its claims about Acthar benefits are not based in fact, but supposition.  The continued promotion of the use of Acthar for the long-term treatment of rheumatoid arthritis is false, misleading and deceptive under Maryland law.

### Mallinckrodt Engaged in Anticompetitive Conduct By Acquiring the Only Competitor Drug, Synacthen

339.    Synacthen posed a competitive threat to Acthar, so Mallinckrodt intervened at the time when other firms were attempting to acquire the U.S. rights to Synacthen from Novartis. Mallinckrodt submitted a bid that included substantially more guaranteed money than the other bidders had offered, effectively ending the bidding process.  By acquiring Synacthen, Mallinckrodt eliminated the possibility that another firm would develop it and compete against Acthar.

340.    At the time, Mallinckrodt stated publicly that it intended to bring Synacthen to market.  Such statements were false, misleading and deceptive as Mallinckrodt's true intentions were to shelve the product to allow Defendants to continue to profit from their scheme.

341.    When Mallinckrodt first decided to pursue an "orphan drug" (i.e., high) pricing model for Acthar, it recognized the potential threat Synacthen posed to Acthar's revenue growth.

342.    Nevertheless, in 2007, Mallinckrodt adopted and pursued the above-described "new strategy" envisioned and launched by Defendant LaPointe, consolidating Acthar distribution to just one distributor (CuraScript) and streamlining its control over sales and distribution through the implementation of ASAP (run by UBC).  These functions were consolidated in one significant company, Express Scripts.

343.    In 2009, Mallinckrodt approached Novartis about acquiring Synacthen.  At that time, Mallinckrodt continued to view Synacthen as a possible future competitor, especially given the increasing prices Mallinckrodt was commanding for Acthar.  Unsuccessful in that initial attempt, Mallinckrodt continued to monitor the competitive threat from Synacthen.

344.    Then in 2012, Mallinckrodt again concluded that Synacthen posed a more immediate threat to Acthar if Synacthen was approved for sale in the United States.

345.    By 2013, Mallinckrodt feared that if another company were to acquire Synacthen and obtain FDA approval, it could undermine its business model.

346.    On information and belief, as long as Mallinckrodt believed no other firm was seeking to bring Synacthen to the United States, Mallinckrodt did not make further attempts to acquire it.  Indeed, just months before Mallinckrodt began pursuing the acquisition of Synacthen, top Mallinckrodt officials questioned whether Synacthen would provide any affirmative value to Mallinckrodt.

**Other Bidders Planned to Use Synacthen to Challenge Acthar's Monopoly**

347.    Unbeknownst to Mallinckrodt at the time, Novartis decided in late 2011 to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States, along with the marketing rights for Synacthen in over thirty-five other countries where the drug was already approved and sold.  Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen.  Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

348.    It is alleged that each of the three firms planned to develop Synacthen for IS and to use Synacthen to compete directly with Acthar.  With this indication, each firm expected to capture a significant share of the U.S. ACTH market from Mallinckrodt by pricing Synacthen

below Acthar's prices.  Having the requisite pharmaceutical expertise and financing, the three firms independently conducted due diligence, crafted business plans and regulatory approval strategies, and took other affirmative steps in furtherance of developing Synacthen for the U.S. ACTH market.

### The Value of the Synacthen Assets

349.    The Synacthen assets and related rights provide a proven formulation for a long-acting, depot-injection drug containing synthetic ACTH.  The drug product manufactured using the Synacthen formulation has been safely and effectively used to treat patients suffering from IS and other conditions worldwide for decades.  The Synacthen assets would therefore facilitate commercializing a synthetic ACTH therapy in the United States.

350.    The asset package being sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug product and the manufacturing process.

351.    In possession of the Synacthen assets, a buyer would not need to create a synthetic ACTH drug formulation de novo, nor would it need to develop from scratch the manufacturing and testing protocols necessary for production of the drug product.

### Mallinckrodt Disrupted the Synacthen Bidding Process

352.    It is alleged that, on October of 2012, Mallinckrodt learned that at least one unidentified firm was attempting to acquire Synacthen from Novartis to develop it to compete with Mallinckrodt for the ACTH market.  Mallinckrodt immediately reached out to Novartis, signed a confidentiality agreement with Novartis, and submitted a confidential offer for the purchase of Synacthen.

353.    Novartis negotiated with the three alternative bidders in parallel with Mallinckrodt.  By the spring of 2013, all three of the alternative bidders had submitted offers for Synacthen, with plans to develop and launch Synacthen in the United States in direct competition with Acthar.  At the point where those negotiations left off, each company exchanged deal terms with Novartis and submitted formal offers.  The offers by the three alternative bidders were comparable in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. sales of Synacthen.

354.    Unlike the three alternative bidders, Mallinckrodt had only incomplete plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. Retrophin ultimately prevailed in the bidding war with a bid of $16 million.  This is because it never truly intended to bring Synacthen to market.

355.    However, on June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Mallinckrodt and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements").  By the Agreements, Mallinckrodt gained the exclusive rights to develop, market, and sell Synacthen in the United States and over thirty-five other countries.  Under the Agreements, Mallinckrodt is obligated to pay a minimum of $135 million, and likely will pay $300 million to Novartis for Synacthen.

356.    In other words, Mallinckrodt swept in at the eleventh hour to overpay—at least 8 times more than the market had determined—for the only immediate competitive threat to its monopoly for Acthar.  Despite paying this amount, they did not seek FDA approval to bring the product to market.

**The Lawsuit Between Retrophin and Mallinckrodt for Mallinckrodt's Antitrust Violations**

357.    In January 2014, Retrophin sued Questcor (n/k/a Mallinckrodt) for antitrust

violations in the United States Federal District Court for the Central District of California.  See

Retrophin, Inc., v. Questcor Pharmaceuticals, Inc., CV-14-00026-JLS (C.D.Cal) ("Retrophin

Complaint") (attached hereto at Exhibit "E"). (To the extent relevant to Plaintiff's Complaint, the

averments of antitrust conduct interposed by Retrophin are incorporated by reference herein).

358.    In the Retrophin Complaint, Retrophin claimed,

> "[i]n June of 2013, plaintiff Retrophin was poised to challenge Questcor's monopoly.  It had negotiated an agreement to purchase from Novartis AG ("Novartis"), the rights to sell in the US a product called Synacthen.  ...
>
> Retrophin planned to obtain FDA approval to sell Synacthen in the US and compete head to head against Questcor by dramatically undercutting Questcor's price for Acthar.  It had negotiated and was ready to sign an agreement to purchase the US rights to Synacthen from Novartis.  The signing was scheduled for June 11, 2013.  The signing of the agreement was so imminent that a press release had been prepared to announce the deal.
>
> On June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor swept in and acquired the rights to Synacthen.  In doing so, it preserved and entrenched its ACTH monopoly in US and eliminated the competitive threat posed by Retrophin's acquisition of Synacthen.  There was no procompetitive aspect of Questcor's acquisition of Synacthen.

Retrophin Complaint, ¶¶ 4-6, at Exhibit "E" hereto.

359.    The FTC agreed with Retrophin's assessment.

360.    The government, in its 2017 FTC complaint, mirrored Retrophin's 2014

allegations that Mallinckrodt engaged in anticompetitive conduct in violation of the antitrust

laws.

361.    Mallinckrodt chose to settle the Retrophin lawsuit for $15.5 million, slightly less

than the $16 million Retrophin bid to purchase Synacthen from Novartis.

**Mallinckrodt's Acquisition of Synacthen Was Unfair and Deceptive**

362.     Mallinckrodt's strategy, first envisioned by Defendant LaPointe, to conspire and agree with Express Scripts to engage in an unfair and deceptive scheme regarding Acthar's "value" was successful.  But for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to develop Synacthen for IS to compete directly with Acthar at a lower price.  The scheme would have been thwarted, once the public became aware of a lower-priced, valuable alternative to Acthar.  But it was only because Express Scripts agreed with Mallinckrodt to not bring Synacthen to market that Mallinckrodt's scheme was successful.

363.     Mallinckrodt claimed at the time that it acquired Synacthen to develop it for new, non-Acthar indications, but given the similarities between the two drugs, any therapeutic indication that Mallinckrodt was to pursue for Synacthen could easily have been pursued for Acthar.

364.     In a public statement released by Mallinckrodt on June 29, 2018, in direct response to the Rockford lawsuit, Mallinckrodt admitted "Mallinckrodt did not pursue commercialization of Synacthen for IS."  However, it falsely claimed that the reason for not doing so was because "the barriers to completion were, in our view, virtually impossible to overcome."  *See* June 29, 2018 Press Release, "The Facts About H.P. Acthar Gel" at Exhibit "C" hereto.

365.     Fourteen months after Questcor acquired Synacthen, Mallinckrodt acquired Questcor for $5.9 billion.  The vast majority of Questcor's value was attributable to Acthar and Synacthen.

366.     However, despite its claims about a willingness to bring Synacthen to market, to date, Mallinckrodt has not brought Synacthen to market for any indication.  Instead, it keeps Synacthen off the market to protect its monopoly power and high prices for Acthar.  Express Scripts continues to allow Mallinckrodt to restrict competition in the market for ACTH products.

### Mallinckrodt's Acquisition of Synacthen Harmed Competition

367.     Mallinckrodt's strategy to conspire with Express Scripts and continue to protect its monopoly power in the market for ACTH drugs was successful.  But for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to develop Synacthen for IS to compete directly with Acthar at a lower price.  With the acquisition of Synacthen, Mallinckrodt was able to thwart an imminent threat to its Acthar monopoly and thereby harmed competition.  But it was only because Express Scripts agreed with Mallinckrodt to not bring Synacthen to market that Mallinckrodt's scheme was successful.

368.     Mallinckrodt claimed at the time that it acquired Synacthen to develop it for new, non-Acthar indications, but given the similarities between the two drugs, any therapeutic indication that Mallinckrodt was to pursue for Synacthen could easily have been pursued for Acthar.

369.     In a public statement released by Mallinckrodt on June 29, 2018, in direct response to the Rockford lawsuit, Mallinckrodt admitted "Mallinckrodt did not pursue commercialization of Synacthen for IS."  However, it falsely claimed that the reason for not doing so was because "the barriers to completion were, in our view, virtually impossible to overcome."  See June 29, 2018 Press Release, "The Facts About H.P. Acthar Gel" at Exhibit "C" hereto.

370.     Fourteen months after Questcor acquired Synacthen, Mallinckrodt acquired Questcor for $5.9 billion.  The vast majority of Questcor's value was attributable to Acthar and Synacthen.

371.     However, despite its claims about a willingness to bring Synacthen to market, to date, Mallinckrodt has not brought Synacthen to market for any indication.  Instead, it keeps Synacthen off the market to protect its monopoly power and high prices for Acthar.  Express Scripts continues to allow Mallinckrodt to restrict competition in the market for ACTH products.

**Mallinckrodt Settles with the FTC**

372.     On January 18, 2017, the FTC announced that Questcor and its new parent Mallinckrodt plc agreed to pay $100 million to settle FTC charges that Questcor and Mallinckrodt violated antitrust laws when Questcor acquired the rights to Synacthen from Novartis in 2013.

373.     According to FTC Chairwoman Edith Ramirez, "Questcor took advantage of its monopoly to repeatedly raise the prices of Acthar, from $40 in 2001 (when it acquired the rights to sell Acthar for $100,000) to more than $34,000 per vial today – an 85,000 percent increase."

374.     The brunt of these high prices was borne by self-funded payors, like Plaintiff, located throughout the country, whose employees and beneficiaries whom were at the mercy of Mallinckrodt and treated with Acthar.

375.     From the time it sought FDA approval for the treatment of IS, Mallinckrodt has raised the price of Acthar to over $45,000.

376.     Remarkably, Mallinckrodt continues to deceive payors like Plaintiff and the public about the true prices of Acthar.  In its June 29, 2018 Press Release, "The Facts About H.P. Acthar Gel" at Exhibit "C", Mallinckrodt claimed that "[t]he price of H.P. Acthar Gel today is

$38,892, before discounts provided to payors." As set forth above, this is demonstrably false and misleading, as Mallinckrodt raised the WAC for Acthar to $31,626.00 on January 16, 2014, 4 ½ years prior, which in turn raised its AWP to $39,532.50 in 2014. Since that time, Mallinckrodt has raised the WAC multiple times, at least once a year, pushing the AWP to over $45,000.00 in 2018.

377.     Mallinckrodt claimed that these exorbitant price increases were in response to demand. But its former Chief Executive Officer, Don Bailey, acknowledged in 2009 that "we only have about 800 patients a year. It's a very, very small – tiny – market." Consequently, the limited use of the product did not justify an over 58,000% price increase from acquisition until 2009.

378.     Since the Acthar market for the treatment of IS was so limited, Mallinckrodt sought to expand its use. By 2012, Acthar was prescribed for Medicare recipients 3,387 times. To Medicare alone, this represented a cost of $141,500,000 in 2012.

379.     Quantified another way, Dr. William Shaffer, a neurologist in Greeley, Colorado who was the highest prescriber of Acthar in 2012, wrote only 78 prescriptions for the drug, but the prescribed Acthar cost Medicare $4,000,000.

380.     Acthar represented 98% or more of Mallinckrodt's sales and revenue from sales since 2007. Its manipulation of the market has resulted in a 266% increase in revenue year-over-year from 2011 to 2013. Total net sales for Mallinckrodt in 2011 were $218.2 million, $509.3 million in 2012, and $798.9 million in 2013. In each of those years, Acthar represented at least 95% of Mallinckrodt's net sales – over $1.45 billion in revenue.

381.     In the words of former CEO Don Bailey "Questcor is basically a single-product company." But, by flexing its monopoly power, Mallinckrodt has been able to raise Acthar

86

prices and increase revenue from Acthar in a "tiny market" from less than $1 million for fiscal 2001 to $799 million for fiscal 2013 - a nearly 80,000% increase.  It did so in conjunction with Express Scripts.

382.    Mallinckrodt's decision to exclusively contract with the agent for its largest customer to provide limited distribution for Acthar removed Express Scripts' competitive pressure in the marketplace to cause Acthar prices to be lower.  Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise its Acthar prices above competitive prices throughout the relevant time period from 2007 through the present.

### COUNT I
### WASHINGTON COUNTY BOARD OF EDUCATION V. ALL DEFENDANTS
### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT,
### MD CODE ANN., COM. LAW § 13-101, *ET SEQ*

383.    Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

384.    Plaintiff and its insured beneficiaries are consumers within the meaning of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, et seq ("MCPA") who transacted with Defendants through their receipt and payment for Acthar.  See Md. Code. Ann., Com. Law § 13-101(c).

385.    Defendants are all persons and merchants within the meaning of Md. Code Ann., Com. Law § 13-101(g), (h).

386.    At all times relevant hereto, Defendant Mallinckrodt has maintained a principal place of business and substantial operations in the State of Maryland, and has regularly conducted business throughout the State of Maryland.  Furthermore, Defendant LaPointe has maintained a principal residence in the State of Maryland, and has regularly conducted business

throughout the State of Maryland, both in his roles as CEO of Sigma Tau and as a member of the

Questcor Board of Directors on behalf of the owners of Sigma Tau, the largest shareholders in

Questcor during the early 2000s and up to at least the time of the launch of the "new strategy"

for Acthar.

387.    The Consumer Protection Act, codified at Maryland Code (1975, 2005

Replacement Volume) §§ 13-101 et seq. of the Commercial Law Article ("MCPA") was

"intended to provide minimum standards for the protection of consumers in the State." § 13-101.

388.    As the Maryland Court of Appeals has explained:

> The General Assembly enacted the Consumer Protection Act . . . in response
> to "mounting concern over the increase of deceptive trade practices in
> connection with sales of merchandise, real property, and services and the
> extension of credit." . . . The Legislature was concerned that these deceptive
> practices were undermining public confidence in merchants . . . . It found
> existing federal and State laws to be "inadequate, poorly coordinated and not
> widely known or adequately enforced," and found "that improved
> enforcement procedures [were] necessary to help alleviate the growing
> problem of deceptive consumer practices." . . . With the Act, therefore, the
> General Assembly intended "to set certain minimum statewide standards for
> the protection of consumers across the State" and to "take strong protective
> and preventative steps to investigate unlawful consumer practices, to assist the
> public in obtaining relief from these practices, and to prevent these practices
> from occurring in Maryland."

*Morris v. Osmose Wood Preserving*, 340 Md. 519, 536-37, 667 A.2d at 624 (1994) (citations
omitted).

389.    Among other things, the MCPA prohibits unfair and deceptive trade practices "in

the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, consumer

services…" MCPA § 13-303(1).

390.    Deceptive trade practices include the following:

> (1) False, falsely disparaging, or misleading oral or written statement, visual
> description, or other representation of any kind which has the capacity,
> tendency or effect of deceiving or misleading consumers;

88

(2) Representation that:

      (i)     Consumer goods . . . have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

\* \* \* \*

      (iv)    Consumer goods, consumer realty, or consumer services are a particular standard, quality, grade, style or model which they are not;

(3) Failure to state a material fact if the failure deceives or tends to deceive;

\* \* \* \*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that the consumer relies on the same in connection with:

(i) the promotion or sale of any consumer goods… or consumer service[.] MCPA § 13-301.

391.    Common Law section 13-105 declares it to be "the intent of the General Assembly that in construing the term 'unfair or deceptive trade practices', due consideration and weight be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission [FTC] and the federal courts."

392.    Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), prohibits "unfair or deceptive acts or practices." Nearly forty years ago the FTC first indicated in dicta that a seller of a product violated § 5 of the FTC Act if advertised claims for a product lacked adequate substantiation. See In re Heinz W. Kirchner, 63 F.T.C. 1282 (1963), aff'd, 337 F.2d 751 (9th Cir. 1964).  The Court in In re Heinz:

"We are inclined to think that an advertiser is under a duty, before he makes any representation which, if false, could cause injury to the health or personal safety of the user of the advertised product, to make reasonable inquiry into the truth or falsity of the representation."

*Id*. at 1294.

In 1972, the FTC held that "it is an unfair practice in violation of the [FTC] Act to make an affirmative product claim without a reasonable basis for making that claim." In re Pfizer, Inc., 81 F.T.C. 23, 62 (1972). The Commission, in Pfizer, indicated how the interpretation would be applied, saying:

> "The question of what constitutes a reasonable basis is essentially a factual issue which will be affected by the interplay of overlapping considerations such as (1) the type and specificity of the claim made–e.g., safety, efficacy, dietary, health, medical; (2) the type of product–e.g., food, drug, potentially hazardous consumer product, other consumer product; (3) the possible consequences of a false claim– e.g., personal injury, property damage; (4) the degree of reliance by consumers on the claims; (5) the type, and accessibility, of evidence adequate to form a reasonable basis for making the particular claims. More specifically, there may be some types of claims for some types of products for which the only reasonable basis, in fairness and in the expectations of consumers, would be a valid scientific or medical basis. The precise formulation of the "reasonable basis" standard, however, is an issue to be determined at this time on a case-by-case basis. This standard is determined by the circumstances at the time the claim was made, and further depends on both those facts known to the advertiser, and those which a reasonably prudent advertiser should have discovered."

*Id.* at 64.

393.    Defendants have engaged in unfair, abusive or deceptive trade practices within the meaning of, and in violation of, the MCPA in that: (2) Defendants' wrongful actions and practices, inaction, omissions, want of ordinary care, misrepresentations, and non-disclosures are substantially injurious to Plaintiff, offend public policy, and/or are unfair, deceptive, abusive, immoral, unethical, oppressive and/or unscrupulous; (2) any justification for Defendants' conduct would be outweighed by the gravity of the injury and harm to Plaintiff; (3) there were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct; and (4) Defendants' conduct violates common law and statutory law as alleged herein.

394.    Defendants violated MCPA § 13-301(3) by failing to state a material fact, a failure which deceives to tends to deceive.  As alleged herein, Defendants' conduct, nondisclosures were false, misleading and likely to deceive Plaintiff in violation of the MCPA.

395.    Defendants violated MCPA § 13-301(9)(i) by deception, fraud, false pretense, false premise, misrepresentation, knowing concealment, suppression, and/or omission of material facts relating to the appropriate, medically-approved uses and benefits of Acthar for the treatment of disease, especially medical conditions for which Acthar was not approved.  Among these were rheumatoid arthritis, for which Acthar is approved only of acute exacerbations of disease and flare ups, not the long-term, maintenance therapy for which Acthar has been and continues to be prescribed for Plaintiff's beneficiaries.

396.    Plaintiff would not have paid for the Acthar at the inflated AWP prices set by Defendants had Defendants not engaged in deception, fraud, false premise, misrepresentation, knowing concealment, suppression, and/or omission of material facts in their marketing, promotion and sale of Acthar exclusively through the ASAP.

397.    Defendants' misrepresentations and fraudulent omissions were material to Plaintiff.  Had Defendants disclosed the truth about Acthar, including its limited uses and benefits, and the real reasons for its exorbitant pricing, Plaintiff would not have paid the prices it did for Acthar.

398.    As a direct and proximate result of Defendants' unlawful, unfair, deceptive and fraudulent conduct in violation of the MCPA, Plaintiff has suffered injury in fact and will continue to be injured by having to pay inflated prices for Acthar for the treatment of rheumatoid arthritis if its beneficiaries.  Further, as a direct and proximate result of Defendants' violation of

the MCPA, Plaintiff incurred actual damages, including the inflated cost of Acthar, among other costs.

399.     As a result of Defendants' unfair and deceptive trade practices, Plaintiff demands judgment against Defendants for declaratory and injunctive relief, including a declaration that the Defendants' conduct has violated, and continues to violate the MCPA, and an appropriate court order prohibiting Defendants from further unfair and deceptive acts and practices described in this complaint.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT II**
**WASHINGTON COUNTY BOARD OF EDUCATION v. ALL DEFENDANTS**
**<u>NEGLIGENT MISREPRESENTATION</u>**

400.     Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

401.     The following elements are required to assert a claim for negligent misrepresentation:

    a.   the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

    b.   the defendant intends that his statement will be acted upon by the plaintiff;

    c.   the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

    d.   the plaintiff, justifiably, takes action in reliance on the statement; and

    e.   the plaintiff suffers damage proximately caused by the defendant's

negligence.

402.     Defendants here undertook and owed a duty of care to Plaintiff and its beneficiaries through their direct intervention in the treatment decisions of Plaintiff's beneficiaries through the ASAP, by requiring Plaintiff's beneficiaries to approve of their treatment with Acthar in advance, and by requiring the beneficiaries' doctors to certify that the Acthar treatment was "medically necessary".

403.     The Acthar Start Form (Exhibit "A" hereto) expressly requires authorization by signature of the patient and health care provider ("HCP").  Such form contains a misleading and deceptive requirement of a prior authorization by the patient for a "referral" to the ASAP.  The authorization also broadly and vaguely authorizes the use and disclosure of "health information relating to [the patient's] medical condition, treatment, and insurance coverage (my 'Health Information')" to a host of unidentified parties, including the Express Scripts Entities, without clearly disclosing them, who they are, or their exclusive role in the distribution and sale of Acthar.

404.     Specifically, by the Acthar Start Form, the patient is forced to authorize releases of Health Information to "my physician(s), my health insurance company, my pharmacy providers and Mallinckrodt ARD Inc., the distributor of Acthar ("Mallinckrodt"), and its agents…".  Exhibit "A" (emphasis supplied).  Read plainly, the Acthar Start Form materially misrepresents and states falsely that Mallinckrodt is "the distributor of Acthar".  The exclusive distributor of Acthar has been CuraScript since 2007.  However, nowhere is the patient advised of such material fact.

405.     Instead, the patient is directed to a facsimile number and an address in the event he or she choose to "revoke (withdraw) this authorization".  The fax number, 877-937-2282,

contacts the Express Scripts Entities and, in particular, their "hub", not Mallinckrodt, as falsely claimed.  The address, 255 Technology Park, Lake Mary, Florida, 32746, is the address of CuraScript, not Mallinckrodt, as falsely claimed.

406.    Defendants all intended to deceive patients and payors, like Plaintiff, by their false statement of the actual, exclusive distribution of Acthar by the Express Scripts Entities and the joint decision by Defendants to increase the AWPs for Acthar to profit themselves, not because of any improvement in the value of Acthar.

407.    The Defendants intended that their false statements would be acted upon by the Plaintiff and its beneficiaries, in paying for the Acthar prescribed to patients, because the Acthar Start Form further required the patient and HCP to authorize Defendant "United BioSource Corporation (UBC), the current operator of the [ASAP], and other designated operators of the Program, to perform a preliminary assessment of the benefit verification for this patient…".  In other words, the ASAP, utilizing the false, misleading and deceptive Acthar Start Form, was intended to

408.    The Defendants had and have knowledge that the Plaintiff would probably rely on their false statements, which, if erroneous, would cause loss or injury to Plaintiff.

409.    The Plaintiff justifiably took action in reliance on the false statements in paying for the Acthar at the falsely inflated AWP-based price.

410.    The Plaintiff suffered damage proximately caused by the Defendants' negligence in making false statements of material fact in the ASAP, especially the Acthar Start Form.

411.    Pecuniary, economic loss, in the form of paying the inflated prices for Acthar, is compensable under a theory of negligent misrepresentation.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT III
## WASHINGTON COUNTY BOARD OF EDUCATION v. ALL DEFENDANTS
## FRAUD

412.    Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

413.    Defendants' acts violate the common law against negligent misrepresentation and fraud.

414.    In setting the inflated, AWP-based prices for Acthar, which prices Plaintiff paid, the Defendants made material misrepresentations that those prices represented the purported "average" of "wholesale prices" for Acthar, or some price reasonably related thereto, which they did not.  Defendants also misrepresented that the inflated AWP prices for Acthar represented the actual value of the product in the marketplace, which they did not.

415.    These representations were material to the transactions at hand in that Plaintiff used and relied upon these AWP prices, as set forth in its Cigna contracts, as the amount to pay and/or reimburse for Acthar.

416.    As set forth more fully above, these prices were artificial prices, unrelated to any actual, reasonable price in the marketplace, or the actual value of Acthar, but created and manipulated by the Defendants for the purpose of generating exorbitant revenue, thus constituting false representations which the Defendants knew or, in the absence of recklessness, should have known to be false.

417.    The Defendants made these false representations about the prices of Acthar with the intent of misleading Plaintiff into relying on the prices as real and fact-based prices, rather than artificially inflated prices.

418.    Plaintiff justifiably relied upon these false misrepresentations in purchasing and/or reimbursing Acthar at the amount charged by Cigna based on the prices set by Mallinckrodt and Express Script by contract, as charged by the Plaintiff's beneficiaries' doctors. These prices were included in Plaintiff's Cigna contract, and thus Plaintiff was obligated to pay them.

419.    The prices for Acthar set forth in such Plaintiff's contracts with Cigna were prices set by Mallinckrodt and Express Scripts as provided by the contracts between them.  As such, all Defendants communicated these false AWP prices for Acthar directly to Plaintiff for the Acthar sold to Plaintiff's beneficiaries.

420.    Defendants knew or should have known that Plaintiff was required to pay the inflated AWPs for Acthar by its agreements with Cigna, and thus intended that Plaintiff reasonably rely on such prices as the "average wholesale prices" for Acthar.

421.    As a direct and proximate result of the false representations of the Defendants, as set forth above, Plaintiff was harmed in that they were unaware of the artificial, inflated prices of Acthar, would not have paid and/or reimbursed the artificially inflated prices for Acthar had they known of the false representations and, in fact, overpaid for the Acthar because of the false representations.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT IV**
**WASHINGTON COUNTY BOARD OF EDUCATION v. MALLINCKRODT AND**
**EXPRESS SCRIPTS ENTITIES**
**UNJUST ENRICHMENT**

422.     Plaintiff hereby incorporates by reference the averments of the foregoing

paragraphs as if fully set forth herein and further alleges as follows.

423.     This Count alleges unjust enrichment against Mallinckrodt and the Express

Scripts Entities.

424.     Plaintiff's covered beneficiaries received direct shipments of Acthar from

Mallinckrodt via Cigna's Tel-Drug.  In exchange for Acthar, Plaintiff made direct payments to

Cigna for the benefit of Mallinckrodt, via Express Scripts.  Indeed, such payments were

transferred by Cigna to Mallinckrodt through its exclusive agent, Express Scripts pursuant to a

prescription written by a doctor that charged the inflated Acthar AWP.  Like Express Scripts,

Cigna reduced its payment to Mallinckrodt via Express Script by a certain amount previously

agreed to by Mallinckrodt, Express Scripts and Cigna.  The amount charged by Mallinckrodt for

the Acthar was the amount paid by Plaintiff, less the applicable co-pay paid by the beneficiary.

425.     The amounts paid by Plaintiff were valuable to Mallinckrodt and Express Scripts,

and these Defendants were unjustly enriched by such payments, in that, the prices charged by

these Defendants at extremely high prices were valuable and beneficial to Defendants.

426.     By engaging in the conduct described in this Complaint, these Defendants have

knowingly obtained benefits from Plaintiff, namely grossly inflated payments, revenues and

profits from their coordination all aspects of Plaintiff's receipt of and payments for Acthar, under

circumstances such that it would be inequitable and unjust for these Defendants to retain such

benefits.

427.   By engaging in the unlawful conduct described herein, these Defendants have been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market.

428.   Mallinckrodt and the Express Scripts Entities were able to extract exorbitant revenue from Plaintiff beyond what they could have received in the absence of such unlawful conduct.  This conduct violated Maryland law and, as such, interfered with the legally protected interests of Plaintiff.

429.   Plaintiff is therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by these Defendants by means of the above-described actions.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and against Mallinckrodt, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT V**
**WASHINGTON COUNTY BOARD OF EDUCATION v. ALL DEFENDANTS**
**CONSPIRACY TO DEFRAUD/CONCERTED ACTION**

430.   Plaintiff hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

431.   As set forth more fully above, beginning at least as early as 2007, the exact date being unknown to Plaintiff, and continuing thereafter until the present, all Defendants and other unnamed co-conspirators, between and among themselves and others, entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud and deceive Plaintiff by causing them to pay more for Acthar than they otherwise would have paid in the absence of the Defendants' conspiracy and concerted action.

432.     Pursuant to the unfair and deceptive scheme to distribute, market and sell Acthar to derive substantial profits, and the conspiracy alleged herein, and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to deceive Plaintiff, and acted or took substantial steps in furtherance of the conspiracy.  Those acts include the following:

    a.   discussing and agreeing among themselves and with their co-conspirators that they would directly control the prices at which Plaintiff paid for Acthar;

    b.   discussing and agreeing among themselves and with their co-conspirators that they would increase the prices at which Plaintiff paid for Acthar;

    c.   discussing and agreeing among themselves and with their co-conspirators that they would directly control the ASAP program materials and website which enrolled patients into an exclusive distribution network for the administration of Acthar, allowing Defendants to conduct their unfair pricing scheme for Acthar;

    d.   discussing and agreeing among themselves and with their co-conspirators that they would directly control the exclusive distribution network for Acthar through the ASAP Program;

    e.   discussing and agreeing among themselves and with their co-conspirators that they would rely on employees to promote the ASAP Program through the marketing alleged herein;

    f.   discussing and agreeing among themselves and with their co-conspirators that they would participate in the affairs of the ASAP program by using a fraudulent scheme to market and sell Acthar at inflated prices; and

    g.   discussing and agreeing among themselves and with their co-conspirators that they would conceal and suppress the truth about the Acthar inflated prices, the monies earned from payors, like Plaintiff, and their exclusive arrangement to maintain and enhance Mallinckrodt's monopoly power as alleged herein.

433.     In addition to the specific facts set forth above, it is alleged the Defendants and their co-conspirators engaged in conspiratorial meetings, among the purposes of which meetings were to discuss the importance of controlling the direct distribution, marketing, sale, prescription

and administration of Acthar to Plaintiff and its covered Patient, and deriving substantial profits from these activities.

434.    The Defendants performed the conspiratorial acts set forth herein intending to injure payors of Acthar, like Plaintiff, by causing them to pay inflated prices so that the Defendants could derive substantial profits.

435.    The Defendants performed the acts alleged herein in furtherance of the common plan or design for the conspiracy with intent and/or with knowledge of the injury and damage it would cause to Plaintiff, and with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

436.    As a direct and proximate result of the Defendants' conspiracy as alleged herein, Plaintiff has been injured and damaged, and the Defendants are jointly and severally liable for such injuries and damages.

**WHEREFORE,** Plaintiff demands that judgment be entered in its favor, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the Court to enter the following relief:

a.    Declare unlawful the acts and practices alleged herein, enjoin the Defendants from committing the acts alleged herein, and restore the status quo before the unlawful conduct took place;

b.    Enter judgment against all Defendants for the violations alleged herein;

c.      Award the actual damages incurred by Plaintiff as a result of the wrongful

acts complained of, along with pre-judgment and post-judgment interest at the maximum rate

allowed by law;

d.      Award statutory damages set forth herein under the statutory claims

alleged;

e.      Award multiple damages by operation of law;

f.      Award punitive damages;

g.      Award Plaintiff the costs of this action, including reasonable attorneys'

fees, and, where applicable, expert fees; and

e.      Award such other and further relief as the Court may deem just and

appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable in this cause.


Dated:  July 15, 2019                                          Respectfully submitted,

*s/Donald E. Haviland, Jr.*
Donald E. Haviland, Jr., Esq.
*(pro hac vice* 19-217-PA061219)
William H. Platt II, Esq.
*(pro hac vice* 19-217-PA061219)
**HAVILAND HUGHES**
201 South Maple Way, Suite 110
Ambler, PA 19002
(215) 609-4661 Telephone
*haviland@havilandhughes.com*
*platt@havilandhughes.com*

John M. Martirano, Esquire
U.S.D.C. for the District of MD
Bar No. 094666
**WASHINGTON COUNTY BOARD OF
EDUCATION**
10435 Downsville Pike
Hagerstown, MD 21740
(301) 766-2946 Telephone
*martjohn@wcps.k12.md.us*

*Counsel for Plaintiff, Washington
County Board of Education*