IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WASHINGTON COUNTY BOARD      *
OF EDUCATION,

      Plaintiff                    *

      v.                        *             **CIVIL NO. JKB-19-1854**

MALLINCKRODT ARD, INC., et      *
al.,

      Defendants.            *

  *     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM

This dispute arises out of the pricing of a drug, Acthar. Over the course of fifteen years, Acthar's price rose from $40 per vial to $40,000 per vial. The plaintiff in this action, the Washington County Board of Education ("Plaintiff"), paid almost $3 million over a three-year period for two of its employees to receive Acthar. Plaintiff contends the entities involved in raising Acthar's price violated numerous Maryland state laws; it brings this action against Mallinckrodt[1] (Acthar's manufacturer), Express Scripts[2] (Acthar's distributor), and Gregg Lapointe (a former board member of Mallinckrodt's subsidiary, Questcor) (collectively, "Defendants").

Plaintiff alleges violations of the Maryland Consumer Protection Act ("MCPA") (Count I); negligent misrepresentation (Count II); fraud (Count III); unjust enrichment (Count IV); and

---

[1]     "Mallinckrodt" consists of defendants Mallinckrodt plc and Mallinckrodt ARD (collectively, "Mallinckrodt").

[2]     "Express Scripts" consists of defendants Express Scripts Holding Company, Express Scripts, Inc., CuraScript, Inc., Priority Healthcare Corp., Priority Healthcare Distribution, Inc., Accredo Health Group, Inc., and United BioSource Corporation (collectively, "Express Scripts").

conspiracy to defraud/concerted action (Count V). Plaintiff asserts all five claims against Mallinckrodt and Express Scripts, and all but the unjust enrichment claim against Lapointe.

Now pending before the Court is Plaintiff's motion to remand the case to state court (ECF No. 34) and Defendants' motions to dismiss the amended complaint (ECF Nos. 50, 51, 56).[3] The motions are fully briefed. No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). The Court will deny Plaintiff's motion to remand, dismiss Lapointe from the case, and grant Mallinckrodt and Express Scripts' motions to dismiss.

## I.   *Factual Background*

### A. *The Parties*

Plaintiff employs 2,500 people in Washington County, Maryland. (Am. Compl. ¶¶ 34–35, ECF No. 36.) Plaintiff provides its employees healthcare benefits through a contract with Cigna Health and Life Insurance Co. ("Cigna"). (*Id.* ¶ 36.) In the world of prescription drugs, this makes Plaintiff a private third-party payor. (*Id.* ¶ 225.) Two of Plaintiff's employees were prescribed Acthar in 2016 to treat their rheumatoid arthritis. (*Id.* ¶ 37.) Between 2016–2018, Plaintiff paid $2,841,747 for these employees to receive Acthar. (*Id.* ¶ 29.) At the time of the filing of this suit, Plaintiff continues to pay for Acthar on their behalf. (*Id.*)

Mallinckrodt is an Irish public limited company with corporate headquarters in the United Kingdom. (*Id.* ¶ 43.) It has manufactured Acthar since 2014, when it acquired Questcor, Acthar's

---

[3]     Also pending are Defendants' motions to dismiss Plaintiff's original complaint. (ECF Nos. 23, 25, 31.) Because Plaintiff timely filed its amended complaint (ECF No. 36), the Court will deny these motions as moot.   The Court notes, however, that although the amended complaint was timely, Plaintiff failed to provide an accurate redline indicating the changes contained in the amended complaint, as required by Local Rule 103(6)(c). In light of this deficiency, Lapointe requests the Court strike Plaintiff's amended complaint or award Lapointe the attorneys' fees it incurred in dealing with this issue. (Lapointe Mot. Dismiss at 3–4 n.2, ECF No. 50-1.) Lapointe's request to strike is moot in light of the Court's conclusion that the amended complaint fails to state a claim. If Lapointe seeks attorneys' fees, it should file a motion in accordance with the procedures outlined in the Local Rules.

former manufacturer. (*Id.* ¶¶ 38–39.) At the time of the acquisition, Questcor became a wholly owned subsidiary of Mallinckrodt.[4] (*Id.* ¶ 39.)

Express Scripts is a pharmacy benefits manager. (*Id.* ¶ 26.) Pharmacy benefits managers serve as intermediaries between drug manufacturers, like Mallinckrodt, and patients and third-party payors, like Plaintiff. (*Id.* ¶ 156.) Express Scripts and its various subsidiaries facilitate the distribution of Acthar. (*Id.* ¶ 26.)

Gregg Lapointe was a former member of Questcor's board of directors. (*Id.* ¶ 13.) Lapointe is a resident of the state of Maryland. (*Id.* ¶ 31.) Lapointe was on Questcor's board in 2007 at the time Questcor launched a controversial "new strategy" to increase Acthar's profitability. (*Id.* ¶¶ 13–14.)

### B. Plaintiff's Allegations

Plaintiff alleges that Defendants were able to raise Acthar's price to unconscionable levels through three complementary schemes that collectively reduced competition, increased profits, and deflected negative attention. These three schemes constitute the heart of Plaintiff's complaint, and the Court summarizes them below.

### 1. The Distribution Scheme

In 2001, Questcor acquired Acthar for $100,000. (*Id.* ¶ 75.) At the time, Acthar was primarily used to treat Infantile Spasms ("IS"), a rare condition with a patient population of about 2,000 children per year. (*Id.* ¶¶ 77–78.) At the time of the acquisition, Questor was struggling financially. (*Id.* ¶ 79.) In an effort to get the company on a more profitable track, Questcor's

---

[4]     Throughout the amended complaint, Plaintiff frequently treats Questcor and Mallinckrodt as interchangeable entities and often refers to actions taken by Questcor as being taken by Mallinckrodt. For the sake of clarity, the Court will refer to the entity as Questcor when discussing events that occurred prior to the acquisition in 2014 and as Mallinckrodt when discussing events that occurred after 2014. Where the timing of the events is unclear, the Court will use Plaintiff's convention of referring to the entity as Mallinckrodt.

largest shareholder, Sigma Tau Finanziaria, installed one its executives, Gregg Lapointe, on Questcor's board of directors. (*Id.* ¶¶ 79, 85, 86.) Lapointe would become the "mastermind" of a new strategy to increase Acthar's profitability. (*Id.* ¶ 13.)

Once Lapointe was on Questcor's board, the company decided to adopt an "orphan drug strategy" for Acthar, which involved centralizing the drug's distribution channels and raising its price. (*Id.* ¶¶ 91, 110.) Because Acthar was the only drug available to treat IS, this strategy would allow Questcor to "leverage its monopoly power" against a "fragile, powerless patient population" in a narrow market. (*Id.* ¶ 111.)

To carry out this strategy's first step—centralizing the distribution channels—Questcor made Express Scripts Acthar's exclusive distributor.[5] (*Id.* ¶ 90.) The companies publicly announced the exclusive relationship in July 2007. (*Id.*) Moving forward, Questcor explained at the time, patients and doctors would need to submit all Acthar prescriptions though the Acthar Support & Access Program ("ASAP"). (*Id.*) Through the coordination of various Express Scripts subsidiaries, the ASAP would serve as a hub for the distribution and payment of Acthar. (*Id.* ¶ 166.) Patients and their doctors could initiate the distribution process by submitting the Acthar Start Form, which contained the requisite patient information and permissions. (*Id.* ¶¶ 166, 403.)

Initially, there was some pushback within Questcor about the new strategy; several board members and one executive departed shortly after the announcement of the exclusive relationship with Express Scripts. (*Id.* ¶¶ 101–02.) Lapointe also departed shortly after the announcement. (*Id.* ¶ 103.) But Questcor's COO made clear in an email to senior staff that Lapointe's departure

---

[5]  Technically, the exclusive relationship was between Questcor and CuraScript, an Express Scripts subsidiary. (*Id.* ¶ 90.)

was not due to his disagreement with the strategy; to the contrary, Lapointe was "a big supporter of the pricing strategy from the very beginning."[6] (*Id.* ¶ 104.)

## 2. *The Pricing Scheme*

Once the exclusive distribution scheme was in place, Questcor began "aggressively" raising Acthar's price. (*Id.* ¶¶ 100, 183.) When Questcor acquired Acthar in 2001, Acthar's average wholesale price ("AWP")—the price third-party payors like Plaintiff paid for the drug—was $40.00 per vial. (*Id.* ¶¶ 179, 213.) Over the next six years, Questcor gradually raised Acthar's AWP, but it was not until the launch of the new strategy in the summer of 2007 that Questcor made its most aggressive price hikes: it raised Acthar's AWP from $2,062.79 to $29,086.25. (*Id.* ¶¶ 181–83.) Questcor continued to raise Acthar's AWP in the ensuing years, and by December 2014, it had raised Acthar's AWP to $40,325.00. (*Id.* ¶ 208.)

Express Scripts reviewed and approved each of these price increases in writing. (*Id.* ¶ 187.) But when asked about the price increases, Express Scripts laid the blame with Questcor. (*Id.* ¶¶ 232–35.) For example, in a conference call with investors in May 2017, an Express Scripts senior vice president denied Express Scripts was involved in setting Acthar's price. (*Id.* ¶ 228 ("I think everybody in our company would agree, that [Acthar] is vastly overpriced for the value. We don't set the price.")) In a television interview, Express Scripts' CMO also criticized Acthar's high price without disclosing that Express Scripts had approved Acthar's price increases. (*Id.* ¶ 251.)

Questcor never disclosed the reasons for the price increases. (*Id.* ¶ 215.) But on June 29, 2018, in response to the filing of litigation relating to Acthar, the company issued a press release stating the price of Acthar was not as high as was being reported because both public and private

---

[6] Lapointe states in its motion to dismiss that Lapointe briefly rejoined the board for a few months in 2009 but Plaintiff makes no mention of this in its complaint. (Lapointe Mot. Dismiss at 18.)

payors received discounts. (*Id.* ¶ 212.) Plaintiff and other private payors, however, did not receive any discounts. (*Id.* ¶ 213.)

### 3. The Marketing Scheme

In 2011, Questcor decided to move beyond the "captive" IS market, and it began marketing Acthar as a treatment for other conditions, including rheumatoid arthritis. (*Id.* ¶ 298.) Although the FDA had approved Acthar to treat "acute exacerbations" of conditions like rheumatoid arthritis, the FDA had never approved it as a "long-term treatment" for the disease. (*Id.* ¶ 318.) In fact, Questcor did not have a clear understanding of how the drug treated diseases other than IS; Acthar's "mechanism of action" was unknown to Questcor. (*Id.* ¶ 122.)

To overcome the lack of clinical data demonstrating Acthar's ability to effectively treat rheumatoid arthritis, Questcor hired Medical Science Liaisons ("MSLs") to encourage doctors to prescribe the drug for "unapproved uses and doses." (*Id.* ¶ 264.) Questcor also engaged doctors, known as Key Opinion Leaders ("KOLs"), to promote the use of Acthar. (*Id.* ¶¶ 270–71.) Questcor paid these KOLs "handsomely" to promote Acthar for "off-label" uses, such as the long-term treatment of rheumatoid arthritis. (*Id.* ¶¶ 114, 302.) Some of the KOLs delivered "false, misleading, and deceptive promotional messages about the safety, efficacy and value" of the drug. (*Id.* ¶ 23.) The payments, however, proved effective at incentivizing doctors to prescribe Acthar: a study published in JAMA Network Open concluded that "most nephrologists, neurologists, and rheumatologists who frequently prescribe[d] Acthar received Acthar-related payments." (*Id.* ¶¶ 285, 322.)

The growth in Acthar sales, however, also brought a potential for increased pushback from patients who struggled to afford the drug's high co-pays. Initially, Questcor sought to minimize pushback by working with the National Organization for Rare Diseases ("NORD"), an

organization that provided free Acthar to patients who could not afford it. (*Id.* ¶ 92.) Lapointe was a member of NORD's Corporate Council. (*Id.*) Later, Questcor created a Patient Assistance Program ("PAP"), which subsidized patient co-pays with tens of millions of dollars. (*Id.* ¶ 18.) The PAP, however, did nothing to subsidize the payments third-party payors like Plaintiff had to pay for Acthar.[7] (*Id.* ¶ 113.)

Questcor's final step in its efforts to promote Acthar was to eliminate the competition. In 2013, Questcor acquired the rights to another drug, Synachten, from Novartis. (*Id.* ¶¶ 255–56.) Synachthen was a synthetic alternative to Acthar that was used internationally but had not yet been approved by the FDA for use in the United States. (*Id.* ¶ 254.) After acquiring the rights to Synacthen, Questcor shelved the drug and never brought it to market. (*Id.* ¶ 259.) The goal of the acquisition had been to "eliminate the nascent competitive threat," so that Questcor would continue to raise Acthar's price. (*Id.* ¶¶ 256–57.) Express Scripts, as the largest pharmacy benefits manager in the United States, had leverage to force Questcor to bring Synacthen to market, but took no steps to do so. (*Id.* ¶¶ 261–62.)

In 2014, Mallinckrodt acquired Questcor, making it a wholly owned subsidiary. (*Id.* ¶¶ 38–39.)

## II.    *Motion to Remand*

Plaintiff initially filed this suit in the Circuit Court of Washington County, Maryland. (Not. Removal at 1, ECF No. 1.) Defendants promptly removed it to federal court on the basis of diversity. (*Id.* at 2.) Although Defendants concede that both Plaintiff and Lapointe are residents of the state of Maryland, Defendants contend Lapointe's citizenship should be disregarded for the

---

[7]    As Plaintiff notes, the facts surrounding the PAP are the basis of a public *qui tam* lawsuit currently pending in the Eastern District of Pennsylvania, in which the government has intervened. *See Strunck, et al. v. Questcor Pharmaceuticals, Inc.*, Civ. No. BMS-12-175 (E.D. Pa. Jan. 17, 2012).

purpose of jurisdiction because Lapointe was fraudulently joined. (*Id.* at 3.) Specifically, Defendants assert the sole reason Plaintiff joined Lapointe was to defeat complete diversity and avoid a potential MDL.[8] (Opp'n Mot. Remand at 1, ECF No. 52.)

To support their contention that Lapointe was fraudulently joined, Defendants point to Lapointe's departure from Questcor's board in 2007, years before most of the conduct described in the complaint occurred. (*Id.* at 6.) Defendants also point to the initial decision by Plaintiff's counsel not to name Lapointe as a defendant in the other Acthar-related lawsuits it has filed.[9] (*Id.* at 1–3.) Plaintiff counters that its claims against Lapointe are viable and it has every intention of recovering against him, as Lapointe was the "mastermind" behind the distribution scheme, pricing scheme, and marketing scheme, which collectively constitute the heart of the complaint. (Am. Compl. ¶¶ 13, 105; Mot. Remand at 2, ECF No. 34.)

### A. Fraudulent Joinder Standard

---

[8] Indeed, numerous lawsuits have been filed in federal and state courts across the country relating to Acthar, including several by Plaintiff's counsel. Plaintiff identifies at least seven pending suits: (1) *City of Rockford v. Mallinckrodt ARD, Inc., et al.*, Civ. No. 17-50107 (N.D. Ill. filed April 6, 2017); (2) *MSP Recovery Claims, Series LLC v. Mallinckrodt ARD, Inc., et al.*, Civ. No. 18-00379 (N.D. Ill. filed Jan. 18, 2018); (3) *International Union of Operating Engineers 542 v. Mallinckrodt ARD Inc., et al.*, Civ. No. 2018-14059 (Court of Common Pleas of Montgomery Cty., Pa., filed May 25, 2018); (4) *Acument Global Technologies, Inc. v. Mallinckrodt ARD Inc., et. al.*, Civ. No. 17-50107, Case No. CT-2275-19 (Circuit Court of Shelby Cty., Tenn. filed May 21, 2019); (5) *Steamfitters Local Union No. 420 v. Mallinckrodt ARD, LLC, et al.*, Civ. No. 19-3047 (E.D. Pa. filed July 12, 2019); (6) *United Association of Plumbers & Pipefitters Local 322 of Southern New Jersey v. Mallinckrodt ARD, LLC, et al.*, Case No. CAML-002912-19 (Superior Court of N.J., Camden Cty., filed July 19, 2019); (7) *Humana, Inc. v. Mallinckrodt ARD, LLC, et al.*, Civ. No. 19-6926 (C.D. Cal. filed August 8, 2019). (Opp'n Lapointe Mot. Dismiss at 9 n.4, ECF No. 65.)

[9] Plaintiff takes issue with Defendants' references to the other Acthar lawsuits Plaintiff's counsel has filed; specifically, Plaintiff requests the Court strike the "venomous" and "unfounded" statement Lapointe made in his brief that "[t]his is not the first time Plaintiff's lead attorneys have attempted to capitalize personally on the price of . . . Acthar." (Opp'n Lapointe Mot. Dismiss at 1–2.) Under Rule 12(f), a party may strike portions of a "pleading." Fed. R. Civ. P. 12. Rule 7(a) provides a closed list of what constitutes a "pleading;" a brief in support of a motion is not on that list. Fed. R. Civ. P. 7. Consistent with the approach taken by other courts in this circuit, the Court will not attempt to strike the contents of a brief under Rule 12(f). *See Anusie-Howard v. Todd*, 920 F. Supp. 2d 623, 627 (D. Md. 2013), *aff'd*, 615 F. App'x 119 (4th Cir. 2015) ("Although some cases have held that Rule 12(f) may be used to strike documents other than pleadings, the weight of recent authority is that such an action is not contemplated or permitted by the Rules."); *James v. Experian Info. Sols., Inc.*, Civ. No. REP-12-0902, 2014 WL 29041, at *6 (E.D. Va. Jan. 2, 2014) (declining to strike a reply brief because a reply brief is not a "pleading").

Under the doctrine of fraudulent joinder, a district court may "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1999). The doctrine is an exceptional one, applying only where a removing party can show either "'outright fraud in the plaintiff's pleading of jurisdictional facts' or that 'there is no possibility that the plaintiff would be able to establish a cause of action against the [non-diverse] defendant in state court.'" *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 704 (4th Cir. 2015) (quoting *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999)). Mere doubts about the strength of a claim are insufficient. *Riverdale Baptist Church v. Certainteed Corp.*, 349 F. Supp. 2d 943, 948 (D. Md. 2004). Rather, to establish fraudulent joinder, it must be clear that, "the facts asserted by the plaintiff . . . could not possibly create . . . liability[,] [such] that the assertion of the cause of action is as a matter of local law plainly a sham and frivolous." *Id.* (quoting *Parks v. N.Y. Times Co.*, 308 F.2d 474, 477 (5th Cir. 1962)).

"The party alleging fraudulent joinder bears a heavy burden—it must show that the plaintiff cannot establish a claim even after resolving all issues of law and fact in the plaintiff's favor." *Johnson*, 781 F.3d at 704 (quoting *Hartley*, 187 F.3d at 424). The standard "heavily favors" plaintiffs, who must show only a "glimmer of hope" of succeeding. *Id.* (quoting *Mayes*, 198 F.3d at 466). The standard for assessing fraudulent joinder is "even more favorable to the plaintiff" than the standard for assessing a motion to dismiss. *Id.* (quoting *Hartley*, 187 F.3d at 424).

### B. Analysis

Because Defendants do not assert that Plaintiff committed outright fraud in its pleading of jurisdictional facts, the issue here is whether Plaintiff has any "glimmer of hope" of recovering

against Lapointe under the claims alleged.[10] *See Mayes*, 198 F.3d at 466. For the reasons explained in Part III, each of Plaintiff's claims is legally deficient and leaves Plaintiff without a "glimmer of hope" of recovering against any of the Defendants, including Lapointe. Although these legal deficiencies are a sufficient basis on which to conclude Plaintiff has no hope of recovering against Lapointe, the Court will also review the factual allegations against Lapointe given the exceptional nature of fraudulent joinder. *See Johnson*, 781 F.3d at 704.

Using Plaintiff's preferred framework for evaluating Defendants' conduct, the Court discerns the following allegations against Lapointe:[11]

The Distribution and Pricing Scheme: Lapointe was installed on Questcor's board by Sigma Tau Finanziara to "engineer[] a coup" and install an aggressive new pricing strategy (Am. Compl. ¶ 103); Lapointe was a "big supporter" of the pricing strategy according to an email from Questcor's COO (*id.* ¶ 104); within one week of the launch of the new strategy, Lapointe resigned from the board because "his work . . . was done" (*id.* ¶¶ 103–04); Lapointe was a member of the Corporate Council of NORD, which was an "important player" in limiting patient pushback against Acthar's high prices (*id.* ¶ 92).

The Marketing Scheme: Lapointe remained tied to Questcor and its conduct after leaving the board because Lapointe was the "mastermind" behind many of the future strategies the

---

[10]     The Court notes Defendants' observations about the initial absence of allegations concerning Lapointe in the other Acthar-related lawsuits filed by Plaintiff's counsel, but it does not find these observations directly relevant in the fraudulent joinder analysis. The fraudulent joinder analysis is supposed to be an objective one that turns on the viability of the plaintiff's claims, rather than the plaintiff's subjective intentions. *See Allard v. Laroya*, 163 F. Supp. 3d 309, 312 (E.D. Va. 2016) (explaining that the focus in a fraudulent joinder analysis should be the "no possibility" standard, rather than plaintiff's subjective intent in joining defendant).

[11]     In considering whether joinder was fraudulent, courts should consider the initial complaint, rather than an amended complaint. *Pinney v. Nokia, Inc.*, 402 F.3d 430, 443 (4th Cir. 2005). Here, the amended complaint adds some additional allegations about Lapointe's misconduct, but neither complaint can support Plaintiff's claims against Lapointe. Because the Court will use the amended complaint in evaluating the other Defendants' motions to dismiss, it will also use the amended complaint in its fraudulent joinder analysis for the sake of consistency.

company adopted (*id.* ¶ 13); Lapointe was the individual who set the company "on an aggressive path" regarding Acthar, which included the marketing scheme (*id.* ¶ 103); the marketing scheme included paying bribes and kickbacks, implementing the PAP, and using KOLs and MSLs to spread false information about the value and efficacy of Acthar (*id.* ¶¶ 18–23).

These allegations plausibly suggest that Lapointe was involved with the distribution and pricing schemes. Although Plaintiff's contention that Lapointe was the mastermind behind these schemes is conclusory, the allegations do suggest Lapointe was involved with their implementation. But these allegations do nothing to remedy the fundamental problem that these schemes are simply not actionable under the claims Plaintiff brings. *See* Part III.A.1–2.

As for the marketing scheme, these allegations do not plausibly suggest Lapointe was involved, and accordingly provide no basis for recovery against Lapointe even if Plaintiff's claims were not legally deficient. For example, the allegations do not plausibly suggest Lapointe was involved in any way with the PAP. According to the government's complaint in the *qui tam* suit referenced by Plaintiff (Am. Compl. ¶¶ 307–27), Questcor did not begin subsidizing co-pays for patients with rheumatoid arthritis through the PAP until 2012, five years after Lapointe left Questcor.[12] *See Strunck, et al. v. Questcor Pharmaceuticals, Inc.*, Civ. No. BMS-12-175 (E.D. Pa. Jan. 17, 2012) (ECF No. 45 ¶ 121). Lapointe's involvement with NORD, an independent organization that initially provided free Acthar to patients who could not afford it (Am. Compl. ¶ 92) does not somehow translate into Lapointe being the "mastermind" behind the PAP; indeed, the government's complaint contends that Questcor created the PAP precisely because its goals for the PAP were broader than NORD could achieve. *Strunck*, Civ. No. BMS-12-175, ECF No.

---

[12] The Court can consider the contents of the government's complaint because it is a matter of public record and Plaintiff has incorporated the complaint by reference. *See* 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357 (2019) (in evaluating a 12(b)(6) motion, courts can consider "matters incorporated by reference or integral to the claim" as well as "matters of public record").

45 ¶ 86. Accordingly, the allegation that Lapointe was the mastermind behind the PAP is simply implausible.

Similarly, Plaintiff's complaint contradicts its contention that Lapointe masterminded the kickback scheme and the use of KOLs and MSLs. Plaintiff contends that the purpose of the kickback scheme and the KOLs and MSLs was to increase Acthar sales for off-label uses, such as the long-term treatment of rheumatoid arthritis. (Am. Compl. ¶¶ 302–06, 320.) But the complaint states that Questcor did not begin selling Acthar to patients with rheumatoid arthritis until 2011, four years after Lapointe left Questcor. (*Id.* ¶ 298.) Indeed, the strategy Lapointe allegedly developed at Questcor involved leveraging Questcor's monopoly over the IS market; other patient populations, Questcor believed at the time, "would not tolerate . . . a high price" for Acthar. (*Id.* ¶ 112.) Accordingly, the complaint does not plausibly tie Lapointe to these key components of the marketing scheme.

In short, Plaintiff's claims against Lapointe fail as a matter of law for the reasons explained in Part III. The specific factual assertions Plaintiff makes against Lapointe either fail to remedy these legal deficiencies or underscore Plaintiff's inability to recover against Lapointe. Accordingly, the Court concludes Lapointe was fraudulently joined and will deny Plaintiff's motion to remand.[13] Because the parties agree that complete diversity exists among the remaining parties and the amount in controversy exceeds $75,000, the Court will retain jurisdiction over the case under 28 U.S.C. § 1332(a)(1) and turn to the merits of the case.

### III. *Motions to Dismiss*

---

[13] The Court will also dismiss Lapointe from the case with prejudice. In general, leave to amend should be "freely given," unless "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Steinburg v. Chesterfield Cty. Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (quoting *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006)). Given that Plaintiff has had two opportunities to state a claim against Lapointe and has been unable to do so, and given the Court's interest in protecting parties who have been fraudulently joined, the Court concludes dismissal of Lapointe with prejudice is warranted.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a plaintiff's complaint. *Presley v. Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A complaint need only satisfy Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, the plaintiff must allege sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility exists where the facts allow the court to reasonably infer that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But, inferring the "mere possibility of misconduct" is not enough to establish a plausible claim. *Id.* at 679. Moreover, a complaint offering "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

Defendants move to dismiss each of the claims Plaintiff has asserted. The Court will evaluate each claim in turn.

### A. *Maryland Consumer Protection Act (MCPA) (Count I)*

The MCPA prohibits "unfair or deceptive trade practices." Md. Code Ann., Com. Law § 13–301. The MCPA proscribes fourteen categories of unfair or deceptive practices, including "any . . . [f]alse . . . or misleading oral or written statement . . . which has the capacity, tendency, or effect of deceiving or misleading consumers" and "any . . . [f]ailure to state a material fact if the failure deceives or tends to deceive." §§ 13–301(1), (3). A private party bringing a claim under the MCPA must allege "(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury." *Stewart v. Bierman*, 859 F.Supp.2d 754, 768 (D. Md. 2012). With respect to the reliance element, "[a] consumer relies on a misrepresentation when the

13

misrepresentation substantially induces the consumer's choice." *Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 796 (D. Md. 2013).

Fraud-based claims under the MCPA are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. *Haley v. Corcoran*, 659 F. Supp. 2d 714, 724 (D. Md. 2009). Under Rule 9(b), a party "must state with particularity the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b). This means that a plaintiff asserting a fraud-based claim must "at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010). Rule 9(b) is "less strictly applied" with respect to claims of fraud by omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Hyde v. Maryland State Bd. of Dental Examiners*, Civ. No. ELH-16-2489, 2018 WL 5786114, at *6 (D. Md. Nov. 5, 2018) (citation omitted).

Plaintiff takes a kitchen sink approach with respect to its MCPA claim and alleges that all of the conduct underlying the distribution scheme, pricing scheme, and marketing scheme support its MCPA claim. (Opp'n Express Scripts Mot. Dismiss at 17–18, ECF No. 66.) While the allegations underlying these schemes may very well support a conclusion that Defendants acted unlawfully, the allegations do not support a claim under the MCPA.

### 1. The Distribution Scheme

The allegations underlying the distribution scheme fail to identify an actionable misrepresentation under the MCPA. Plaintiff concedes that Questcor and Express Scripts disclosed their decision to enter into an exclusive distribution relationship in July 2007; its position

is that Defendants' failure to publicly disclose the "actual reason" behind that relationship—presumably, a profit-seeking reason—is an actionable misrepresentation under the MCPA.[14] (Opp'n Express Scripts Mot. Dismiss at 19.)

But the "omission" Plaintiff identifies is not an actionable one. An actionable omission under the MCPA typically occurs when an entity fails to disclose a business practice, or an aspect of a business practice, to a misleading effect. *See e.g.*, *Smith v. Capital One Auto Fin., Inc.*, Civ. No. JKB-11-1023, 2011 WL 3328565, at *3 (D. Md. Aug. 2, 2011) (finding an actionable omission where an auto finance company failed to inform plaintiff it intended to sell her car). But the situation here is different; Defendants fully disclosed that they were entering into an anticompetitive relationship regarding Acthar, they just did not disclose their reason for doing so. Plaintiff does not cite any authority, nor can the Court find any, suggesting the MCPA obligates an entity to disclose the motives behind its otherwise public conduct. If this obligation did exist, it seems a company might be required to disclose its profit-seeking motive every time it publicly raised the price of its product. This would be a significant expansion of the MCPA, and the Court declines to hold such disclosure is required.

Plaintiff's claim faces the further problem that anticompetitive conduct is not actionable under the MCPA. *Davidson v. Microsoft Corp.*, 792 A.2d 336, 345 (Md. Ct. Spec. App. 2002) ("Maryland has separate statutory schemes addressing antitrust and unfair or deceptive trade practices" and plaintiff's antitrust allegations do not "fit within the MCPA framework.") Plaintiff's attempt to circumvent this rule by framing its claim as a misrepresentation does not

---

[14] Plaintiff also suggests Defendants did not disclose the "means by which Acthar distribution was limited." (Opp'n Express Scripts Mot. Dismiss at 19.) This assertion is contradicted by the complaint, which provides a fairly detailed explanation of how Defendants created the ASAP, who was involved, and how the scheme reduced competition. (Am. Compl. ¶ 90.) Accordingly, there is no actionable "omission" regarding the "means" of the distribution scheme.

avoid the reality that entities engaging in antitrust violations rarely announce publicly that they are doing so and that they are doing so with a purpose to maximize profits. In light of this reality, adopting Plaintiff's approach would make most anticompetitive schemes actionable under the MCPA. The Court declines to upend *Davidson* and expand the reach of the MCPA in this manner.[15]

Plaintiff's allegations might very well state a claim for an antitrust violation. Indeed, the court in another Acthar-related lawsuit, *City of Rockford v. Mallinckrodt ARD, Inc.*, found plaintiff's antitrust claims were viable based on substantially similar allegations. *See* 360 F. Supp. 3d 730, 755 (N.D. Ill. 2019), *reconsideration denied*, 2019 WL 2763181 (N.D. Ill. May 3, 2019). But Plaintiff did not bring an antitrust claim, it brought an MCPA claim, and it has failed to identify an actionable misrepresentation to support it.

### 2. The Pricing Scheme

The pricing scheme also fails to support Plaintiff's MCPA claim. Plaintiff identifies two categories of misrepresentations relating to the pricing scheme: (1) Acthar's "artificial" and "inflated" AWPs, and (2) various misstatements that Mallinckrodt and Express Scripts made about Acthar's price.

Plaintiff contends the "artificial" and "inflated" AWPs are actionable because they were a "fraudulent misrepresentation of [the] true and actual price for Acthar." (Opp'n Express Scripts Mot. Dismiss at 20.) Plaintiff does not identify Acthar's "true and actual price," but it cites a string

---

[15] Although Plaintiff discussed the Synacthen acquisition in its amended complaint, it does not identify Synacthen as a basis for its MCPA claim in the complaint's explanation of Count I or in its briefs. But even if Plaintiff did intend for the Synacthen acquisition to serve as a basis for its MCPA claim, the allegations fail to adequately support the claim. The only conceivably actionable misrepresentation Plaintiff identifies related to the acquisition is the statement that Questcor made at the time of the acquisition that it intended to bring Synacthen to market, when it allegedly did not. (Am. Compl. ¶ 340.) But this allegation does not meet 9(b)'s particularity requirements, as it fails to identify the time or place of the misrepresentation, or the individual who made the statement. *See Owens*, 612 F.3d at 731.

of cases that allegedly support the theory that "inflated" AWPs are actionable misrepresentations under consumer protection statutes like the MCPA.[16]

But these cases do not support Plaintiff's position. Each of these cases involved a "spread" between the price at which providers acquired a drug (the acquisition cost) and the price at which third-party payors later reimbursed providers for the drug (the AWP). *See e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 30, 94–95 (D. Mass. 2007), *aff'd*, 582 F.3d 156 (1st Cir. 2009). Although some markup between the acquisition cost and the AWP is standard in the industry—usually around 20 to 25 percent—the markups in these cases were substantially higher, sometimes as high as 1,000 percent. *Id.* at 94–95, 97. The drug manufacturers in these cases then "market[ed] the spreads" between the acquisition cost and the AWP to providers—who could keep the difference between the two prices—to encourage them to prescribe the drug. *Id.* at 35. These schemes were ultimately actionable as misrepresentations under consumer protection statutes not because the AWPs were high, but because the AWPs were so much higher than the acquisition costs, that the AWPs did not reflect the price of the drug. *Id.* at 94–95.

Plaintiff does not allege here that there was an abnormally large spread between Acthar's acquisition cost and its AWPs. Indeed, as Plaintiff notes, the historical spread between Acthar's acquisition cost and its AWPs was consistently 25 percent, the industry standard. (Am. Compl. ¶ 214); *see In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d at 97. Plaintiff's assertion that Acthar's high AWPs are actionable rests on a different and simpler premise: they were "artificial" and "inflated" because they were extraordinarily high. But as the *Rockford* court

---

[16]     This string cite includes: *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20 (D. Mass. 2007), *aff'd*, 582 F.3d 156 (1st Cir. 2009); *Watson Labs., Inc. v. State*, 241 So. 3d 573, 578 (Miss. 2018); *Com. v. TAP Pharm. Prod., Inc.*, 36 A.3d 1197 (Pa. Commw. Ct. 2011), *vacated on other grounds*, 94 A.3d 350 (2014); *State v. Abbott Labs.*, 816 N.W.2d 145 (Wis. 2012); *In re Mississippi Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829 (Miss. 2015); *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148 (D. Mass. 2003).

explained when dismissing the plaintiff's fraud claims, "high prices do not in and of themselves constitute false representations." *Rockford*, 360 F. Supp. 3d at 777. Acthar's high price may have been unethical or even the result of unlawful anticompetitive conduct, but there are no allegations in the complaint suggesting the AWPs were themselves deceptive.[17] As such, Acthar's "inflated" AWPs cannot serve as the basis of an MCPA claim.

The handful of allegedly false statements that Mallinckrodt and Express Scripts made about Acthar's price also cannot support Plaintiff's MCPA claim. These allegedly false statements include Mallinckrodt CEO Mark Trudeau's statement in a 2018 press release that Mallinckrodt gave discounts on Acthar to third-party payors (Am. Compl. ¶ 212), and statements from Express Scripts officials downplaying Express Scripts' involvement in setting Acthar's price (*id.* ¶¶ 184, 228, 251). These statements might constitute misrepresentations, but Plaintiff does not allege that it relied on them with the particularity required under 9(b).[18] Plaintiff provides only the conclusory assertion that it relied on Defendants' "deception, fraud, false premise, misrepresentation, knowing concealment, suppression, and/or omission of material facts" without alleging that Plaintiff heard or saw any of the specific misstatements. (*Id.* ¶ 396.) This is especially problematic given that none of the misstatements identified were directed towards Plaintiff and some were made in situations that Plaintiff almost certainly would not have been aware of them, such as the misstatement Express Scripts made about its role in pricing Acthar "on a private investor

---

[17]     The Notice of Supplemental Authority that Plaintiff filed (ECF No. 71) only underscores this deficiency. In this authority, *Andersen, et al. v. Laboratory Corp.*, 17-193 (M.D.N.C. Aug 16, 2019), the Middle District of North Carolina held that the prices a lab charged patients were actionable under a consumer protection statute because the prices were not just high, they were deceptive. (Notice of Supp. Auth. at 23, ECF No. 71-1.) For example, the lab did not disclose the prices to patients until after the patient had received the services. (*Id.* at 24.) Plaintiff has made no comparable allegation here.

[18]     Plaintiff appears to operate under the assumption that to prevail on its misrepresentation claims, it must show that Plaintiff was the one that relied on the misstatements, rather than Plaintiff's beneficiaries. Even if reliance by Plaintiff's beneficiaries was somehow imputable to Plaintiff (and the Court is not holding that it is), Plaintiff has not alleged that Plaintiff's beneficiaries relied on these alleged misstatements either.

conference call hosted by Citi." (*Id.* ¶ 228.) Absent more particularized allegations explaining how these statements "substantially induce[d]" Plaintiff's decision to pay for Acthar, *Currie*, 950 F. Supp. 2d at 796, these alleged misstatements cannot support Plaintiff's MCPA claim.[19]

### 3. The Marketing Scheme

Plaintiff appears to identify three aspects of the marketing scheme that it asserts are actionable: (1) the subsidies Mallinckrodt provided patients to cover Acthar co-pays through the PAP program; (2) the misrepresentations the KOLs and MSLs made about Acthar's ability to treat rheumatoid arthritis; and (3) the bribes and kickbacks Mallinckrodt paid doctors to prescribe Acthar. (Am. Compl. ¶¶ 18–23.) Each of these aspects of the marketing scheme raises problematic if not unlawful conduct, but none provide a basis for a claim under the MCPA.

First, the PAP fails to provide a basis for an MCPA claim because Plaintiff has not identified an actionable misrepresentation related to the program. The PAP was a public program; in fact, the PAP could only achieve its goal of limiting patient pushback against Acthar's high price if patients knew about it and took advantage of the subsidies. (*Id.* ¶ 18.) As a result, any effect the PAP had on raising or sustaining Acthar's price was done publicly. The only misrepresentation Plaintiff identifies related to the program is Defendants' failure to disclose their motivation behind their decision to implement it. (Opp'n Express Scripts Mot. Dismiss at 20.) But as explained above, there is no authority suggesting the MCPA obligates companies to disclose

---

[19] Defendants also argue that Plaintiff's MCPA claim must fail because Plaintiff continues to purchase Acthar, even though it is now aware of Defendants' allegedly fraudulent and deceptive conduct. (Express Scripts Mot. Dismiss at 15, ECF No. 56-1.) This continued payment, they assert, "render[s] implausible" Plaintiff's contention that it relied on Defendants' misrepresentations in purchasing Acthar. (*Id.*) But as Plaintiff notes, third-party payors are frequently "stuck" paying high prices for drugs because of their obligations to their beneficiaries. (Opp'n Mallinckrodt Mot. Dismiss at 25 n.14, ECF No. 64.) The court in *In re Pharm. Indus. Average Wholesale Price Litig.*, addressed this situation and concluded that third-party payors who continue to pay for a drug after uncovering deception should not be barred from recovering because third-party payors face "significant impediments" to changing their reimbursement practices. 491 F. Supp. 2d at 96. The Court notes the logic behind this conclusion, but it need not resolve the question of whether Plaintiff's continuing payments for Acthar defeats its claim, as Plaintiff's claim fails for simpler reasons.

the motives behind their otherwise public conduct. The PAP may very well have violated an antikickback statute—indeed, that is what the government alleges in the *qui tam* lawsuit Plaintiff describes[20]—but Plaintiff has not identified a misrepresentation related to the PAP that is actionable under the MCPA.

The false information the KOLs and MSLs allegedly spread about Acthar's ability to treat diseases like rheumatoid arthritis also fails to support Plaintiff's MCPA claims. (Am. Compl. ¶¶ 23, 269–77.) Although the KOLs and MSLs may have made misrepresentations, Plaintiff states only that they delivered "false, misleading, and deceptive promotional messages about the safety, efficacy and value of Acthar" (Am. Compl. ¶ 23) without identifying the time or place of the misrepresentations or the identity of the individual(s) who made them, as is required under Rule 9(b). *See Owens*, 612 F.3d at 731. Further, Plaintiff does not allege that Plaintiff actually spoke to or received any false information from KOLs or MSLs, rendering its conclusory assertions of reliance implausible.

The allegations underlying the bribery and kickback scheme pose a more complicated question as to liability under the MCPA. Unlike the exclusive distribution scheme and the PAP, Mallinckrdot did not publicly disclose that it was paying doctors bribes and kickbacks to prescribe Acthar. Accordingly, the "omission" at issue is the failure to disclose underlying conduct, rather than the motivation behind that conduct. Although this type of omission is more comfortably within the parameters of the MCPA, see *Smith,* 2011 WL 3328565 at *3, the question of whether the omission is actionable is not entirely a straightforward one.

On the one hand, the Maryland Court of Special Appeals held in *Klein v. State* that bribery is not actionable as an unfair and deceptive practice under the MCPA. 452 A.2d 173, 176 (Md.

---

[20]     *See Strunck*, Civ. No. BMS-12-175 (E.D. Pa. filed Jan. 17, 2012).

Ct. Spec. App. 1982) (explaining that although bribery and unfair and deceptive practices have a "potential[ly] symbiotic relationship," that "does not put them in the same family").[21] Because individuals engaging in bribery typically do not publicly announce they are doing so, it seemingly would upend *Klein* for the Court to hold that Mallinckrodt's failure to publicly announce it was paying bribes is actionable under the MCPA.

On the other hand, the Court of Appeals held in *Green v. H & R Block, Inc.* that a failure to disclose a kickback can be an actionable omission under the MCPA. 735 A.2d 1039 (Md. 1999). In *Green*, H & R Block referred customers to lending institutions without disclosing that it received a kickback each time it made a referral. *Id.* at 1043. The court held this omission could be misleading because the heading on the loan application—"Beneficial National Bank Rapid Refund Loan Disclosure Statement"—could mislead consumers into believing that the bank received the full benefit of the charges. *Id.* at 1058. But other courts have made clear that not every undisclosed kickback violates the MCPA. For example, in *Bourgeois v. Live Nation Entm't, Inc.*, the court held that there was no actionable misrepresentation where Ticketmaster failed to disclose that part of the $12 service fee it charged customers was used to pay kickbacks to venues.[22] 3 F. Supp. 3d 423, 458 (D. Md. 2014), *as corrected* (Mar. 20, 2014). The court explained that the failure to disclose this kickback was not deceptive because Ticketmaster had not made any representations about how the service charge would be disbursed. *Id.*

This situation is closer to *Bourgeois* than *Green*. Similar to *Bourgeois*, Plaintiff does not allege that Mallinckrodt made any representations about how it would promote Acthar, so failing

---

[21] Although *Klein* is a relatively old case, the Court of Appeals still refers to it as if it is good law. *See Washington Home Remodelers, Inc. v. State, Office of Attorney Gen., Consumer Prot. Div.*, 45 A.3d 208, 217 (Md. 2012).

[22] The court in *Bourgeois* explained this logic during the course of its analysis of a negligent misrepresentation claim, but it made clear that the same logic supported its conclusion that Plaintiff had failed to identify an actionable misrepresentation under the MCPA.

to disclose that it paid kickbacks was an omission, but not necessarily a deceptive one. *See Bourgeois*, 3 F. Supp. 3d at 458. This stands in contrast to *Green*, where it was a deceptive omission for H & R Block not to disclose that it received a kickback because it had implied to customers that it did not receive one. *See Green*, 735 A.2d at 1058. Absent any articulation of why Mallinckrodt's omission was deceptive, the only theory the Court can conceive of is that it was deceptive for Mallinckrodt not to disclose that it was paying kickbacks because Mallinckrodt had implicitly represented that all of its conduct was legal. But courts have rejected the notion that an entity implicitly represents that its conduct is lawful when engaging in the ordinary course of business. *See Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 988 (D. Md. 2002), *aff'd*, 92 F. App'x 933 (4th Cir. 2004) (explaining that when a business provides a list of charges to a customer it does not implicitly represent that the charges are legal). Accordingly, the Court concludes there is no actionable omission related to the bribery and kickback scheme under the MCPA. This conclusion is consistent with *Green* and avoids unsettling *Klein*.

In sum, the allegations underlying the marketing scheme describe problematic and perhaps even unlawful conduct. But the allegations do not support a claim under the MCPA.

### B. Negligent Misrepresentation (Count II)

To state a claim for negligent misrepresentation, a plaintiff must show:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 461 n.18 (2017).

Plaintiff primarily bases its negligent misrepresentation claim on a misstatement in the Acthar Start Form. (Am. Compl. ¶¶ 402–11.) The Acthar Start Form is a form that patients and their doctors sign authorizing patients to receive Acthar and authorizing the disclosure of patients' health information to the various "agents" involved in Acthar's distribution. (*Id.* ¶¶ 403–04.) The form allegedly misstated that Mallinckrodt was the "distributor of Acthar" (instead of Express Scripts), and did not disclose the exclusive relationship between the companies. (*Id.*) To further support its negligent misrepresentation claim, Plaintiff also cites the same misstatements from Mallinckrodt and Express Scripts about Acthar's price and effectiveness that Plaintiff contends support its MCPA claim. (Opp'n Mallinckrodt Mot. Dismiss at 28; Opp'n Express Scripts Mot. Dismiss at 30–32.)

The Acthar Start Form cannot serve as the basis for Plaintiff's negligent misrepresentation claim. First, Plaintiff does not plausibly allege that it relied on the misstatement in the form, as Plaintiff does not allege that it ever saw the Acthar Start Form. (*See* Am. Compl. ¶¶ 400-11.) Indeed, it seems unlikely Plaintiff would have seen the form given the form was about gathering patient information and permissions, rather than about payment or pricing. (Am. Compl. Ex. A, ECF No. 36-2.) If Plaintiff never saw the form, its conclusory assertion that it relied on the misstatement (*id.* ¶ 409) is implausible and the Court need not accept it as true. *Iqbal*, 556 U.S. at 678.[23]

The absence of an allegation that Plaintiff saw the Acthar Start Form also creates a problem for Plaintiff under the economic loss doctrine. Under Maryland law, where the failure to exercise due care creates a risk of economic loss only, "an intimate nexus between the parties [i]s a

---

[23] It is worth noting that Plaintiff does not argue that the fact that its beneficiaries viewed the Acthar Start Form is somehow imputable to Plaintiff. Even if it had, however, Plaintiff does not allege that its beneficiaries relied on this misstatement either.

23

condition to the imposition of tort liability." *Weisman v. Connors*, 540 A.2d 783, 791 (Md. 1988) (quoting *Jacques v. First Nat'l Bank*, 515 A.2d 756 (Md. 1986)). The purpose of the economic loss doctrine is "to limit the expansion of tort liability absent privity." *Balfour*, 155 A.3d at 450. Where there are no direct dealings between a plaintiff and defendant, an intimate nexus can stem from the "defendant's knowledge of the plaintiff's identity, the class in which a plaintiff belongs, and the defendant's knowledge that the prospective plaintiff may be relying on the information provided by a defendant." [24] *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 13 (Md. 2013). Here, Plaintiff is attempting to recover only for economic losses, and accordingly needs to show an intimate nexus between the Plaintiff and Defendants. Because Plaintiff has not alleged that it ever saw the Acthar Start Form or that third-party payors would generally be able or expected to view the form, Plaintiff cannot show Defendants knew Plaintiff "may be relying" on the form's misstatement. *See id.* This is fatal to Plaintiff's negligent misrepresentation claim.[25]

The other misstatements Plaintiff cites to support its negligent misrepresentation claim also fail to provide adequate support. These misstatements are the same misstatements Plaintiff identified to support its MCPA claim. (Opp'n Mallinckrodt Mot. Dismiss at 28; Opp'n Express Scripts Mot. Dismiss at 30–32.) For the reasons discussed in Part III.A, Plaintiff does not adequately allege that it relied on any of these misstatements in deciding to pay for its beneficiaries' Acthar.

---

[24] Plaintiff appears to imply that a less stringent version of the intimate nexus test applies under § 522 of the Restatement (Second) of Torts. (Opp'n Express Scripts Mot. Dismiss at 29.) But the Court of Appeals has made clear that the "privity-equivalent intimate nexus test" still applies when a Plaintiff invokes § 522 of the Restatement. *Balfour*, 155 A.3d at 462.

[25] Even if Plaintiff had plausibly alleged that it viewed the Acthar Start Form, it still is not entirely clear Defendant could state a claim for negligent misrepresentation. The Maryland Court of Appeals has been reluctant to impose a tort duty where, as is the case here, there is a "complex web of contracts" prescribing duties and liability between parties. *See Balfour*, 155 A.3d at 460 (declining to find an intimate nexus between parties involved in a government construction project because of the complex web of contracts involved).

Accordingly, the Court will dismiss Plaintiff's negligent misrepresentation claim.

### C. Fraud (Count III) and Conspiracy to Defraud/Concerted Action (Count V)

Plaintiff points to Acthar's "inflated AWP's pled throughout the Amended Complaint" as a basis for its fraud claim. (Opp'n Lapointe Mot. Dismiss at 31, ECF No. 65; Opp'n Mallinckrodt Mot. Dismiss at 32; Opp'n Express Scripts Mot. Dismiss at 35–41.) Plaintiff identifies the "content" of the misrepresentation as the inflated AWPs; the "place" of the misrepresentation as the bill Defendants sent to Plaintiff containing the inflated AWPs; and the "time" of the misrepresentation as each time the bills were sent. (*Id.*) For the reasons discussed in Part II.A.2 there is nothing inherently fraudulent about charging a high price for a product. Acthar's high price may indicate anticompetitive conduct, but it cannot serve as the basis of a fraud claim. *See Rockford*, 360 F. Supp. 3d at 755 (dismissing plaintiff's fraud claims because the price of Acthar was high but not fraudulent).

Accordingly, the Court will dismiss Plaintiff's fraud claim. It will also dismiss Plaintiff's conspiracy to defraud claim because civil conspiracy is "not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1045 (Md. 1995).

### D. Unjust Enrichment (Count IV)

Under Maryland law, a claim for unjust enrichment is available when "the defendant has obtained possession of money which, in equity and good conscience, he ought not to be allowed to retain." *Plitt v. Greenberg*, 219 A.2d 237, 241 (Md. 1966) (citation omitted). Specifically, a claim for unjust enrichment is established when "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance

or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 887 A.2d 525, 546 (Md. 2005). "[T]he classic measurement of unjust enrichment damages is the gain to the defendant, not the loss by the plaintiff." *Mogavero v. Silverstein*, 790 A.2d 43, 53 (Md. Ct. Spec. App. 2002) (citation omitted).

To support its unjust enrichment claim, Plaintiff points to Acthar's massive price increases and its "artificially inflated AWP[s]." (Opp'n Mallinckrodt Mot. Dismiss at 33; Opp'n Express Scripts Mot. Dismiss at 37.) Defendants counter that Plaintiff's claim for unjust enrichment must be dismissed because the underlying tort claims on which the claim is based all fail as a matter of law. (Mallinckrodt Mot. Dismiss at 19; Express Scripts Mot. Dismiss at 24.)

It is not clear to the Court whether it is permissible under Maryland law for a suit to consist of a single claim for unjust enrichment without an accompanying underlying tort. It does not appear that the Maryland appellate courts have directly addressed the question, and other states are split on the matter.[26] On the one hand, Maryland courts have described unjust enrichment as hinging "upon notions of justice and fairness," rather than tort liability. *See Mass Transit Admin. v. Granite Const. Co.*, 471 A.2d 1121, 1126 (Md. Ct. Spec. App. 1984). Indeed, Maryland courts have said a claim for unjust enrichment can exist where the defendant received a benefit "quite honestly in the first instance," but it would not be in "good conscience" for the defendant to keep it. *Id.* at 1125. As a matter of practice, however, the standard approach courts appear to take is to dismiss an unjust enrichment claim if the court concludes the plaintiff has not stated a claim for tortious conduct. *See e.g., State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic, LLC,*

---

[26]     For example, in California, unjust enrichment cannot serve as an independent basis of relief, *Hill v. Roll Internat. Corp.*, 195 Cal. App. 4th 1295, 1307 (2011), while in West Virginia it can, *Employer Teamsters-Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 471 (S.D.W.Va. 2013). Appellate courts in Texas are divided on the matter, *Elias v. Pilo*, 781 F. App'x 336, 338 n.3 (5th Cir. 2019).

Civ. No. CCB-18-1279, 2018 WL 6514797, at *4 (D. Md. Dec. 11, 2018), *reconsideration denied*, 2019 WL 4722675 (D. Md. Sept. 25, 2019) (dismissing plaintiff's unjust enrichment claim after concluding plaintiff's fraud claim was not viable); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011) (explaining that English and American law traditionally describe unjust enrichment in moral terms but usually do not apply it this way).

The Court is reluctant to overstep its bounds. While the conduct Plaintiff alleges in its complaint is certainly problematic, Plaintiff has not yet identified a law that it violated. For the Court to conclude Defendants could be liable to Plaintiff—for potentially millions of dollars—on principles of "justice and fairness" alone, *Mass Transit*, 471 A.2d at 1126, would be a significant step that the Court declines to take without more clearly supportive precedent.

Accordingly, the Court will dismiss Plaintiff's claim for unjust enrichment.

## IV. *Conclusion*[27]

For the foregoing reasons, an Order shall enter denying Plaintiff's motion to remand, dismissing Lapointe from the case, and granting Mallinckrodt and Express Scripts' motions to dismiss.

DATED this _3_ day of January, 2020.

BY THE COURT:

James K. Bredar
Chief Judge

---

[27] In its opposition briefs, Plaintiff requests leave to file an amended complaint should the Court find any deficiencies with its complaint. (Opp'n Mallinckrodt Mot. Dismiss at 35–36; Opp'n Express Scripts Mot. Dismiss at 39; Opp'n Lapointe Mot. Dismiss at 34.) Pursuant to Federal Rule of Civil Procedure Rule 7(b), the proper procedure for seeking leave to amend is to file a motion. A copy of the amended complaint should be submitted with the motion. 6 C. Wright & A. Miller, Federal Practice & Procedure § 1485 (2019).